**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| CHARLES EPLEY | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No. 5:18-cv-142-BQ |
| | § | |
| MARCO GONZALEZ, et al., | § | |
| Defendants. | § | |

**PLAINTIFF'S RESPONSES TO QUESTIONNAIRE**

**QUESTIONNAIRE AND DECLARATION**

On this date Plaintiff, under penalty of perjury, provides the following answers and information as required by the Court. To the best of his ability, Plaintiff answers questions succinctly and avoid making legal arguments or conclusions.

**I.    Questionnaire**

1. In your Amended Complaint, you allege that on June 6, 2016, Montford Unit Sergeant Marco Gonzalez, Officer David Camargo, Officer Julio Espinosa, Officer Rafael Guitron, Officer Bobby Gutierrez, and Officer Jonathan Smith used forced against you.

   a.   You claim that when Montford Unit officers took you "to a cell occupied by three (3) African-American prisoners," it "triggered severe PTSD symptoms which prevented [you] from entering the cell…." Do you agree that you refused to accept housing in the four-person cell?  Answer "yes" or "no".

PLAINTIFF'S RESPONSE: To the best of my recollection, I would have to say "NO", in the sense that I did not make a well thought decision to refuse. Instead, I was so debilitated by the Post-Traumatic Stress Disorder (PTSD) symptoms that I was unable to enter the door as a result of being paralyzed by extreme fear. Severe PTSD symptoms also trigger severe Traumatic Brain Injury (TBI) symptoms, such as confusion.  I was experiencing a combination of severe PTSD and TBI symptoms.

The psychiatrists gave me the single-cell medical restriction because I often can neither understand orders nor control my behavior when experiencing certain PTSD symptoms.  A qualified psychiatrist with a qualified neurologist would be able to better explain my reaction, conduct and behavior.

-----

b.  You claim that officers placed you "inside an empty day-room…" The authenticated video recording from the incident shows that Sergeant Gonzalez and Nurse Wagner ordered you three separate times to come to the door of the dayroom and submit to hand restraints; they warned you that failure to do so would result in chemical agents and/or force being used against you to regain compliance. Despite these warnings, you remained leaning against the back wall with your hands covering your face. Why did you refuse to submit to hand restraints?

PLAINTIFF'S RESPONSE: I would have to see the video-recording to understand the situation the Court is referring to.

To the officials who entered the dayroom to talk to me, I informed them that the psychiatrists had ordered me to NOT go into a cell occupied by prisoners, per the medical order that I be kept single-cell at all times. I also repeatedly requested to be allowed to be examined by the duty medical doctor.

If Sergeant Gonzalez and nurse Wagner spoke to me from outside the day-room, then I either did not understand their words because I was too far away or because I was afflicted with **feelings of unreality** which cause me extreme fear and auditory/visual distortions, such as voices sounding like noises made by animals, walls moving around me…The psychiatrists, who have treated me, have told me to move away from the stressors when I have **feelings of unreality**. I was probably doing that. The other officials went inside the dayroom to talk to me. If Gonzalez & Nurse Wagner wanted me to hear their announcements they should have stepped inside the dayroom, when I was on the other side.

Severe PTSD symptoms also trigger severe TBI symptoms such as confusion. A qualified psychiatrist with a qualified neurologist would be able to better explain my reaction, conduct and behavior.

-----

c.  In you amended Complaint, you state that "[a]t one point, [you] tried to crawl toward the door's special opening to allow the officials to handcuff [you]…" Had defendants entered the room when you attempted to crawl? Answer "yes" or "no".

PLAINTIFF'S RESPONSE: I would answer "yes" or "no" if I could see the video-recording.

To be best of my recollection, I was waiting for the duty psychiatrist to examine me. At one point the defendants shot gas thru the door's special opening. When that happens, the procedure is for the prisoners to lay on the floor to indicate that they are not a threat to the officials. This is what I did.

When I saw the gas, I believed that the duty medical doctor did not care about my safety. Thus, I tried to crawl toward the door's special opening to be handcuffed to prevent unnecessary violence and because I was suffocating and felt I was going to die. I believe that I began crawling shortly after I went on the floor. It seems that the defendants had not entered the dayroom when I began crawling.

-----

    d.   The video shows that when Defendants entered the dayroom, you were lying on your side. Why?

PLAINTIFF'S RESPONSE: I would have to see the video-recording to recall the sequence of events.

To fully cooperate with the Court, so as to avoid appearing to evade the question, I would venture to say that there was a delay between the time the gas was shot into the dayroom and when the defendants entered the dayroom. I do not remember how long, but a lot can happen in a few seconds.

The officers are trained to wait outside until the prisoners are incapacitated by the gas.

Inside a room, as opposed to outside, one suffocates very quickly. Further, the gas has a tendency to accumulate at the floor level. Thus, when I was lying on the floor - to show that I was not a threat - I was breathing the gas at maximum strength causing me to suffocate. I may have turned on my side to breath air less saturated with gas. I was terrified by the gas, the defendants, the conflicting orders, whereas, I had followed the very same psychiatrist's given single-cell procedure during twenty years.

-----

    e.   Did you, at any point, resist Defendants' attempts to restrain your hands and legs or otherwise attempt to move from the prone position? Answer "yes" or "no".

PLAINTIFF'S RESPONSE: I would have to see the video-recording to recall/interpret my behavior.

I was very skinny due to being malnourished. I only wore an underwear. I was lying on the concrete floor. It was very painful when the officials crushed me. Moreover, at one point, Sergeant Marco Gonzalez broke my rib(s) when he slightly raised himself and then fell back on me, I may have had a body reaction to the intense pain. Sergeant Marco Gonzalez also slammed my head on the concrete floor, after he was already over me, which caused me to become confused and overwhelmed with pain. I may have had a body reaction then. Or it could have been the fear of suffocating to death. I did not have a gas mask, whereas, the defendants did. They were not suffocating. I was suffocating.

I never "wrestled" with anyone. I was already lying on the floor when the officer crushed me down.

The medical records compiled by the medical officials report that on June 06-2016, I was 71 inches tall and that I weighed 144 pounds. The six defendants combined weight - with their armors - could have been close to 1,500 pounds, certainly over 1,000 pounds.

Note: Upon request from the Court, I will provide two uncontroverted proofs – provided by the defendants themselves - that I did **not** violate any rule, regulation, law…

-----

    f.   If your answer is "yes" to 1.e above, explain why you attempted to move and/or resist.

PLAINTIFF'S RESPONSE: I would need to see the video-recording to interpret my behavior.

I made involuntarily attempts to move/resist when I had the eight (8) frontal teeth pulverized to place the prothesis, whereas, I had volunteered to have dental procedure done and I knew that I needed to have it done.

-----

g.  The authenticated records and the video show that you did not report that you had any injuries prior to the officials placing you in the four-person cell. Why did you elect not to report your alleged injuries?

PLAINTIFF'S RESPONSE:  I did **not** elect not to report my injuries. I was prevented from doing so.

First, I was overwhelmed by extreme fear. I had informed the defendants that a medical order had been issued by a psychiatrist that I be single-cell at all time (something they already knew), and yet they brutalized me because I followed the orders given to me by the psychiatrists (the one who had issued the medical order and the ones after him who have maintained it). The pain I was feeling caused me to be intimidated. The fear of being brutalized more prevented me from asking for the medical treatment in the presence of the defendants who had caused me to be injured. The "nurse" who touched my nose did it in a way to cause me pain. It was a warning to not ask for medical care.

Second, the blow to my head caused me to feel very weak, nauseating, confused. I could not understand what the defendants wanted me to do. Thinking was very difficult. I was unable to think coherently. I was not certain where I was.

The laws dictate what the officials must do after a Use of Force, and that include taking photos and conducting a medical examination. Maybe, I was waiting for the defendants to do that on their own.

A qualified psychiatrist with a qualified neurologist could better explain my thinking, conduct, behavior that I am able to do.

-----

h.  As a result of the alleged incident, you claim that your head, face, nose, ear, and front teeth were injured. You also claim that your ribs were broken and you suffered from severe pain.

i.  The video shows your nose was bleeding after the incident; How long did it bleed?

PLAINTIFF'S RESPONSE: I do not know because I lost consciousness due to the trauma to the head. The lost of consciousness caused me to lose the sense of time. I did not have a watch.

-----

ii. You allege that Defendants broke your nose. How do you know your nose was broken?

PLAINTIFF'S RESPONSE: When a bone is broken there is special pain about it. Even a slight touch causes an immediate sharp and radiating pain which take time to subsite. The pain went on for weeks.

----

1.   Did you receive a medical diagnosis regarding your nose? Answer "yes" or "no."

 PLAINTIFF'S RESPONSE:  YES.

-----

2.   If your answer is "yes" to 1.h.ii;1. above, who made the diagnosis?

PLAINTIFF'S RESPONSE: The Lynaugh prison medical staff official Samuel B. Itie. The entry for the nose, in his official medical report reads: Contusion and mild swelling bridge of nose, nasal bridge mildly deviated to the lt [left?], subjective pain on palpitation of nose. Samuel B. Itie said to me: "I know that your nose is broken because of the swelling combined with the deviation."

-----

3.   If your answer is "yes" to 1.h.ii.1, above, when was the diagnosis made?

PLAINTIFF'S RESPONSE: On June 10-2016.

-----

4.   Describe any treatment that was prescribed or that you received for your nose.

PLAINTIFF'S RESPONSE: The pain medications given to me at Lynaugh on June 10-2016.

-----

 iii. Specifically describe the injuries you allege you suffered to your head, face, ear, and front teeth.

PLAINTIFF'S RESPONSE:

-   HEAD: Samuel B. Itie diagnosed me with a concussion. Samuel B. Itie said that he feared that I could have sustained a Traumatic Brain Injury which could endanger my life because of a subdural hematoma, which could cause a brain herniation and death.

    The medical records show that Samuel B. Itie placed telephone calls to alert medical doctor Deshields - the Regional Medical Director I was told - to obtain the authorization to have me transferred to a free-world hospital. The phone calls were made in front of me. Dr. Deshields did not respond.

    I suffered: Excruciating migraine attacks, nausea with vomiting, dizziness, loss of consciousness., sensitivity to noise and light, blurry vision, confusion, extreme fatigue…

-   FACE: The most important injury is decreased vision in my right eye. My right eye now gets "tired" very quickly. Vision in that eye becomes "blurry" when, for example, I look at the screen of a computer for a certain length of time. When that happens, I think about the events which occurred at Montford and I become increasingly depressed…

- NECK: In certain strenuous situations or if I turn my neck brusquely to the right, I continue to feel sharp shooting pains radiating from the right side of the upper vertebra in my neck. I also have chronic numbness.

- EAR: Reduced hearing in my right ear. At times, I have prolonged ringing in the right ear.

- FRONT TEETH: I had continuing excruciating dental pains which often prevented from being able to aliment myself. Certain, upper frontal teeth had mobility. Eventually, eight (8) upper frontal teeth had to be pulverized, during a procedure by a dentist, to place prothesis.

  The impact, on June 06-2016, also caused two frontal lower teeth to be dead. When the dentist touched them with a very cold substance, I did not react. The dentist recommended to also pulverize the lower frontal four (4) teeth to place prothesis. It has not been done because of the stress I experienced when the eight upper frontal teeth were replaced by prothesis. I had to make repeated trip to the dentist over a period of about two months for the procedure to be completed. I became very depressed as a result of having to have the dental work to be done.

  -----

  iv. How do you know your ribs were broken?

PLAINTIFF's RESPONSE: For the same reason I knew that my nose was broken. Having broken rib(s) is particularly debilitating because every breath causes severe sharp pains.

-----

1. Did you receive a medical diagnosis regarding your ribs? Answer "yes" or "no".

PLAINTIFF'S RESPONSE: YES.

-----

2. If your answer is "yes" to 1.h.iv.1 above, who made the diagnosis?

PLAINTIFF'S RESPONSE: Lynaugh medical staff official Samuel Itie. I am not a doctor. The entry by Samuel Itie, on 06-14-16, reads: DIAGNOSIS… **fracture of rib(s)**, **sternum and thoracic spine**.

-----

3. If your answer is "yes" to 1.h.iv.1 above, when was the diagnosis made?

PLAINTIFF'S RESPONSE: On June 14-2016.

-----

4. Describe any treatment that was prescribed or that you received for your ribs.

PLAINTIFF'S RESPONSE: Pain medications prescribed by Samuel B. Itie.

-----

NOTE: The Court is now moving to other issues without asking about the other injuries. Thus, I do not know if I am allowed to, for example, report that I continue to have chronic pain in my knees (see ECF # 15, at pages 04-05 of 49, 20 of 49, 46 of 49).  Should I report about the additional psychiatric & brain injuries sustained on 06-06-2016 and their impacts? Please advise.

-----

    i.   You claim that officials did not permit you to leave the four-person cell "to obtain much-needed medical care, or to shower to remove the burning chemicals."

    i.   Did you request medical treatment from any **Montford Unit official** following the incident? Answer "yes" or "no".

PLAINTIFF'S RESPONSE: YES.

-----

    1.   If your answer is "yes", list the name of the persons(s) from whom you requested treatment.

PLAINTIFF'S RESPONSE: To the best of my ability, I asked everybody who happened to walk near the four-person cell that evening, until I lost consciousness. They walked away, some of them laughing.  Most of the Montford officials - in the area where I was - did not wear name-tags and/or did not stop; thus, I could not identify them. No one helped me.

The three hostile African-American prisoners observed the officials refusing to help me.

During the night I worsened. I became so extremely dizzy that I could not walk to the window to ask for help, and I eventually lost consciousness on my bunk. When I regained consciousness, I was in a corner (which is also a blind-spot) on the opposite end from where the entrance door of the cell was located. On the same wall where the entrance door is located, but on the left end of that wall when you pass the door to enter the cell. A person walking in the hallway, alongside the cell, could not see from the outside the entire area of the corner blind-spot. A person may see part of it if he were to touch the window and try to look directly at the corner in the blind-spot.

When I regained consciousness, after a period of time I cannot estimate, I had sperm on my face.

From that point on, the three hostile African-American prisoners prevented me from trying to call the officials for help. I was too weak and in too much pain to confront the three hostile prisoners.

-----

    2.   If your answer is "yes," how did you request such treatment? Verbally or in writing?

PLAINTIFF'S RESPONSE: Verbally. I had to knock at the window to get the officials' attention because of the pain caused by the ribs when I talked. Officials threatened me with disciplinary for touching the window. I was placed in the cell almost naked. I did not have anything to write with.

3.  If your answer is "yes", specifically describe the medical treatment you believe Montford Unit officials should have provided to you.

PLAINTIFF'S RESPONSE:

01: The bloody nose was strict proof that I had received a trauma to the head. Thus, I should have been immediately examined by the nurses to ascertain if I had a **concussion** (which I did).

Next, I should have been immediately referred to the duty medical doctor to be transferred to a free-world hospital in case I had a life endangering subdural hematoma. While certain subdural hematomas do not kill the patients, they cause permanent neurological damages when there are brain herniations.
Free-world hospital are equipped to minimize the harm done by subdural hematomas.

The above was the priority, and was what Lynaugh medical staff official Samuel Itie tried to do four days later. I should also have been treated for the other physical injuries by, for example giving me much-needed pain medications, as Samuel Itie did on June 10-2016 and June 14-2016.

02: I should have been provided with immediate care for the brain, heart... damaging **psychiatric injuries** to prevent the previous PTSD from escalating into the present **Complex-PTSD** which has been deemed, by some medical experts, to be essentially untreatable. The psychiatric traumas sustained at Montford in June of 2016, have greatly worsened every aspects of my life.

Note: This Honorable Court has shown much irritations at my conduct, because I write too much, file unnecessary pleadings... Yet, these acts are unfortunate manifestations of the psychiatric traumas sustained at Montford on 06/06-07/2016.
It is impossible for me to try to litigate this lawsuit and not be retraumatized in the process.

-----

4.  On what date did you leave the Montford Unit?

PLAINTIFF'S RESPONSE: During the morning hours of Tuesday June 07-2016.

-----

5.  Did you receive medical treatment from any source after leaving Montford? If your answer is "yes", please describe.

PLAINTIFF'S RESPONSE: YES.

On June 10-2016, I received at the Lynaugh prison medical treatment for some of the injuries sustained at Montford, on Monday June 06-2016.

I was also given the previously (to the June 06-16 events) prescribed psychiatric medications at Robertson, but nothing at Robertson for the injuries sustained at Montford.

-----

ii. Did you have access to running water in the four-person cell? Answer "yes" or "no".

PLAINTIFF'S RESPONSE: NO. This is why: The three hostile African-American prisoners did not allow me to use the sink – from which the running water came - because I would have dropped blood into "their" sink. I was too severely injured and in too much pain to confront them.

------

iii. The authenticated records show that Montford Unit officials provided you with soap and water and utilized a "purge-fan" to help alleviate the chemical agent. Do you agree?

PLAINTIFF'S RESPONSE: NO. The video-recording should end with the officials dropping me on the floor of the four-person cell near the "shitter" (toilet). I was not allowed to leave the cell until the next day when I was forced to board the bus taking me to the Robertson prison. I do not even know what a "purge-fan" is. I did not see any "fan" inside the four-person cell.

The prisoners are allowed to have small moveable white fans, but nobody inside the four-person cell had such a fan. I do not believe that Montford allows prisoners in transit to have fans.

-----

The following pertains to the Honorable Court's inquiry about my allegations against defendants:
  j.   David Camargo;
  k.   Julio Espinosa;
  l.   Rafael Guitron;
  m.  Bobby Gutierrez;
  n.   Jonathan Smith
having violated constitutional and federal laws (at page 6, 7 and 8 of the original questionnaire).

PLAINTIFF'S RESONSE: I am providing the same response for all five officers because I believe that they are equally liable. Moreover, because they wore "riot-gear" type outfit which covered their name-tags, if they had name-tags, I am unable to discuss them individually.

COUNT # 01. The five officers named above, knowingly and intentionally participated in an illegal Use of Force. They should have refused to participate in the Use of Force.

The five officers should, for example, have said:
    This prisoner (i.e., me) is not raising his voice. He is not making any threat. He is not a danger to himself or others [if I had been a danger to anyone, he would not have been placed into the four-person cell]. He keeps telling us that he has a medical order that he is single-cell. If it is truth, it would illegal to force him into a four-person cell. This is a psychiatric facility. He is a psychiatric patient. He is staying on the far side of the dayroom because he is afraid of us as a patient afflicted with PTSD. We have medical doctors everywhere. I want the medical doctor on duty and/or Warden Robert Stevens to personally order me to execute the Use of Force.

The five officers failed to do that. Instead, they colluded to execute an illegal Use of Force.

COUNT # 02: When the five officers were on the top of me, they were inches away from Sergeant Marco Gonzalez. The five officers had personal knowledge that defendant Sergeant Marco Gonzalez was using excessive force. Then and there the five officers should have withdrawn, and asked for a medical official and/or a higher ranking official to intervene. Instead, the five officers not only allowed defendants Marco Gonzalez to injure me, but the five officers also became **parties** to the acts by holding me down so as to facilitate for defendant Marco Gonzalez to severely injure me. Innocent bystanders do not act like the five officers did.

COUNT # 03:  Upon leaving the dayroom, the five officers should have immediately demanded that photographs of me be taken and that a meaningful and complete medical examination of me be conducted, per the established procedures/protocols and the laws. Instead, the five officers colluded with defendants Marco Gonzalez to cover-up and conceal the evidences that I had been injured due Sergeant Marco Gonzalez excessive Use of Force.

COUNT # 04: The manner that the five officers used to drop me, still bleeding, in the area where the three African-American prisoners defecate was in effect to tell them – in the informal manner the Texas prison officials communicate with the Texas prisoners: We hurt him because we think of him as trash. Do what you want with him. We will not protect him. You will not be punished.

The above had serious adverse consequences for me because of the intentional racial unbalance into the four-person cell which was in accord/consistent with the statements made by Ramsey prison Captain Reginald Gilbert (on May 27-2016?) when I left the Ramsey prison. See ECF # 53, at page 8 of 10. This exacerbated my fears, worsening the PTSD symptoms.

Had one white or one Hispanic person be present, it would have been different. But, essentially, throwing close to the "shitter/toilet" an injured, bleeding, older and disabled white man to three much younger, heavier, stronger, and mentally-ill African-American prisoners were to, in fact, say to them: You are all leaving this prison tomorrow morning. **Rape him**. **We do not care**. This message was confirmed when I knocked at the windows to plead for medical treatment, but the officials kept walking away, some of them laughing. The three prisoners saw that repeatedly.

-----

2.   You name Sergeant Herrera as a Defendant. Specifically describe all facts forming the basis of your claims(s) that Sergeant Herrera violated your constitutional rights.

PLAINTIFF'S RESPONSE:  I was severely injured on June 06-2016.  I received medical care on June 10-16. This is proof that I needed medical treatment on June 07-16.

Sergeant Herrera was inside the nurse-station staffed by medical staff members. By stepping inside the area normally reserved for the medical staff members (to ensure the confidentiality of the medical treatments provided to the prisoners) Sergeant Herrera was in effect saying: Here and now, I am the one who decides who gets medical care. You – medical staff members – need to understand that you must stay out of this. Do not, one of you, dare to get involved with this.

Medical staff members have the duty to intervene whenever they believe that a prisoner is in need of medical treatment, this is true in every prison but particularly in an Inpatient Psychiatric Facility, like Montford, because prisoners, such as myself, are exceptionally vulnerable.
The fact that I am laboring to explain is that the medical staff members who were at the nurse-station when I was taken by two security officials – and in handcuff – from the four-person cell to the bus which took me to the Robertson prison, had the duty to intervene and to investigate why I was injured and the extend of my injuries. Next, the medical staff members had the duty to call the medical doctor on duty to determine if I could be safely transported in a bus.

None of this was done because of Sergeant Herrera's demeanor, conduct (e.g., body-postures), statements, tone of her voice… Yet, the Nurses were not innocent bystanders.

I claim that the medical staff members, at the nurse-station when I was taken from the four-person cell to the bus, did in fact **collude** with Sergeant Herrera to deny me much-needed medical care and follow-up treatments so as to cover-up and conceal my severe injuries.

The above medical staff members are among the Montford John/Dane Doe defendants. I was only able to identify Sergeant Herrera because she positioned herself in-between me and the medical staff members so as to deny me any possible contact with the medical staff members.

To be clear, there is/was a semi-circular counter. The nurse-station is/was inside that counter. Sergeant Herrera was – with the medical staff members - inside, whereas, I was kept outside and was ordered to keep walking without being allowed to stop to ask for medical care. If you were to draw a straight line, you had: Me handcuffed, one Montford prison guard to my left (and one also to my right), the counter, Sergeant Herrera, the medical staff members behind Sergeant Herrera.

Sergeant Herrera threats of additional future punishments, if I were to return to Montford, were intended to dissuade/intimidate me from filing a lawsuit. Had I had filed the lawsuit while incarcerated, I could have been transferred back to Montford. This is one of the reasons why I felt compelled to delay until I was released to file this lawsuit. Moreover, fearing to be returned to Montford, I had to underreport my medical problems at the Lynaugh prison; thus, I experienced unnecessary pain/suffering at Lynaugh because of the statements made, in part, by Sgt. Herrera.

-----

The following pertains to the Honorable Court's inquiry about my allegation against defendants:
3.  Tara Flores;
4.  Maria Martinez;
5.  Shaquavia Wagner;
6.  Tasia Rains;
having violated constitutional and federal laws (at page 9, 10, 11, 12 & 13 of the Questionnaire).

PLAINTIFF'S RESPONSE: I am providing the same response for all four nurses because they never identified themselves to me; Thus, I am unable to discuss them individually.

I have never been at Montford prior to June 02-2016. I was placed essentially naked in a cold single-cell which I was told to exist once to talk to psychologist Twila Penland, on June 03-2016.

Psychologist Twila Penland knew that I was single-cell. She said that she believed that I should remain single-cell for my health/safety. No other official has introduced himself/herself to me.

On June 06-2018, I was told to go from the single-cell where I had been to the area which form the basis of the lawsuit. The names of the above nurses were obtained from medical records which they had compiled. Thus, the nurses were personally involved with the harm I sustained.

COUNT # 01:  The nurses should have prevented the illegal use of force by alerting the medical doctor on duty and/or Warden Robert Stevens that I was protected by the single-celled medical restriction, as opposed to allowing that I be injured. The nurses were not innocent bystanders.

COUNT # 02: Once I was injured, the nurses failed to provide me with any medical care, whereas, they had a duty to thoroughly examine me and to provide me with medical assistance for my physical and psychiatric injuries. The nurses were not innocent bystanders;

 COUNT # 03: The nurses falsified the medical records, by omission, so as to conceal the nature and extend of my injuries as part of their collusion with the security officials who had injured me.

Note: I do not know the name of the nurse who, when I was taken outside the dayroom, placed her hand on my nose causing me unnecessary pain in an attempt to conceal the blood and to intimidate me from asking for medical care. She never identified herself to me.

-----

7.  You name Warden Stevens as a Defendant.

   a.   Specifically describe all facts forming the basis of your claim(s) against Warden Stevens.

PLAINTIFF'S RESPONSE: I do not understand the question/how to respond to it. Yet, I will try:

Warden Robert Stevens was personally involved – and is therefore personally responsible - because he was personally informed of the violations in my grievances:

My grievance # 2016158831. Exhibit Complaint # 04, of ECF # 15, filed on June 06-2018.

My grievance # 2016160882. Exhibit Complaint # 05, of ECF # 15, filed on June 06-2018.

   The rulings issued in the above grievances were highly predictable. I believe that during
   Discovery, it will be established that Warden Robert Stevens has a pattern of showing
   conscious disregard to meritorious grievances alerting him of Constitutional violations.

The rulings to the grievances are evidence that Warden Stevens failed to remedy the Constitutional violations. This Questionnaire is a meaningful attempt by this Honorable Court to investigate what happened. Warden Stevens failed to conduct a meaningful investigation of what happened, whereas, he had easy access to the video-recording almost immediately after the events occurred. Warden Stevens was in a privileged position to identify the Does defendants and to question them. Moreover, Warden Robert Stevens failed to sent a Questionnaire to me.

I believe that during Discovery we will be able to ascertain who told Warden Robert Stevens to violate the medical order that I be kept in a single-cell for my health/safety and protection. Based on events which occurred at the Lynaugh prison, I believe that it was Lynaugh prison Director of Classification Michelle D. Sellers so as to create a **precedent** that the Lynaugh officials could use when I returned to Lynaugh to place me into a cell with a prisoner they knew would harm me.

I have been provided with no evidence that Warden Robert Stevens has taken any corrective actions by either having disciplined the defendants, or properly trained the defendants or by rescinding his informal policy/custom/practice of allowing the Defendants to:

1. Conduct illegal use of force to harm targeted prisoners;
2. Ignore the prisoners' medical restrictions;
3. Deny the prisoners medical treatments when injured,
4. Deny protection to the prisoners who are vulnerable because of their injuries, religious practices, disorders, ages, disabilities, race, nationalities…

-----

b. Did you speak directly with Warden Stevens? Answer "yes" or "no."

PLAINTIFF'S RESPONSE:  NO.

-----

c. If you answer to 7.b. is "yes," list the date(s) on which you spoke with Warden Stevens.

PLAINTIFF'S RESPONSE:  N/A.

-----

d. You allege that Warden Stevens implemented a policy of "allowing or encouraging illegal acts."

  i.  How did Warden Stevens implemented the alleged policy?

PLAINTIFF'S RESPONSE: The official records released by the Huntsville-based officials indicate that Warden Robert Stevens failed to discipline the Montford-based defendants. Warden Stevens's personal decision to not discipline the defendants encourages/tacitly authorizes his staff to commit the violations creating an informal policy/custom/practice.

-----

  ii.  Specifically describe how the alleged policy violated your constitutional rights.

PLAINTIFF'S RESPONSE: It is possible that I do not understand this question.

I believe that the policy/custom/practice created a context in which the defendants felt they were tacitly authorized to violate my constitutional rights (e.g., showing deliberate indifference to my health/safety, and to my protection needs) with impunity or without major adverse consequences.

-----

       iii.     Specifically describe how you were harmed by the alleged policy.

PLAINTIFF'S RESPONSE: (1). I sustained unnecessary, severe and permanent physical and psychiatric traumas and injuries. I do not know if I may list the traumas and injuries here;
(2). I was denied much-needed medical treatments for the traumas and the injuries I sustained.
(3). I was denied protection from the hostile three African-American prisoners.

-----

   e.  You allege that Warden Stevens failed to adequately train his subordinates.

       i.     Specifically describe the way(s) in which Warden Stevens failed to adequately train his staff.

PLAINTIFF'S RESPONSE:

Warden Stevens failed to conduct effective training sessions to ensure that his staff:
1. Know when a prisoner has a single-cell medical restriction;
2. Comply with the medical restriction;
3. Know where to properly house a prisoner who is single-cell restricted.

Warden Stevens failed to train the nurses to direct patients with known psychiatric disorders to the duty medical doctor to be evaluated/examined so as to prevent unnecessary use of force.

Warden Stevens failed to enforce the official protocols/procedures, enacted by the Texas state Legislature, to minimize the use of force, so as to prevent unnecessary injuries.

Warden Stevens failed to enforce the official protocols/procedures, enacted by the Texas state Legislature, to always take photos and conduct throughout medical examination after a use of force.

Warden Stevens failed to train his staff to be vigilant and responsive to the protection needs of prisoners who are vulnerable because of their race, injuries, age, disability, nationality…

Warden Stevens failed to train his medical staff members to diligently intervene when they see prisoners in need of medical care.

Warden Stevens failed to train his security staff to refrain from interfering with the medical treatments provided by the qualified medical personnel, such as the medical doctors.

Warden Stevens failed to discipline his staff when he was personally informed either verbally or in writing (e.g., grievance process) that his staff had committed Constitutional violations.

    ii.      Specifically describe how Warden Stevens's alleged failure to adequately train his staff violated your constitutional rights.

PLAINTIFF'S RESPONSE: It is possible that I do not understand this question.
I believe that Warden Stevens' failure to train his staff encouraged his staff and/or tacitly authorized his staff to be deliberately indifferent to my health and safety, needs for protection....

-----

    iii.     Specifically describe how you were harmed by Warden Steven's alleged failure to adequately train his staff.

 PLAINTIFF'S RESPONSE: (1). I sustained unnecessary severe and permanent physical and psychiatric traumas and injuries. I do not know if I may list the traumas and injuries here;
(2). I was denied much-needed medical treatments for the traumas and injuries I sustained.
(3). I was victimized inside the cell which his staff illegally forced to enter.

-----

8. You name as Defendants John and Jane Does at the Montford Unit.

    a.    Specifically describe how the **Montford Unit** Does Defendants violated your constitutional rights.

PLAINTIFF'S RESPONSE: The Montford Unit Does Defendants were personally involved because they had personal knowledge of the illegal use of force and/or the denials of much-needed medical care and/or the cover-up/concealment of my injuries at the Montford Unit so as to continue to deny me much-needed medical care and to collude with the identified defendants to help them skirt being held liable. The Montford Doe Defendants were not innocent bystanders.

Certain, Montford Unit Does defendants are liable by their **omissions** (they had personal knowledge but failed to act), whereas, others are liable by their **commissions** (they had personal knowledge and acted at the Montford Unit and/or with certain Lynaugh prison-based defendants.)

All the Montford Unit-based defendants demonstrated deliberate indifference to my health and safety and/or violated certain conspiracy federal laws. Discovery will reveal the/more specifics.

Note: This is as **succinct** of a response as I can provide. I do not know if I should lengthen the response by breaking down the Montford Unit-based Does defendants into "groups" (and then go on to provide details about what each group did), such as about:
- The group who witnessed the illegal use of force but did nothing to stop it.
- The group involved with the denials of medical care after the use of force on June 06-2016.
- The group involved with the denials of medical care at the nurse-station on June 07-2016.
- The group who communicated with certain Lynaugh prison-based defendants… Please advise.

-----

b.  List all date(s) on which you allege the Doe Defendants violated your constitutional rights.

PLAINTIFF'S RESPONSE:

4.  On June 06-2016, shortly before the use of force and after.

5.  On June 07-2016, when I was taken from the four-person cell until I boarded the bus.

6.  From June 09-2016, until I left the Lynaugh prison on or about June 29-2016, when I was at the Lynaugh prison and they communicated by telephone, emails…with, for example Lyanugh defendants, Director of Classification Michelles D. Sellers, Mental-Health Roxie Ingram, Use of Force Investigators Captain Raul Melero and Sgt. Heather M. Gonzales.

-----

c.  Specifically describe how you were harmed by the alleged actions of the Doe Defendants.

PLAINTIFF'S RESPONSE:

7.  On June 06-2016, the Montford-based Does defendants:
    A.  Failed to stop the illegal Use of Force from occurring.
    B.  I was subsequently denied much-needed medical care for my serious injuries.
    C.  I was subsequently denied protection inside the four-person cell.

8.  On June 07-2016, the Montford-based Does defendants:
    A.  Denied me much-needed medical care for my serious injuries.
    B.  They failed to stop my transfer to the Robertson prison, whereas, I was not medically fit to be transported in a bus due to the injuries sustained on the previous day.

9.  When I was at the Lynaugh prison, the Montford-based Does defendants:
    A.  Conspired to stop the medical care that Lynaugh prison medical officials Samuel B. Itie had initiated on June 10-2016, so as to conceal the nature and extend of my injuries to help the identified Montford-based defendants skirt being held liable.
    B.  Conspired to compromise the integrity and the reliability of the facts finding process conducted by Captain Raul Melero and Sergeant Heather M. Gonzales so as to help the identified Montford-based defendants skirt being held liable.
    C.  May have conspired with certain Lynaugh-based defendants to retaliate against me for using the grievance process (to report the constitutional violations and the violation of federal laws), and for asking for much-needed medical care.

-----

9. You name as Defendants John and Jane Does at the Robertson Unit, "including but not limited to, the bus driver who operated the bus which transported Plaintiff from Montford to Robertson on Tuesday June 07-2016."

    a.   Does the Doe Bus Driver work at the Montford Unit or the Robertson Unit?

PLAINTIFF'S RESPONSE: I do not know. It could be that "transportation" has it is own structure independent from a particular unit. The bus driver appeared to know Sgt. Gonzalez.

------

    b.   Specifically describe how the Doe Bus Driver violated your constitutional rights.

PLAINTIFF'S RESPONSE:

Count # 01. During the Morning hours of June 07-2016, I was taken from the four-person cell to the Desk adjacent to area where the prisoners board the buses. Then and their Sergeant Marco Gonzalez said to me:

   "I am the one who fucked you. I hate French people. If you come back to Montfort, I will fuck you again."

 A few seconds later, the bus driver (who appeared to be a relatively athletic white male – i.e., taller than me, with a somewhat muscular built – with dark blond hair) entered from the outside and came to the Desk. Sergeant Marco Gonzales who was looking at me, turned toward the bus driver and, pointing at me, said to him:

   "I fucked him up really good yesterday. When you get to Montford make sure that the nurse does not give him any medical care. Just have them put him in seg [i.e., Administrative-Segregation in the transit area], and keep him in seg until he gets shipped to his unit."

The bus driver looked at me, and said to Sergeant Marco Gonzalez:

   "I will talk to the guys. I will make sure that he [looking straight at me, and moving his ahead toward me] does not get any medical care at Robertson and that they immediately put in him seg"

When I arrived to Robertson, I descended the bus. There was a nurse, a large white woman with long blond hair who refused to identified herself. However, I found a medical record – dated June 07-2016, titled: Transfer Screening Form (Nurse Chart Review) HSN-1, Part II Enroute Chart Review electronically signed by SPARKS, SONYA L. L.V.N (ECF # 54, Exhibit # S05). Thus, Nurse SPARKS could be the nurse or she may know who was the nurse. I consider Nurse SPARKS to be one of the Jane Doe Defendant. The Nurse (possibly named SPARKS) was on the left. Several security officials were standing there on the right side, not saying anything. An unusually tall and large Hispanic male, with a very aggressive demeanor and tone of voice, was holding the list of the arriving prisoners.

I moved toward the Nurse and reported that I had been injured, as other prisoners were also telling the nurse to provide me with medical care. The Nurse immediately said to me:

"Who has injured you?"

Next, the Doe bus driver rushed toward the security officials, speaking at them in general, but looking at the very large Hispanic male holding the list, and said:

"Security beat him up bad in Montford. The Sergeant at Montford said that he should not get any medical treatment, and to immediately put him in seg until he gets shipped."

I replied to the Nurse:

"Officers at Montford."

The Nurse, who never asked me what were my injuries, replied:

"If the officers want you to get hurt, I will not provide you with any medical care."

Next, the Nurse pulled-back behind the large Hispanic male holding the list, to whom the bus driver had spoken to. The large Hispanic male loudly said to me with a threatening tone of voice and demeanor:

"Shut the fuck up or I will beat you up more. Come with me to seg, now!"

Fearing to be - once again – brutalized and having excruciating pain, I went to Administrative-Segregation.


Count # 02: The bus drivers have the responsibility to ensure that the prisoners are fit to board the buses and be transported in them because, for security reasons, once the buses depart, they are not supposed to stop for any reason. When a bus driver has any doubt, he must ask qualified medical personnel to clear the prisoner for transportation. The Doe Bus Driver had the legal duty to ensure that I was fit to board his bus for the transfer to Robertson.

Certain prisoners, who were boarding the bus with me, repeatedly alerted the Doe Bus Driver that I been severely injured and asked him to call the medical staff members. I also asked the Doe bus driver for medical care. The bus driver ignored my pleas for medical care.

Because he had personal knowledge that I had been injured, the Doe Bus driver should have asked qualified medical personnel to clear me to be transported in his bus. The bus driver never did that. Instead, the Doe bus driver handcuffed me to another prisoner and ordered me to board his bus. Being handcuffed to another prisoner:
- Put me in a stress position;
- Prevented me from moving when I was in pain;
- Caused me at times to be "squeezed" by the other prisoner during turns which greatly exacerbated by pain and suffering.

c. Is the bus driver the only Defendant you wish to name? Answer "yes" or "no".

PLAINTIFF'S RESPONSE: NO.

-----

d. If you answered "no" in 9.c. above, provide identifying information for **each** Doe Defendant you wish to name, and include his or place of employment (i.e., Montford Unit or Robertson Unit).

PLAINTIFF'S RESPONSE: Per the first paragraph of page twelve, only official Twila Penland identified herself. In rare occasions I saw name-tags. Thus, I have to group the Does Defendants:

First Montford Group: The officials who were outside the dayroom and witnessed the excessive Use of Force on Monday June 06-2016, and the subsequent denial of much-needed medical care. Certain, wore civilian clothes; Thus, they were either senior medical officials or administrators.

**Identification**: The video may have captured their photos, and the known defendants could then identify them. Also, during Discovery the known defendants – such as Warden Robert Stevens - could provide information about who were the officials among them. They are his staff members.

Second Montford Group: The officials who walked pass the four-person cell and who refused to provide me with much-needed medical care.

**Identification**: Because they were moving apparently at random combined with the fact that I was greatly debilitated by the injuries that evening, I would be unable to recognize them. Hopefully, there are videos of the hallway. I pray that the Court knows how to identify them.

Third Montford Group, the medical staff members at the nurse-station on Tuesday June 07-2016, who colluded with Sergeant Herrera.

**Identification**: The employee-roster of the medical staff members combined with the testimony of Sergeant Herrera during Discovery.

First Robertson Group: The officials who were present when I disembarked from the bus upon arriving at Robertson; including a very large Hispanic male who was extremely belligerent.

**Identification**: The security and medical employee-roosters for that day. The testimony of Robertson Sergeant Daniel Lopez during Discovery. The medical record I have found – see Exhibit # S05 of ECF # 54 - which identity nurse SONYA L. SPARKS. I consider her to be a Jane Doe Defendant. Moreover, Nurse SPARKS could very well be the Nurse who personally denied medical care when I arrived at Robertson. Nurse SPARKS may be able to identify the other Robertson Doe Defendants during discovery, such as Ms. "Blue".

Hopefully, there are video-recordings of the areas where the prisoners arrive.

Second Robertson Group. The Does defendants who were to bring me the food-trays.

**Identification**: The employee-roosters and logs of whom brought the food-trays when I was in transit at Robertson. Hopefully, there are video-recordings of the hallways in the transit building.

-----

 e. Describe, including **specific facts**, how you believe **each** Doe Defendant listed in 9.c. above violated your constitutional rights.

PLAINTIFF'S RESPONSE: In an effort to comply with the Court's request that I be succinct:

First Montford Group:

 10. Their omissions - failure to intervene, whereas, they had personal knowledge – allowed the known defendants to traumatize me during the illegal Use of Force reported above.

 11. Their omissions – failure to intervene, whereas, they had personal knowledge – allowed the known defendants to severely injure me during the excessive Use of Force.

 12. Their omissions caused me to be denied much-needed medical care after the Use of Force.

 13. Their omissions caused me to be victimized by the occupants of the four-person cell.

Second Montford Group:

 14. Their omissions caused me to be denied much-needed medical care after the Use of Force.

 15. Their omissions caused me to be victimized by the occupants of the four-person cell.

Third Montford Group:

 16. Their omissions caused me to be denied much-needed medical care after the Use of Force.

 17. Their omissions caused me to be subjected to additional pain/suffering during transport.

First Robertson Group:

 18. Certain Does only: Their actions caused me to be denied much-needed medical care.

 19. Certain Does only: Their omissions caused me to be denied much-needed medical care.

Second Robertson Group:

 20. Their actions caused me to be denied food to aliment myself.

-----

f.  Describe, including **specific facts**, how you were harmed by the action(s) of **each** Doe Defendant listed in 9.c. above.

PLAINTIFF'S RESPONSE: In an effort to comply with the Court's request that I be succinct, I have refrain from reporting the details which have already be reported above. I fear not understanding how I can reconcile being specific with being succinct when the details have already been reported above in this document. May I incorporate by reference what I have previously reported? Please advise.

First Montford Group:

21. I sustained severe psychiatric traumas and physical injuries, as reported above.

22. I was denied much-needed medical care for my psychiatric traumas and physical injuries, as reported above.

23. I was victimized by the occupants of the four-person cell, as reported above.

Second Montford Group:

24. I was denied much-needed medical care for my psychiatric traumas and physical injuries, as reported above.

25. I was victimized by the occupants of the four-persons cell, as reported above.

Third Montford Group:

26. I was denied much-needed medical care for my psychiatric traumas and physical injuries, as reported above.

27. I was subjected to additional unnecessary pain and suffering during the transport from the Montford Unit to the Robertson Unit, as reported above.

First Robertson Group:

28. I was denied much-needed medical care for my psychiatric traumas and physical injuries, as reported above.

Second Robertson Group:

29. I was denied access to food to aliment myself.

-----

10. In your amended Complaint, you allege that Sergeant Herrera and Montford Unit and Robertson Unit Doe Defendants retaliated against you.

a. Describe, including **specific facts,** how Sergeant Herrera and the Montford Unit and Robertson Doe Defendants retaliated against you.

PLAINTIFF'S RESPONSE:

Certain defendants' actions/omissions can violate several Constitutional rights simultaneously.

Based on Sergeant Herrera's conduct, demeanor, tone of voice… it is clear to me that the night time Does Defendants – whom Plaintiff is unable to identify – had informed Sergeant Herrera that I had made repeated efforts to obtain much-needed medical care. Sergeant Herrera wanted to punish me (e.g., ridicule, insults, threats…) for having had the audacity to ask for medical-care, whereas, the officials had made it clear I will not get any.

-----

b. Why do you believe these Defendant retaliated against you?

PLAINTIFF'S RESPONSE: All the defendants retaliated for the same underlying reason whether or not they knew the reason.

The Texas prison officials use a particular form of communication to skirt being held liable. Instead, of getting into details as to why acts of retaliations are to be inflicted upon a prisoner, the officials "pass the word" that a particular prisoner is, for example, "up to no good", and the officials use their positions and influences to cause harm and difficulties because they know that it is what they are expected to do. They "back-up the team", because they need the "team to back-them-up", so to speak. It is called: "Going with the grey", in prison lingo.

The goal of the conspiracy was to prevent me from filing my religious lawsuit, and they have succeeded. The officials concluded that due to my disabilities, I could not litigate without the protection of the single-cell; Thus, they try to take it. Moreover, they calculated that severely injuring me would further impair my ability to litigate.

Once survival is the main issue for a prisoner, litigating a religious lawsuit is no longer possible.

Transporting me from prison to prison was another way to: (1). Isolate me; (2). Destabilize me; (3). Deny me access to my legal materials, which were always held on a different prison.

-----

c. Specifically describe how you were harmed by the alleged retaliation.

PLAINTIF'S RESPONSE: I was inflicted severe psychiatric traumas and physical injuries in addition to being prevented from filing my religious lawsuit. Again, the lawsuit was not an end in itself. Its goal was to allow me to practice my religion in a more meaningful manner. This was denied to me. My religious practice also would have provided me with therapeutic benefits, such as reducing my distress. These benefits were denied to me.

-----

11. In your Amended Complaint, you allege that all Defendants participated in a conspiracy.

  a.  Describe **all facts** forming the basis of your claim that Defendants engaged in a
       conspiracy to violate your constitutional rights.

PLAINTIFF'S RESPONSE:

The Lynaugh Defendants rush me to Montford because it was administratively less suspicious for
them to have the psychiatric single-cell medical restriction violated in a psychiatric facility.

The Montford Defendants violated the medical order giving me the protection of the single-cell
medical restriction to create a **precedent** for the Lynaugh Defendants to also violate the medical
order, which is what the Lynaugh defendants did, at least twice, when I was returned to Lynaugh.

I was severely injured by the Montford Defendants to punish me for having **resisted** their efforts
to violate the medical order granting me the protection of the single-cell, whereas, the Montford
Defendants initially wanted to make it appeared that I had volunteered to surrender the protection
of the single-cell medical restriction.

I was subsequently denied much-needed medical treatment to make it appear that no harm had
been done to me so as to give the illusion that even if I have had "a problem" the first time I was
taken to the four-person cell, upon being "counsel" by the security officials I had volunteered to
surrender the protection of the single-cell medical restriction i.e., that it was in fact **my** decision.

Three African-Americans were placed in the four-person cell for the Lynaugh officials to justify
placing an African-American prisoner in a cell with me so as to implement the punishment that
Ramsey Captain Reginald Gilbert had told me I would suffer.

-----

  b.  How did Defendants' act**,** as described in 11.a. above**,** violate your constitutional rights**?**

PLAINTIFF'S RESPONSE: To comply with the "instruction" (during Discovery Warden Robert
Stevens may reveal who gave the instruction) to force me into the four-man cell, the defendants:

  30. Inflicted upon me unnecessary permanent psychiatric trauma and severe physical injuries.

  31. Denied me much-needed medical treatment for the above traumas and injuries.

  32. Allowed for the African-Americans to victimize me, possibly for me to "get used to it".

  33. Transported me in the bus without any medical treatment to add to my pain and suffering.

  34. Continued to deny me much-needed medical care and food (at the Robertson prison).

-----

    c.  Specifically describe how you were harmed by the alleged conspiracy.

PLAINTIFF'S RESPONSE: I do not understand the difference between this question (c.) and the above question (b.). I know there is a difference, but I do not get it. I would say that:

    35.  I sustained permanent severe psychiatric traumas and permanent severe physical injuries.

    36.  I unnecessarily experienced severe pain and suffering due to not being given much-needed medical treatment.

    37.  I was victimized by the hostile three African-American prisoners which had serious long-term consequences.

    38.  My relations with the Texas prison officials during the following one and half year until my release, and with judicial officials even now to a degree, has been emotionally very difficult. I am now unable to trust government officials which is impairing my reinsertion into society.

-----

    d.  Why do you believe Defendants conspired to harm you?

PLAINTIFF'S RESPONSE: I fear that I may not understand the question. Having read it numerous times, I assume that the Court is now inquiry about the underlying reason why after about twenty-six (26) years in prison without a Use-of-Force against me and about twenty (20) years at the Ramsey prison, I was suddenly transferred to Montford to be severely harmed.

Per the exhibits attached in the Complaint filed on June 06-2018, I practice an ancient European Nature-based religion. My religious Tradition can be traced back to ancient India, and a particular form of Yoga. In brief, my religious practice has much in common with the Native-Americans and is in direct opposition to Islam.

Historically, the Texas prison officials have allowed the prisoners to neither grow beards nor to grow long cranial hairs. In 2015, the U.S. Supreme Court granted a Moslem prisoner the right to grow a short bear, in Holt v. Hobbs. The Texas prison officials were furious. In May of 2016, information published by newspapers made its way into the Ramsey prison that the federal Court of Appeals for the Fifth Circuit had ruled in favor of Texas prisoner David Rasheed Ali, in Ali v. Stevens, to allow him (and by extension all the Texas prisoners) to grow a much longer beard.

In May of 2016, the Texas officials at the Ramsey Prison's law library were preventing me from accessing the legal information about the Ali v. Stephens case. At the time, I was assigned to wing Seven-East, cell 01-07 (always single-cell as I had been for 20 years) of the Ramsey prison. A few feet away, in Wing Seven-East, cell 01-13 top bunk, was an African-American Moslem prisoner who claimed to be named "Dray". "Dray" was the clerk at the Ramsey's law library, and the favorite of Ramsey's law library supervisor Roslyn Paige, also an African-American person.

Because "Dray" has access to the law library computer, I asked "Dray" to provide me with the Courts' ruling in the Ali v. Stephens case. "Dray" became defensive asking why me who was always against Islam and always cleaned-shaven wanted to see the legal opinion the federal Court had issued to allow the Moslems to grow longer beards.

Hoping to get the legal documents - to which I was entitled but which were denied to me by the officials -, I informed "Dray" that I wanted to follow in prisoners David Rasheed Ali's legal "footsteps" so as to have the prisoners to be able to grow their cranial hairs long, to address very important spiritual needs for those who practice Nature-based religions. "Dray" then agreed to obtain the ruling in the Ali v. Stephens case. However, "Dray" told official Roslyn Paige that I wanted to file a religious lawsuit against the Texas officials. Next, official Paige and prisoner "Dray" informed Ramsey prison building Major Juan Jackson and Captain Reginald Gilbert. The above officials then colluded to retaliate by having me transferred to the Lynaugh prison.

On or about May 27-2016, and during the morning hours, as I was waiting behind the Center-Desk of the Ramsey prison (for the bus to first take me from the Ramsey prison to the Huntsville prison), Captain Reginald Gilbert, who is African-American, approached me, and said:

> "When you arrive where we are sending you, you will have more to worry about than your hair motherfucker. We are going to take away your single-cell medical restriction and put a nigger in the cell who is going to beat you up, turn you into his bitch and fuck you. The French Consulate will be too far away to help you this time."

Next, I was transferred to the Huntsville prison, and then to the Robertson prison on my way to the Lynaugh prison. Within a few hours of arriving at the Lynaugh prison, on Thursday June 02-2016, I was transferred to the Montford prison.

-----

12. You generally allege that all Defendants violated your due process rights.

   a. Describe **all facts** forming the basis of your claim that Defendants violated your due process rights.

PAINTIFF'S RESPONSE:

COUNT # 01: When I was placed inside the dayroom, I was denied the opportunity to be heard in a meaningful manner by a psychiatrist. Montford is a psychiatric facility. I have psychiatric diagnosis. I have the right to report my psychiatric medical restriction to qualified medical personnel. The records show that I told the medical officials that I was single-cell (pursuant to a medical order having been issued by a psychiatrist). The officials I was able to speak to were not qualified medical personnel. If they were, the Use of Force would not have occurred.

Had a medical doctor heard me in a meaningful and timely manner, my medical restriction would have been verified in a few seconds i.e., the time to go to the computer and to look at my TDCJ-

Health Summary for Classification, known as form HSM-18. I would have been housed in a single-cell and I would have been neither severely injured nor traumatized.

COUNT # 02:  When I was placed in the four-person cell, I was denied the opportunity to be heard in a meaningful manner by the security and medical staff members. Had I been heard in a timely and meaningful manner, I would have received medical treatment and not been victimized by the hostile three African-American prisoners.

COUNT # 03: The defendants severely injured me, and then denied me much-needed medical treatment, to deny the opportunity to be heard in the Courts. Here is why:

    A. As a direct result of the psychiatric traumas sustained at Montford I was so impaired that I could not sustain the demands associated with the level of intellectual functioning associated with presenting religious legal claims to the Courts.

    B. As a direct result of the severe physical injuries I was not able to access the law library program/service in a meaningful and consistent manner to allow me to present my legal claims to the Courts.

    C. The chilling-effect experienced as a direct result of having been inflicted the combination of the traumas and of the injuries and by having been threatened by certain defendants prevented me from being heard in the Courts.

    D. The chilling-effect experienced when I read the rulings - issued by Warden Robert Stevens - to my grievances because they made me realized that the defendants were being protected by him, whereas, he had personal knowledge of the constitutional violations.

-----

    b. Specifically describe how you were harmed by the alleged due process violation.

PLAINTIFF'S RESPONSE: As to COUNT # 01: The harms beginning with the Use of Force, such as:
I sustained psychiatric trauma and severe physical injuries during the subsequent Use of Force.
I was denied much-needed medical treatment for the injuries sustained during the Use of Force.

As to COUNT # 02:
I was denied much-needed medical treatment for the injuries sustained during the Use of Force.
I was victimized by the hostile three African-American prisoners after I forced into the cell.

As to COUNT # 03: I was not heard in the Courts in a timely manner.

-----

13. You generally allege that Defendants' action violated the Rehabilitation Act of 1973 (RA) and the American with Disability Act (ADA).

a.   Identify the disability from which you suffer.

PLAINTIFF'S RESPONSE: I qualify as a disabled person because I am substantially limited in most major life activities as a result of the following serious medical conditions:

39. Post-Traumatic Stress Disorder (PTSD), which some psychiatrists deem to be Complex, and which include disorders - sometimes made as separate diagnosis to patients who do not have PTSD - such as Anxiety/Panic attacks, Depersonalization/Derealization...

40. Recurring severe depressive episodes.

The recurring pain (e.g., neck, knees…) combined with the Traumatic Brain Injury symptoms, such as the excruciating migraine attacks with dizziness, nausea, vomiting, confusion… trigger the recurring severe depressive episodes with occasional suicidal thoughts. The PTSD symptoms also triggers the depressions.

-----

b.   Specifically describe **all facts** forming the basis of your claims under the RA and ADA.

PLAINTIFF'S RESPONSE: I believe that the defendants failed to make reasonable accommodation for my disabilities by denying me medical services and reasonable housing accommodations. This was done because certain officials discriminated against me due to my disabilities combined with my nationality to deny me access to the law library activity/program to block me from litigating my lawsuit. I have suffered from discrimination because of my PTSD due to the Texas prison system's culture of hostility toward prisoners with mental-disorders.

The single-cell only housing is a reasonable accommodation of a medical service as evidenced by the fact that I was single-cell only for over twenty (20) years and that single-cells are available at Montford. The Montford defendants failed to make reasonable accommodation for my disabilities both by denying me the single-cell housing and by failing to inform me – in terms I could understand considering my disabilities – of what was happening before the execution of the Use of Force. Again, I was waiting in the dayroom because I believed that a psychiatrist was going to examine/evaluate me when I suddenly experienced being gazed and then the defendants severely injured me.

The denial of a reasonable housing accommodation (i.e., the single-cell) resulted in me being victimized by the hostile – because of my race, nationality, and disabilities - three African-American prisoners in the four-person cell where the defendants had forced to go.

I was subjected to unnecessary pain and suffering when I was transported in a bus (e.g., at every turn I felt excruciating pain coming from my ribs/chest area), whereas, the reasonable accommodation would have been to transport me in a van, or not to transport me at all.

To be clear, I am not suggesting an ambulance. Medical type vans are readily available. In fact, on June 02-2016, I was transported to the Montford prison in a van.

If I qualified to be transported in a van before the injuries, I surely qualified for a van after having been severely injured, for which I was not provided with any much-needed medical treatment.

-----

   c.  Specifically describe how Defendants' alleged RA and ADA violations harmed you.

PLAINTIFF'S RESPONSE: The violations - in the Northern District of Texas - cause me to be subjected to unnecessary:

41. Severe psychiatric traumas and physical injuries, on June 06-2016;

42. Pain and suffering when I was denied much-needed medical treatments for my psychiatric traumas and physical injuries first at Montford and then at the Robertson prison;

43. Pain and suffering when I was transported first from the Montford prison to the Robertson prison, and then from the Robertson prison on my way to the Lynaugh prison without much-needed medical treatment for my injuries and without reasonable accommodation for transportation, such as being transported by a van, as opposed to a bus.

44. Hunger and despair at my helplessness when I was denied food to aliment myself while in transit at Robertson because I was unable to get out of my bed – due to the injuries sustained at Montford - when the officers suddenly opened the trap in the door and gave me approximately three seconds to grab the food-tray, something I was unable to do.

-----

## II.   <u>Declaration</u>

I, Charles Epley, declare under the penalty of perjury that the foregoing answers are true and

correct, and I certify that a true and correct copy of my answers to the Questionnaire has been

forwarded to the United States District Court, Lubbock Division, Lubbock, Texas.

Signed this <u>05th</u> day of January, 2019.

CHARLES EPLEY, Plaintiff – Pro Se
BOITE POSTALE N° 30036
31701 BLAGNAC CEDEX - FRANCE

EMAIL: EpleyLegal@gmail.com