IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2019 MAY 29   AM 9: 01

DEPUTY CLERK

CHARLES EPLEY,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        CIVIL ACTION NO. 5:18-CV-142-BQ
                                        )
MARCO GONZALEZ,                         )
*Sergeant at Montford, et al.,*         )
                                        )
        Defendants.                     )

## REPORT AND RECOMMENDATION

Proceeding pro se and *in forma pauperis*, Charles Epley filed this action under 42 U.S.C. § 1983 complaining of events alleged to have occurred during his incarceration at the John Montford Unit (Montford Unit) within the Texas Department of Criminal Justice (TDCJ).[1] Epley filed his original Complaint on May 8, 2018 (ECF No. 3), and an Amended Complaint on June 6, 2018. ECF No. 15. The United States District Judge subsequently transferred this case to the undersigned United States Magistrate Judge for further proceedings (ECF No. 23).

On August 15, 2018, the undersigned granted Epley permission to proceed *in forma pauperis*. ECF No. 26. The undersigned thereafter reviewed Epley's Amended Complaint[2] and authenticated records from TDCJ, and ordered Epley to complete a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976). Epley timely completed and returned the questionnaire.[3] ECF No. 56.

---

[1] Epley is no longer a prisoner; however, his claims relate to events that occurred during his incarceration.

[2] After reviewing Epley's Amended Complaint, the undersigned determined that some of the Defendants and claims were not properly before this court. The undersigned therefore entered an order severing and transferring the Defendants and claims to the appropriate divisions. *See* ECF No. 24.

[3] The court did not find the holding of a *Spears* hearing to be practical because Epley currently resides in France.

1

Epley has not consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned enters this Report and recommends that this action be dismissed under 28 U.S.C. § 1915(e)(2)(B).

## I.      Standard of Review

Section 1915(e) requires dismissal of an IFP complaint *at any time* if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)–(iii); *see Newsome v. E.E.O.C.*, 301 F.3d 227, 231–33 (5th Cir. 2002) (affirming dismissal of pro se, non-prisoner plaintiff's claims as frivolous and for failure to state a claim under § 1915(e)(2)(B)(i) and (ii)). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327. When analyzing a pro se plaintiff's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (noting responses given to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical or other prison records if they are adequately identified and authenticated").

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts

hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378 (5th Cir. 2002)).

## II.    Discussion

### A.    Epley's Claims

Epley names the following persons as Defendants, all employed at the Montford Unit in Lubbock, Texas:  (1) Sergeant Marco Gonzalez; (2) Correctional Officer (CO) David Camargo; (3) CO Julio Espinosa; (4) CO Rafael Guitron; (5) CO Bobby Gutierrez; (6) CO Jonathan Smith; (7) Sergeant Herrera; (8) Nurse Tara Flores; (9) Nurse Maria Martinez; (10) Nurse Shaquavia Wagner; (11) Nurse Tasia Rains; (12) Warden Robert Stevens; and (13) John and Jane Does. *See* Am. Compl., at 1–2[4] (ECF No. 15).  Epley further names as Defendants[5]:  (1) John and Jane Does at the French Robertson Unit in Abilene, Texas[6]; (2) John and Jane Does with the "Step 2 Medical Grievance Program"; (3) Grievance Supervisor K. Ward; (4) Grievance Supervisor C. Martinez; (5) Grievance Supervisor M. Blalock; (6) Assistant Regional Director Steve Massie; (7) Katheryn Bell, Office of the Administrative Monitor for Use of Force; (8) Maggie Schillaci, Office of the Administrative Monitor for Use of Force; (9) John and Jane Does, State Classification Committee;

---

[4] Page citations to Epley's pleadings refer to the electronic page number assigned by the court's electronic filing system.

[5] With respect to many of these Defendants, Epley's Amended Complaint does not make clear where they are located.

[6] Because it was not clear from the face of Epley's Amended Complaint whether the Doe Defendants were employed at the Montford Unit, Robertson Unit, or both, the court retained Epley's claims against the Doe Defendants in the interest of judicial economy. *See* Am. Compl., at 11 ("John/Jane Does security and medical officials—including, but not limited to, the bus driver who operated the bus which transported Plaintiff from Montford to Robertson on Tuesday June 07-2016—were at all times herein (Tuesday June 07-2016) at the 'reception' area of the transit building of the Administrative-Segregation at Robertson.").  After reviewing Epley's questionnaire responses, however, the court understands Epley to assert claims against both Montford and Robertson Doe Defendants, and addresses such claims herein. *See* Questionnaire, at 19–20.

(10) Legal Assistant Zeke Tisdale; (11) Assistant General Counsel Nicholas Morrell; (12) General Counsel Sharon Felfe Howell; and (13) Attorney General Ken Paxton. *Id.* at 2.

Epley alleges that on June 6, 2016, Montford Unit Sergeant Gonzalez and COs Camargo, Espinosa, Guitron, Gutierrez, and Smith used excessive force against him and violated his due process rights. *Id.* at 17–21. Specifically, Epley avers that after refusing to accept housing in a four-person cell,[7] he asked Montford "officials to allow [him] to be examined by a medical doctor/psychiatrist." *Id.* at 17. Epley alleges officials thereafter placed him "naked, except for underwear, inside an empty day-room . . . ." *Id.* at 18. According to Epley, Defendants then shot pepper spray through the food slot; in response, he lay on his stomach. Thereafter, Epley claims that Defendants entered the dayroom and "ran toward me and crushed me as I was laying on the ground compliant, not posing a threat to anyone, and not evading or struggling with any officer." *Id.* Epley further asserts that Sergeant Gonzalez "forcefully slammed [his] head against the concrete/cement floor" and used his weight to "crush" him again." *Id.* Epley states that as a result of the incident, he suffered broken ribs, a broken nose, a concussion, and injuries to his head, neck, face, right eye, right ear, and teeth. *Id.* at 20; Questionnaire, at 4–7 (ECF No. 56). He also alleges he suffered a traumatic brain injury (TBI), knee pain, and psychiatric complications. Am. Compl., at 20; Questionnaire, 6–7.

Epley also contends that Nurses Flores, Martinez, Wagner, and Rains failed to protect him from the June 6 use of force. Questionnaire, at 12. He believes that "[t]he nurses should have prevented the illegal use of force by alerting the medical doctor on duty and/or Warden Robert Stevens that [he] was protected by the single-cell medical restriction, as opposed to allowing that [he] be injured." *Id.* Epley further alleges that Montford Unit officials—including Nurses Flores,

---

[7] Epley contends he was to be single-celled at all times.

Martinez, Wagner, and Rains—denied him adequate medical care for the injuries he allegedly sustained during the June 6 use of force incident and violated his due process rights. *See* Am. Compl., at 22; Questionnaire, at 7–8, 12. Epley claims that following the use of force, and once he was placed in the four-person cell, he asked for medical treatment from anyone who happened to walk by. Questionnaire, at 7. Epley acknowledges, however, that he did not formally request medical treatment, despite being given the opportunity to do so, until June 10, 2016—four days after the use of force—because, according to Epley, he "was overwhelmed by extreme fear" and his injuries made it difficult "to think coherently." *Id.* at 4–5. Epley asserts that Sergeant Herrera contributed to the alleged denial of medical care by intimidating medical staff into denying treatment prior to his transport from the Montford Unit to the Robertson Unit. *Id.* at 10–11.

Moreover, Epley contends that K. Ward, C. Martinez, M. Blalock, Steve Massie, Katheryn Bell, Maggie Schillaci, Zeke Tisdale, Nicholas Morrell, Sharon Howell, and Attorney General Ken Paxton violated his due process rights by "impeding" grievance investigations and falsifying documents. Am. Compl., at 3–16. Epley also avers that Warden Stevens failed to properly train his subordinates and implemented an unconstitutional informal policy of "allowing or encouraging illegal acts." *Id.* at 21; Questionnaire, at 12–15. He further makes various state law claims, including assault, battery, and negligence related to the incidents described above. *See* Am. Compl., at 3–11, 48.

More generally, Epley also alleges that all Defendants, including those the court previously severed and transferred, engaged in a broad conspiracy to violate his constitutional rights and harm him. *Id.* at 1–49. He similarly posits that certain Defendants[8] retaliated against him. *Id.* at 3–10; Questionnaire, at 21–22. Finally, Epley alleges that Defendants' actions violated his rights under

---

[8] Epley specifically avers that Sergeant Herrera and certain Montford Unit and Robertson Unit Doe Defendants retaliated against him. *See* Am. Compl., at 3–10; Questionnaire, at 21–22.

the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973 (RA).  Am. Compl.,

at 49; Questionnaire, at 27.  Epley seeks monetary damages for his injuries.  Am. Compl., at 49.

**B.      Epley has had ample opportunity to develop the factual bases of his claims.**

The court initially observes that it permitted Epley to proceed with an Amended Complaint

(the operative document in this action), which spans almost ninety pages.  Moreover, the court

provided Epley with an additional opportunity to develop his claims through the questionnaire.

*See, e.g.*, *Cobb v. Simmons*, 373 Fed. App'x 469, 470 (5th Cir. 2010) (explaining that pro se

plaintiff-prisoner had "had ample opportunity to set forth the basis for his claims, including, inter

alia, in his responses to the district court's questionnaire"); *Berry*, 192 F.3d at 507 (noting

responses given to a questionnaire are incorporated into the plaintiff's pleadings).  The majority

of Epley's questionnaire responses, however, provide scant factual details and are couched with

qualifying language such as "I would have to see the video-recording to recall/interpret my

behavior" or, "A qualified psychiatrist with a qualified neurologist would be able to better explain

my reaction, conduct and behavior."  *See, e.g.*, Questionnaire, at 1–3.  Stated differently, Epley

provided the court with potential explanations as to why he or the named Defendants behaved

certain ways rather than providing the court with his version of the facts.  *See, e.g.*, *id.* at 2 ("The

psychiatrists, who have treated me, have told me to move away from the stressors when I have

feelings of unreality.  I was probably doing that.").  Nevertheless, the court liberally construes

Epley's pleadings (Amended Complaint and questionnaire responses), as it must at this stage of

the proceedings, and analyzes his claims below.

**C.      Epley's excessive force claim should be dismissed.**

Epley's use of force claim arises from the June 6, 2016, incident.  To establish a

constitutional violation for excessive use of force by a jail or prison official, a plaintiff must show

that the defendant unnecessarily and wantonly inflicted pain. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986). Whether an official's use of force is unnecessary or wanton depends on if the "force was applied in a good-faith effort to maintain or restore discipline or maliciously or sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley*, 475 U.S. at 320). Factors relevant to this determination include, but are not limited to, the following: (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officers; and (5) any efforts officers made to temper the severity of a forceful response. *See Hudson*, 503 U.S. at 7; *Baldwin v. Stadler*, 137 F.3d 836, 838 (5th Cir. 1998) (citing *Hudson v. McMillian*, 962 F.2d 522, 523 (5th Cir. 1992)). Each of the foregoing factors is discussed below.

### 1.    *Extent of Injury*

Epley alleges that he suffered, and continues to experience, a host of physical and psychological ailments as a result of the June 6 incident. Epley asserts that as a result of the use of force, he suffered broken ribs, a broken nose, a concussion, and injuries to his head/brain, neck, face, right eye, right ear, and teeth. Am. Compl., at 20; Questionnaire, at 4–7. He also contends he continues to experience knee pain, decreased vision in his right eye, reduced hearing in his right ear, problems with his teeth, and complications related to an alleged brain injury as well as psychiatric symptoms.[9] Am. Compl., at 20; Questionnaire, at 6–7.

The video footage and still photos from TDCJ show that Epley had a bloody nose as well as several scratches and red, bruised skin following the use of force. The video also reflects that

---

[9] By Epley's own admissions, and as reflected in the authenticated records, Epley suffered a TBI years before June 6, 2016, which caused many of the symptoms he alleges he continues to experience as a result of the June 6 incident, such as "excruciating migraine attacks, confusion particularly during stressful situations, sleeping disturbances, chronic fatigue, feelings of unreality . . . anxiety and panic attacks, vivid and distressing flashbacks and nightmares, severe and recurrent depressive episodes." *See* Am. Compl., at 16.

after the incident, Sergeant Gonzalez asked Epley several times if he was injured, but Epley refused

to answer, instead muttering unintelligibly in French.   Nurse Wagner visually examined Epley's

face and used a towel to wipe the blood from his face and nose.   The video shows that Epley did

not grimace or react in any way as Wagner wiped his face, including his nose.   Based on her visual

examination and Epley's lack of response, Nurse Wagner determined that Epley had not suffered

any injuries (other than scratches and a bloody nose).   On video, Epley was alert and coherent

(albeit distraught), and did not display any outward signs of pain or other injury as Defendants

escorted him to his assigned cell.

The authenticated video footage negates many of the more serious injuries alleged by

Epley, e.g., a broken nose and external injuries to his head, teeth, right eye and ear, and thereby

relieves the court of accepting said allegations as true.   *See Scott v. Harris*, 550 U.S. 372, 380

(2007) (holding that the district court did not have to accept the plaintiff's description of his driving

where it was "blatantly contradicted by" video from the police car's dash camera); *Funari v.

Warden of James V. Allred Unit*, No. 7:12-CV-011-O-DA, 2014 WL 1168924, at *2 (N.D. Tex.

Mar. 20, 2014) (finding the court could rely on video of the event when it blatantly contradicted

the "visible fiction" offered by the plaintiff); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th

Cir. 2011) (citing *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010)) ("In the

context of cases involving video evidence, this Court will accept the video's depiction over the

opposing party's account of the facts where the video obviously contradicts that version of the

facts."); *Bourne v. Gunnels*, No. CV H-16-0515, 2017 WL 2483815, at *8 (S.D. Tex. June 7, 2017)

(citing *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)) (discounting prisoner's claim that

prison officers' use of force caused prisoner to lose consciousness where video footage refuted

such allegation).   The injuries the video footage reflects Epley did suffer—a bloody nose,

abrasions, and bruised, red skin—are minor, if not *de minimis*, injuries. *See Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (affirming district court's dismissal of plaintiff's claim for excessive force because injury consisting of "a sore, bruised ear lasting for three days" was *de minimis*); *Wyatt v. Shaw*, No. 95-40030, 1995 WL 450120, at *1 (5th Cir. June 30, 1995) (affirming dismissal of prisoner's excessive force claim because prisoner "suffered only temporary, *de minimis* injuries as a result of his exposure to the residual effects of the chemical agent"); *Hodge v. Williams*, Civil Action No. 4:08–CV–330–Y, 2009 WL 111565, at *3 (N.D. Tex. Jan. 16, 2009) (finding as *de minimis* inmate's claimed injuries of "cuts on his hand," a cut inside his lip, and a sore neck).

Moreover, the authenticated medical records do not reflect Epley suffered the injuries he has alleged. For example, Epley claims his ribs were broken on June 6, but the records do not reflect such a diagnosis. Instead, they show that after Epley complained of rib pain, TDCJ medical staff at the James Lynaugh Unit (Lynaugh Unit) ordered x-rays to "rule out" a possible rib fracture, but Epley refused the x-rays. The nurse noted that Epley was possibly suffering from "costochondritis"—inflammation of the rib cartilage. Epley similarly refused x-rays of his neck and right knee, despite complaining of pain, as well as a dental exam. Thus, medical staff was unable to conduct a thorough analysis of the cause of his subjective pain.

Generally, "[a]n inmate's bare assertion of a serious medical condition is insufficient without medical evidence verifying the condition exists." *Amos v. Jefferson*, No. 5:17CV195, 2019 WL 950367, at *10 (E.D. Tex. Feb. 27, 2019) (citing *Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir. 1995)). The court, however, accepts as true Epley's allegations at this stage of the proceedings. As alleged, many of Epley's injuries—including a broken nose and ribs—are more than *de minimis*. *See, e.g., Hudson*, 503 U.S. at 10 ("[T]he blows directed at Hudson, which caused

bruises, swelling, loosened teeth, and a cracked dental plate, are not *de minimis* for Eighth Amendment purposes."); *Morris v. Bria*, Civil Action No. 7:17-CV-034-O-BP, 2018 WL 2436724, at *6 (N.D. Tex. May 30, 2018) (finding prisoner suffered more than *de minimis* injury where defendants conceded prisoner "received injuries to his left eye, head, lip, and left hand, including a fracture of one of his fingers," and prisoner further "averred, under oath, that the Defendants' use of force caused him to bleed for hours, gave him a possible concussion, made his eyes burn from the chemical agents, and made him dizzy and nauseous to the extent that he vomited in his cell the day of the incident"). This factor, therefore, weighs in favor of allowing Epley's claim to proceed beyond screening.

## 2.   *Need for Force, the Amount of Force Used, and the Reasonably Perceived Threat*

In his Amended Complaint and questionnaire responses, Epley admits that prior to the use of force, he refused to obey Defendants' orders on at least two occasions—first, by refusing to accept housing, and second, by refusing to submit to a strip search and hand restraints after entering the dayroom. *See* Am. Compl., at 17 ("During the PM hours of Monday June 06-2016, I was taken to a cell occupied by three (3) African-American prisoners I had never seen before. This triggered severe PTSD symptoms *which prevented me from entering the cell occupied by the three prisoners*." (emphasis added)); Questionnaire, at 1 (stating that he "was *unable to enter the [cell] door* as a result of being paralyzed by extreme fear" (emphasis added)), 2 (contending that he did not submit to hand restraints because he "was afflicted with **feelings of unreality**" (emphasis in original)); *see also id.* at 2–3 (explaining that after Defendants shot pepper spray into the dayroom, he lay in the prone position but at some point rolled onto his side, demonstrating that Epley moved despite explicit orders from Defendants not to move or resist upon their entry into the dayroom). Epley initially refused to accept housing in a multi-person cell, believing that he should be single-

celled at all times. Am. Compl., at 17 . Epley then "asked the officials to allow [him] to be examined by a medical doctor/psychiatrist." *Id.* In response, Montford Unit officials placed him in the dayroom. *Id.* at 18.

Before any use of force occurred, Defendants obtained authorization from the Montford Unit Assistant Warden to use chemical agents and force, if necessary, to regain Epley's compliance after he refused to accept housing and thereafter submit to a strip search and hand restraints. The authenticated video footage records that after the five-person team assembled, Sergeant Gonzalez twice ordered Epley to submit to hand restraints so officers could move him to his assigned cell, and warned Epley that failure to comply would result in the use of chemical agents and force, if necessary. Epley refused to comply with Sergeant Gonzalez's orders, instead standing against the back wall of the dayroom with his hands covering his face. The video subsequently shows that Nurse Wagner ordered Epley to come to the door and submit to restraints, but he again refused. Consequently, Officer Espinosa opened the food tray slot, and Sergeant Gonzalez administered one round of chemical agent into the dayroom; Espinosa then closed the slot. The video shows that over a span of approximately thirty seconds, Sergeant Gonzalez directed Epley to come to the door and submit to restraints four additional times before Epley finally lay in the prone position on the floor, which Defendants interpreted as a sign of submission. Sergeant Gonzalez advised Epley that the five-person team was going to enter the room and that he should not get up or resist because Defendants would use additional force.

Defendants' written reports from the incident indicate that as the team entered the dayroom, Epley moved from the prone position, resulting in CO Gutierrez using his riot shield to restrain Epley. Epley concedes that after laying on the ground he moved from his belly to his side at some point. The authenticated video similarly confirms that Epley actively resisted Defendants' efforts

to apply hand restraints by stiffening his arms, causing Defendants to noticeably struggle with Epley before finally bringing his hands behind his back to apply the hand restraints.

Epley's actions justified the use of some degree of force by Defendants. *See Calhoun v. Wyatt*, No. 6:11CV4, 2013 WL 1882367, *6 (E.D. Tex. May 2, 2013) (noting that inmate's refusal to obey orders "set the stage for the use of force"); *see also Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) ("If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force."). Disobeying orders poses a threat to the order and security of the prison as an institution. *Bourne*, 2017 WL 2483815, at *10; *Rios v. McBain*, Civ. No. A504CV84, 2005 WL 1026192, at *7 (E.D. Tex. Apr. 28, 2005) (noting that "open defiance of orders plainly poses a threat to the security of the institution, regardless of whether or not the defiance is emanating from within a locked cell"). This is true even where officials mistakenly direct, as Epley contends here, an inmate to accept housing in a multi-person—as opposed to a single-person—cell. *See Soto*, 744 F.2d at 1267 ("Inmates cannot be permitted to decide which orders they will obey, and when they will obey them."); *Amos v. Jefferson*, Civil Action No. 5:17cv195, 2019 WL 950367, at *12 (E.D. Tex. Feb. 27, 2019) (citing *Soto*, 744 F.2d at 1270) (explaining that a prisoner's refusal to comply with repeated direct orders is the type of "behavior [that] cannot be tolerated in a facility of incarceration"); *Buentello v. Rayford*, Civil Action No. 6:15cv780, 2018 WL 3625858, at *6 (E.D. Tex. Mar. 14, 2018) (citing *Kitt v. Bailey*, Civil Action No. H–14–0368, 2015 WL 3909116, at *6 (S.D. Tex. June 24, 2015)) ("An inmate does not have the constitutional right to pick and choose which prison rules to obey."); *Minix v. Blevins*, CA No. 6:06-306, 2007 WL 1217883, at *24 (E.D. Tex. Apr. 23, 2007) (citation omitted) (recognizing that even where prisoner believes order to be unjustified or improper, such belief does not give him the right to disobey at his whim);

*see also Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995) (explaining that "a prison inmate does not have a protectable liberty or property interest in his custodial classification and an inmate's disagreement with a classification is insufficient to establish a constitutional violation"). Defendants reasonably could have perceived Epley—an offender referred to the Montford Unit for psychiatric observation who was behaving erratically and failing to comply with orders—as a threat to their safety and to institutional order and security.

Epley's contention that Defendants' use of force was excessive because he was "laying on the ground compliant, not posing a threat to anyone, and not evading or struggling with any officer" (Am. Compl., at 18) is belied by the video footage. At no time did Epley comply with Defendants' orders to: (1) accept housing; (2) come to the dayroom door to submit to a strip search and hand restraints; or (3) remain still and not resist so as to avoid an additional use of force after Defendants entered the dayroom. The video footage clearly demonstrates that only after Epley repeatedly refused to comply with orders did Sergeant Gonzalez administer the chemical agent—one round from a pepper spray gun—to gain compliance. Because Epley still refused to come to the door and submit to restrains, Defendants entered the dayroom, and after a brief, less than one minute struggle, Defendants were able to apply restraints—which Epley had repeatedly refused and actively resisted—and exit the dayroom. The fact that Epley was in a secured dayroom does not diminish his failures to accept housing and submit to a strip search and hand restraints, nor does it lead to the conclusion that he did not pose a security threat. *See, e.g.*, *Soto*, 744 F.2d at 1270; *Rios*, 2005 WL 1026192, at *7.

The video footage also conclusively rejects Epley's contention that Sergeant Gonzalez "forcefully slammed [his] head against the concrete/cement floor," thus negating his assertion to

the contrary.[10] *See Scott*, 550 U.S. at 380. The video footage does show that after entering the dayroom, CO Gutierrez lay on top of Epley, pressing the riot shield into Epley with his body weight in an attempt to shield himself and the other officers. The video also shows that COs Camargo and Espinosa lay on top of Epley as they brought his hands behind his back. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Hudson*, 503 U.S. at 9 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The court does not find, in the context of Epley's disobedience, that Defendants used more force than necessary. *See, e.g., Bourne*, 2017 WL 2483815, at *9 (concluding officer's use of a chemical agent and subsequent entry into prisoner's cell to extract prisoner did not amount to excessive force); *Silguero v. Williams*, Civil No. 7:10–CV–050–O, 2012 WL 6567366, at *2 (N.D. Tex. Dec. 17, 2012) (concluding officers' use of a chemical agent and subsequent force "was the direct result of [prisoner's] own behavior, was applied in an effort to restore discipline, and was reasonable under the circumstances").

Defendants entered the dayroom to apply hand and leg restraints because even after administering chemical agent, Epley did not come to the dayroom door as directed. In sum, Epley has alleged no facts demonstrating that Defendants used force in any manner other than to restore order and enforce his compliance. As such, *Hudson* factors two, three, and four (i.e., the need for force, the relationship between that need and the amount of force used, and the reasonably

---

[10] In fact, the video footage and the authenticated records confirm that Sergeant Gonzalez was not part of the five-person team and never used physical force in any way, other than administering the chemical agent. Sergeant Gonzalez's use of a chemical agent, standing alone, does not violate the Eighth Amendment, particularly where he administered the agent in an attempt to gain compliance. *Soto*, 744 F.2d at 1270 ("The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a *per se* violation of the Eighth Amendment, whether an inmate is locked in his cell or not."); *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975) (citing *Landman v. Peyton*, 370 F.2d 135, 138–39 (4th Cir. 1966)) ("The use of tear gas when reasonably necessary to prevent riots or escapes or to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment."); *see Bourne*, 2017 WL 2483815, at *9 (citing *Clemmons*, 509 F.2d at 1340) ("It is well established that the use of a chemical agent to prevent riots or escapes or to subdue recalcitrant prisoners does not constitute cruel and unusual punishment.").

perceived threat by Defendants) weigh in favor of finding that Defendants' use of force was not excessive to the need.

### 3.    *Efforts to Temper the Forceful Response*

The video footage shows that Defendants provided Epley with numerous opportunities to comply with their orders prior to administering a chemical agent and applying force. Sergeant Gonzalez ordered Epley twice, and Nurse Wagner urged him an additional time, to submit to a strip search and hand restraints so that they could move him into his assigned cell; Gonzalez also advised Epley with each order that his failure to comply could result in the use of force, including a chemical agent. Moreover, Sergeant Gonzalez directed Epley to come to the door and submit to restraints for placement into his assigned cell *four* additional times prior to Defendants entering the dayroom to physically apply the restraints. Had Epley complied with any of Defendants' seven orders (or simply accepted his housing assignment in the first instance), the use of force would not have been necessary. *See Brewer v. Prier*, 334 F. App'x 618, 619 (5th Cir. 2009) (noting that officer attempted to obtain prisoner's "compliance through non-forceful means" but prisoner's refusal to comply "made the use of force necessary"); *Davis v. Agosto*, 89 F. App'x 523, 526 (6th Cir. 2004) (explaining that had prisoner obeyed officers' "unexceptional request [for prisoner to submit to handcuffs], the subsequent use of mace (to say nothing of batons) would have been unnecessary"); *Bria*, 2018 WL 2436724, at *9 (finding defendants "made clear efforts to avoid and temper the severity" of force where they waited eleven minutes before entering prisoner's cell and spoke with prisoner and sprayed chemical agent into his cell in an attempt to gain his compliance); *Bourne*, 2017 WL 2483815, at *10 (noting that officers "went to great lengths to avoid using force," including ordering prisoner several times to relinquish the food tray, obtaining authorization to use force if necessary, and warning prisoner multiple times the officers would use

a chemical agent and/or force if necessary); *Zidell v. Morris*, No. 4:11–CV–845-A, 2013 WL 704325, at *6 (N.D. Tex. Feb. 26, 2013) (citing *Brewer*, 334 F. App'x at 619) (noting that "[n]one of the actions taken by [the officers] prior to using force had any noticeable effect on plaintiff . . . making necessary the use of force").

In sum, a review of the factors set forth in *Hudson*—particularly Defendants' efforts to preserve institutional order and discipline and Epley's resistance to the same—demonstrates that Epley pleads no facts establishing Defendants maliciously and sadistically applied force in violation of the Eighth Amendment. Epley's allegations, in combination with the video footage and authenticated records, show that there was a need for the application of force—including the use of a chemical agent and some degree of physical compulsion—and Defendants' administration of force was not excessive to the need. *See Baldwin*, 137 F.3d at 840 (quoting *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)) (explaining that "[t]he amount of force that is constitutionally permissible . . . must be judged by the context in which that force is deployed"). Accordingly, Epley's claims against Sergeant Gonzalez and COs Camargo, Espinosa, Guitron, Gutierrez, and Smith should be dismissed as frivolous and for failure to state a claim.

**D.    Epley has not pleaded facts demonstrating a viable bystander liability claim against any Defendant.**

Epley asserts that "the five officers"—which the court construes as referencing the five-person use of force team—"had personal knowledge that defendant Sergeant Marco Gonzalez was using excessive force. Then and there the five officers should have withdrawn, and asked for a medical official and/or a higher ranking official to intervene." Questionnaire, at 10. According to Epley, the officers did not intervene, but instead "became parties to the acts by holding [him] down so as to facilitate for defendant Marco Gonzalez to severely injure [him]." *Id.*

Epley further alleges that Nurses Flores, Martinez, Rains, and Wagner "should have prevented the illegal use of force by alerting the medical doctor on duty and/or Warden Robert Stevens that I was protected by the single-cell medical restriction, as opposed to allowing that I be injured. The nurses were not innocent bystanders." *Id.* at 12. To the extent these allegations may attempt to assert a claim for bystander liability, Epley's efforts fail.

A prison official who does not personally exert excessive force on an inmate may still incur constitutional liability for failing to protect the inmate from another's use of excessive force under a theory of bystander liability. *See, e.g., Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). Bystander liability for a failure to protect applies if the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013); *Hale*, 45 F.3d at 919 ("[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983."). The rationale motivating bystander liability is that "a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Terry v. Castleberry*, No. H-06-2025, 2008 WL 687519, at *5 (S.D. Tex. Mar. 12, 2008) (*citing Randall v. Prince George's Cty.*, 302 F.3d 188, 204 n.24 (4th Cir. 2002)).

Because Epley has not stated a viable claim that Sergeant Gonzalez—or any other Montford Unit Defendant—used excessive force in violation of the Eighth Amendment, he cannot demonstrate that COs Camargo, Espinosa, Guitron, Gutierrez, and Smith, or Nurses Flores, Martinez, Rains, and Wagner violated his rights by failing to intervene. *See Davis v. Cannon*, 91 F. App'x 327, 329 (5th Cir. 2004) (concluding that where the alleged actions did not constitute excessive force, bystanders are not liable for failing to intervene); *see also Simpson v. Flores*, No.

SA-09-CV-0125 OG (NN), 2011 WL 675041, at *1 (W.D. Tex. Feb. 15, 2011) (noting courts must first determine whether an unconstitutional use of force took place to determine if an officer failed to protect an inmate); *Hicks v. Page*, Civil Action No. H-08-2486, 2010 WL 793684, at *7 (S.D. Tex. Mar. 4, 2010) (dismissing as frivolous a claim for bystander liability inmate made no showing that officer used excessive force in violation of the Eighth Amendment). Epley's claims should therefore be dismissed.

E.   **Epley has not pleaded facts demonstrating deliberate indifference by Defendants to any serious medical need.**

Epley avers that after the use of force, "[t]he fear of being brutalized more prevented [him] from asking for the medical treatment in the presence of the defendants who had caused [him] to be injured." Questionnaire, at 4. He further contends that after Defendants placed him in his assigned cell (and presumably left the area), he "asked everybody who happened to walk near the four-person cell that evening [for medical treatment]," but "[t]hey walked away, some of them laughing." *Id.* at 7; *see* Am. Compl., at 22. According to Epley, he then "became so extremely dizzy that [he] could not walk to the window [of his cell] to ask for help, and [he] eventually lost consciousness on [his] bunk." Questionnaire, at 7. When he awoke, Epley asserts that his cellmates "prevented [him] from trying to call the officials for help." *Id.* In addition, Epley alleges that Nurses Flores, Martinez, Wagner, and Rains were deliberately indifferent to his serious medical needs "because they compiled medical records . . . after the brutal acts occurred" but did not provide him with "much-needed medical, dental and psychiatric treatments for the injuries [he] had sustained . . . ." Am. Compl., at 21–22. Finally, Epley also claims that Sergeant Herrera and Montford and Robertson Doe Defendants prevented him from receiving medical treatment and/or failed to obtain treatment for him. Questionnaire, at 10–11, 15–16.

Under the Eighth Amendment, prison officials have a duty to provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish an Eighth Amendment violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (emphasis in original)). Deliberate indifference "is an 'extremely high' standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009)), and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell,* 463 F.3d 339, 345–46 (5th Cir. 2006). As to the subjective component, a prison official acts with deliberate indifference only where he (1) knows the inmate faces a substantial risk of serious harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id.*; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

A prison official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)) (alterations and internal quotation marks omitted). "[D]eliberate indifference cannot be inferred merely from negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, a prison official "must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dall. Cty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

Here, Epley has not alleged sufficient facts demonstrating that any Defendant violated his Eighth Amendment rights concerning medical care. Initially, the court notes that the video footage shows Nurse Wagner visually examined Epley immediately after the use of force occurred, and that Epley denied injury and refused to respond in English. Upon examination and asking Epley whether he had any injuries, Nurse Wagner determined that in her professional opinion, Epley did not require medical treatment. Although Epley may believe that Nurse Wagner should have examined him more thoroughly, such an allegation does not rise to the level of a cognizable constitutional claim. *See, e.g., Garcia v. Bolton*, Civil Action No. 9:17-CV-72, 2019 WL 1302001, at *5 (E.D. Tex. Jan. 23, 2019) (holding prisoner had not stated a claim for deliberate indifference

where records showed that defendant "questioned plaintiff about his injuries, evaluated his injuries, and then made the determination that no treatment was necessary," and noting that prisoner's claim constituted mere disagreement with the plan of care); *Mackey v. Cockrell*, No. Civ.A. 5:03–CV–006–C, 2003 WL 22299340, at *8 (N.D. Tex. Sept. 16, 2003) (citing *Green v. City of Montezuma*, 650 F.2d 648, 651 (5th Cir. 1981)) ("Although Plaintiff argues that Defendant Fleming should have examined him more thoroughly after the alleged use of force, he has not alleged or argued that the cursory examination was anything more than simple negligence and hence it should be dismissed for failure to state a claim."). Construed most favorably, Epley's claim amounts to nothing more than negligence, malpractice, or disagreement with treatment, which does not support a claim of deliberate indifference under § 1983. *See, e.g.*, *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (quoting *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979)) (explaining that "[m]ere negligence, neglect or medical malpractice" does not give rise to a § 1983 cause of action).

Epley also contends that after Defendants placed him in the four-person cell, he asked unnamed Doe Defendants for medical treatment as they walked by his cell, but "[t]hey walked away, some of them laughing." Questionnaire, at 7. Epley acknowledges, and the authenticated records show, that TDCJ officials transferred Epley to the TDCJ French Robertson Unit "[d]uring the morning hours of Tuesday June 07-2016," or roughly eighteen hours after the use of force. *Id.* at 8. Epley asserts that during this brief period, Montford medical staff should have examined him to "ascertain if [he] had a concussion," "referred [him] to the duty medical doctor to be transferred to a free-world hospital in case [he] had a life endangering subdural hematoma," and "provided [him] with immediate care for the brain [and] heart." *Id.* Epley further avers that prior to his transport on the prison bus, Sergeant Herrera and Doe Defendants should have obtained treatment

for him, but they "did in fact collude . . . to deny [him] much-needed medical care . . . so as to cover-up and conceal [his] severe injuries." Questionnaire, at 10–11.

As noted above, Nurse Wagner examined Epley immediately after the use of force and determined that he did not require treatment; thus, construing Epley's claim most favorably, he asserts that the Montford Unit Doe Defendants should have provided or obtained additional treatment. The claim that Montford medical personnel should have provided additional, or specialized medical care, however, amounts to a disagreement in treatment, which is not actionable. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (explaining that the question of whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Domino*, 239 F.3d at 756; *Auguillard v. Toce*, Civil Action No. 14-394-JJB-RLB, 2015 WL 5093842, at *5 (M.D. La. Aug. 27, 2015) (citing cases for support) (explaining that "a decision to refer an inmate for additional treatment, tests or evaluation is a matter of professional medical judgment that the courts will not normally second-guess in the context of a claim of deliberate medical indifference"); *Atkins v. Bradford*, No. CA C–12–331, 2012 WL 6132508, at *6 (S.D. Tex. Nov. 9, 2012) (noting prisoner's claim that officials should have taken him to the hospital because he was burned amounted to a disagreement with the treatment provided and did not state a claim for deliberate indifference).

But even analyzing Epley's allegation on its face—that Doe Defendants ignored his requests for medical care—he has not pleaded facts demonstrating that any Defendant was deliberately indifferent to a serious medical need. Epley generally contends that the Doe Defendants ignored his complaints; however, he does not specifically allege that any Defendant was subjectively aware of a substantial risk of serious harm and then ignored that risk. *See Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837). Instead, Epley claims that he

"knock[ed] at the [cell] window to get the officials' attention . . . [but they] threatened [him] with a disciplinary for touching the window." Questionnaire, at 7. In other words, Epley alleges he generally *attempted* to inform Doe Defendants that he desired additional medical care—not that he specifically communicated facts to specific individuals sufficient to give rise to a constitutional duty to respond. He also makes no allegation that on June 7, prior to his transport, his claimed injuries were obvious and that Defendants were subjectively aware of his injuries solely by reason of their visibility. *See id.* at 11, 15–16. Standing alone, Epley's allegations do not establish that any of the Doe Defendants knew of facts from which an inference of serious harm could be drawn, made such an inference, and then ignored it.[11] *See, e.g., Zimmerman v. Cutler*, 657 F. App'x 340, 348 (5th Cir. 2016) (holding that defendant could not be subjectively aware of detainee's broken arm where "fracture in [detainee's] arm was not obvious"; "[h]is only obvious injuries were the scratches on his arm"); *Lawson*, 286 F.3d at 262 (requiring that inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Moreover, Epley admits, and the records show, that he received additional medical treatment on June 10, 2016—four days after the use of force incident—at the TDCJ Lynaugh Unit. *Id.* at 8. Specifically, Lynaugh medical staff tested Epley's eye movements, checked for subjective complaints of pain (e.g., rotated Epley's shoulders), examined his nose, and prescribed pain reliever. Thus, any claim Epley *might* have against Doe Defendants at the Montford Unit would at best be for an alleged delay in treatment. A delay in treatment, however, "can only constitute an Eighth Amendment violation if there has been deliberate indifference [that] *results in substantial harm*." *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (quoting *Mendoza*, 989

---

[11] To the extent Epley asserts that his cellmates prevented him from asking for medical treatment or blocked his access to running water so that he could wash the pepper spray off, his claim is without merit. *See* Questionnaire, at 7, 9. His cellmates' alleged actions cannot serve as a foundation for establishing Defendants' purported deliberate indifference. *See, e.g., Lawson*, 286 F.3d at 262.

F.2d at 193) (emphasis added).  Such harm is a necessary element for recovering damages due to alleged delays in receiving medical treatment.  *See Rhine v. Ellison*, 537 F. App'x 410, 411 (5th Cir. 2013) (affirming dismissal of plaintiff's deliberate indifference to serious medical needs claim where he failed to allege facts showing that a delay in treatment resulted in substantial harm).  In this case, Epley pleads no facts alleging any substantial harm resulting from the alleged delay in receipt of medical treatment.  According to Epley, he suffered from pain, dizziness, and a brief loss of consciousness during the four-day period between the use of force and the date he claims he received medical treatment.  Other than these temporal complaints, he does not contend that the alleged delay in treatment caused serious harm or complications.  *See* Questionnaire, at 16 (responding that Montford Doe Defendants' actions "denied much-needed medical care for [his] serious injuries," but failing to allege any further harm as a result of the delay).  These facts, standing alone, do not demonstrate that Epley suffered any substantial harm as a result of the alleged delay.  *See, e.g.*, *King v. Kilgore*, 98 F.3d 1338, 1996 WL 556845, at *1 (5th Cir. Sept. 9, 1996) (affirming district court's dismissal of prisoner's deliberate indifference claim where prisoner failed to establish substantial harm from delay in treatment that allegedly prolonged his asthma attack, causing "him pain, suffering, and discomfort"); *Caldwell v. Furr*, Civil Action No. 2:16-CV-456, 2018 WL 7825492, at *8 (S.D. Tex. Nov. 18, 2018) (explaining that prisoner's claim for delay in treatment failed where following a use of force incident, a nurse examined prisoner and determined he could be taken to the medical department once he was no longer a security threat, but prisoner made no showing that five-day delay between examination by the nurse and medical department exacerbated his injuries from the use of force); *Jackson v. Gordy*, Civil Action No. 2:16–CV–338, 2018 WL 1156013, at *12–13 (S.D. Tex. Jan. 8, 2018) (concluding prisoner

had failed to provide competent summary judgment evidence showing he was substantially harmed by a three-week delay between time of injury and surgery).

Ultimately, Epley concedes, and the authenticated records confirm, that Nurse Wagner examined him immediately after the incident and he subsequently received treatment at the Lynaugh Unit.  Questionnaire, at 8.  As such, Epley has failed to state a non-frivolous claim for delayed medical treatment resulting in substantial harm.  *See McDonald v. City of Dall.*, No. 3:16-CV-2354-M-BK, 2016 WL 7839342, at *3 (N.D. Tex. Dec. 19, 2016) (recommending dismissal of plaintiff's delay in treatment claim because his "failure to allege the requisite substantial harm proves fatal").

**F.      Epley has failed to state a cognizable constitutional claim against Defendants for allegedly falsifying documents.**

Epley alleges that Defendants "intentionally enter[ed] false information in [his] medical records to conceal/suppress the injuries [he] had sustained" during the June 6 incident.[12]  Am. Compl., at 22.  To the extent Epley contends that all the Montford Unit Defendants falsified documents, including medical records, in violation of his rights, Epley has not stated a viable constitutional claim.

Epley does not explain how he believes the records were falsified, nor does he plead facts indicating how such alleged falsification violated his constitutional rights.  *See id.*  For this reason alone, his claim should be dismissed.  *See, e.g., Gravely v. Speranza*, 219 F. App'x 213, 215 (3d Cir. 2007) (affirming dismissal of prisoner's claim for falsification of documents in part because prisoner "did not give any indication as to what documents he believed were falsified or how their

---

[12] In his Amended Complaint, Epley also seems to assert a claim against the Robertson Unit Doe Defendants for falsifying documents (although he did not so allege in his questionnaire responses).  *See* Am. Compl., at 24–25.  He further alleges that Defendants Ward, Martinez, Blalock, Steve Massie, Bell, Schillaci, Tisdale, Morrell, Howell, and Attorney General Paxton falsified documents.  *See id.* at 3–16.  For the reasons explained above, these claims should also be dismissed.

25

alleged falsification violated his constitutional rights"); *Deal v. Dep't of Corrs.*, Civil Action No.: 15-00534-BAJ-EWD2017 WL 6566198, at *4 (M.D. La. Dec. 22, 2017) (dismissing on summary judgment prisoner's claim that defendants falsified documents to divert blame where prisoner did not provide "any competent evidence to support his charge that prison documents were falsified"). More importantly, falsifying prison records does not violate the Constitution. *See Henderson v. Buttross*, A-17-CV-436-LY, 2017 WL 2391806, at *3 (W.D. Tex. June 2, 2017) (noting falsification of documents is not a constitutional violation and cannot support a § 1983 claim); *Fountain v. Thaler*, Civil Action No. 6:13cv958, 2015 WL 5168775, at *11 (E.D. Tex. Sept. 2, 2015) (citing *Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986)) (dismissing prisoner's claim that defendants falsified grievances because such action does not violate the Constitution). Thus, the district court should dismiss Epley's claims.

## G.   Epley has not pleaded facts demonstrating that Defendants engaged in a conspiracy to violate his constitutional rights.

Epley alleges that all Defendants named in his Amended Complaint, including Defendants the court severed and transferred to the appropriate divisions, engaged in a conspiracy to harm him. Epley claims that Defendants conspired together to prevent him from filing a § 1983 lawsuit he intended to file concerning religious rights. Questionnaire, at 24–25. Specifically, Epley avers that he practices "an ancient European Nature-based religion," and he planned to file a lawsuit "to have the prisoners to be able to grow their cranial hairs long, to address very important spiritual needs for those who practice Nature-based religions." *Id.* After TDCJ officials discovered that he planned to file a § 1983 lawsuit based on the alleged denial of religious freedom, Epley claims that officials transferred him from the Ramsey Unit to the Lynaugh Unit, and then subsequently moved him to the Montford Unit, where it would be easier to "violate[] the medical order giving [him] the protection of the single-cell medical restriction . . . ." *Id.* at 23, 25. Epley asserts that the

Montford Unit Defendants participated in the alleged conspiracy by using force against him, denying him medical treatment, housing him with African-American prisoners who victimized him, and allowing him to be transported to the Robertson Unit without medical treatment. *Id.* These acts, Epley posits, were part of an orchestrated effort between TDCJ officials across the state to dissuade him from filing the lawsuit. *See id.* at 22.

To establish a conspiracy under § 1983, a plaintiff must show that the defendants had an agreement to commit an illegal act, which resulted in injury to the plaintiff. *See Hay v. City of Irving*, 893 F.2d 796, 799 (5th Cir. 1990). "The elements of civil conspiracy are (1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right." *Kerr v. Lyford*, 171 F.3d 330, 340 (5th Cir. 1999), *abrogated on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003). Mere conclusory allegations of conspiracy, absent reference to material facts, cannot constitute grounds for § 1983 relief. *Holdiness v. Stroud*, 808 F.2d 417, 424 (5th Cir. 1987). Without an underlying § 1983 violation, no actionable conspiracy claim exists. *Kerr*, 171 F.3d at 341–42.

Epley has wholly failed to plead facts showing Defendants acted in concert with the specific intent to deprive him of a constitutional right. Epley makes conclusory allegations that Defendants conspired "to prevent [him] from filing [his] religious lawsuit." Questionnaire, at 22. According to Epley, Defendants "calculated that severely injuring [him] would further impair [his] ability to litigate" because "[o]nce survival is the main issue for a prisoner, litigating a religious lawsuit is no longer possible." *Id.* Stated differently, Epley claims that the Montford Defendants used force against him in an attempt to prevent him from filing a § 1983 claim based on the denial of religious freedom. *See id.*

The facts as alleged do not show that the Montford Defendants committed an actual violation of a constitutionally protected right—the first necessary element of a conspiracy claim. Prisoners have a constitutionally protected right of access to the courts, including the filing of a § 1983 lawsuit. *See Brewer v. Wilkinson*, 3 F.3d 816, 820–21 (5th Cir. 1993). In this case, however, Epley does not allege that Defendants actually prevented him from filing a § 1983 lawsuit—for example, by denying him pens and paper or by refusing to mail his complaint.[13] *See Bounds v. Smith*, 430 U.S. 817, 824 (1977) ("It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, and with stamps to mail them."); *see also* Questionnaire, at 24 (alleging that the conspiracy harmed him in several ways, but not listing that Defendants prevented him from filing a lawsuit). Epley instead argues that he would have filed a lawsuit, but Defendants' alleged use of force—which he believes is one act in a larger conspiracy to harm him—dissuaded him from doing so. Questionnaire, at 22. Epley's failure to plead actual injury is fatal to his conspiracy claim—i.e., he has not demonstrated an actual violation of a constitutionally protected right.[14] *See, e.g., Lewis*, 518 U.S. at 355 (explaining that a plaintiff alleging a denial of the right to access the courts must plead actual harm); *Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir. 1984) (holding that there must be an actual deprivation of a constitutional right; the mere conspiracy to deprive a plaintiff of a constitutional right is insufficient). Moreover, the court has already determined that Epley has not established that the Montford Unit Defendants used excessive force against him.

---

[13] To the extent Epley's claim may be interpreted as a standalone claim for denial of access to the courts, such claim should also be dismissed for the same reason. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 355 (1996) (explaining that a plaintiff alleging a denial of the right to access the courts must plead actual harm). Moreover, Epley has not alleged any facts demonstrating that Montford Unit Defendants denied him access to the courts. *See* Am. Compl., at 44.

[14] The court also notes that Epley has been fully able to prosecute his claims in this lawsuit, through the filing of an original and Amended Complaint, as well as numerous other filings. The fact this complaint is presently before the court negates any possible finding that actions of the Defendants somehow prevented him from pursuing his religious freedom claim.

Thus, Epley cannot establish the first element based on an alleged conspiracy to use force against him.

Alternatively, even if Epley had pleaded facts satisfying the first element, he has not shown that Defendants acted in concert. Epley generally alleges that the Montford Unit Defendants participated in an overarching conspiracy between persons at multiple TDCJ units. *See* Am. Compl., at 24. He pleads no facts, however, supporting the presence of an agreement between the Montford Defendants and others, or that they ever met to discuss Epley's transfer from the Ramsey Unit *and* their purported scheme to harm him. *See Leggett v. Williams*, 277 F. App'x 498, 501 (5th Cir. 2008) (holding that magistrate judge did not err in dismissing prisoner's conspiracy claim in part because prisoner failed to plead facts showing that defendants entered into an agreement to deprive him of his property); *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir. 1979) ("In order to establish a cause of action based on conspiracy, plaintiff must show that the defendants agreed to commit an illegal act."). He merely asserts a personal belief that the alleged harm stems from a large conspiracy, which is insufficient to establish the existence of a conspiracy. Questionnaire, at 23–25. "Mere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy under 42 U.S.C.A. § 1983." *See Leggett*, 277 F. App'x at 501 (quoting *Hale v. Harney*, 786 F.2d 688, 690 (5th Cir. 1986)).

In the "Causes of Action" section of Epley's Amended Complaint, he also lists a conspiracy claim pursuant to 42 U.S.C. §§ 1985 and 1986. Am. Compl., at 48. Although Epley does not specify, the court construes Epley's complaint as asserting a claim under § 1985(3), which provides the following:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing

or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Under the foregoing statute, "[a] plaintiff must show membership in some group with inherited or immutable characteristics . . . or that the discrimination resulted from the plaintiff's political beliefs or associations." *Flander v. Kforce, Inc.*, 526 F. App'x 364, 369 (5th Cir. 2013) (per curiam) (quoting *Galloway v. Louisiana*, 817 F.2d 1154, 1159 (5th Cir.1987)). Even assuming that Epley is a member of a protected class—through his religion or allegation that he is disabled—Epley has not alleged that Defendants engaged in a conspiracy to harm him based on his membership in a protected class. *See* Questionnaire, at 24–25 (alleging that Defendants conspired to prevent him from filing a § 1983 lawsuit based on the alleged denial of religious freedom—not that they intended to discriminate based solely on his religion). Thus, the court also finds that he has not stated a viable conspiracy claim under § 1985.

Correspondingly, Epley cannot state a claim under § 1986, which provides for recovery against anyone "who, having knowledge that [a § 1985 conspiracy] is about to be committed," does nothing about it, because there can be no liability under § 1986 without first establishing a § 1985 conspiracy. Accordingly, the undersigned recommends that the district judge dismiss all of Epley's §§ 1983, 1985, and 1986 conspiracy claims.

**H.     Epley pleads no facts demonstrating Defendants violated his due process rights.**

Epley contends that the Montford Unit Defendants violated his due process rights by denying him the opportunity to be heard[15] by:  (1) a psychiatrist; (2) security and medical staff members; and (3) the courts.   Questionnaire, at 25–26.   Epley avers that, if Defendants had permitted him to be evaluated by a psychiatrist, the use of force could have been avoided.  *Id.* at 25.  Epley similarly claims that had Defendants permitted him to speak with security and staff members, he would have received medical treatment.  *Id.* at 26.  Finally, he again claims that the use of force prevented him from pursuing legal claims.  *Id.*

Although unclear, Epley seems to allege that the denial of these avenues of communication violated his due process rights.  Epley does not specify whether he intends to bring a substantive or procedural due process claim.   Under either component, however, Epley has failed to plead any facts demonstrating a violation.   To trigger federal substantive due process protection, a prisoner must show the deprivation of a constitutionally protected right and that the governmental deprivation was not "rationally related to a legitimate governmental interest."  *Mikeska v. City of Galveston*, 451 F.3d 376, 379 (5th Cir. 2006).   Where a deprivation imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," a prisoner can state a viable substantive due process claim.  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  *Sandin* makes clear that punishments impacting the duration of a prisoner's confinement or that exceed the expectation of a sentence in an extreme way can give rise to due process protection.  *See id.*  The alleged denial of the opportunity to see a psychiatrist or other medical staff, or to access the courts,

---

[15] Epley uses the word "heard" in a futile attempt to fit his claim within the due process framework.  In reality, Epley conflates "heard" with examined or seen.  *See, e.g.*, Questionnaire, at 25 ("I was denied the opportunity to be heard in a meaningful manner by a psychiatrist. . . . The officials I was able to speak to were not qualified medical personnel. If they were, the Use of Force would not have occurred.").  The court will nevertheless examine Epley's claim within the due process framework.

however, does not, standing alone, amount to action that infringes on a constitutionally protected liberty interest. *See generally Triplett v. Fed. Bureau of Prisons*, No. 3:08-CV-1252-K ECF, 2008 WL 4378430, at *3 (N.D. Tex. Sept. 25, 2008) (compiling cases addressing deprivations not protected by due process, including loss of commissary and telephone privileges, changes in custodial classification, loss of prison employment, housing in an undesired prison facility, and imposition of a restriction that potentially adversely affects parole). Simply put, although Epley believes he "[has] the right to report [his] psychiatric medical restriction [allegedly, a single-cell restriction] to qualified medical personnel" before being placed in a cell (Questionnaire, at 25), such action is not constitutionally protected.

Similarly, Epley has not pleaded facts stating a procedural due process claim. Epley alleges that Defendants denied him the opportunity to be heard by medical staff prior to placement in a four-person cell. *See* Questionnaire, at 25–26. Epley is not entitled to a hearing prior to such placement. *See Meachum v. Fano*, 427 U.S. 215, 225–26 (1976) (explaining that "given a valid conviction, a criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution"); *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990) (citing *Wilkerson v. Maggio*, 703 F.2d 909, 911 (5th Cir. 1983)) ("Classification of prisoners is a matter left to the discretion of prison officials."); *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.").

In effect, Epley restates his First and Eighth Amendment claims, framing them as due process violations[16]; such claims are not proper under the Due Process Clause. Accordingly, the district court should dismiss Epley's due process claim.

**I.      Epley fails to plead facts showing that Defendants retaliated against him in violation of the Constitution.**

Epley generally alleges that Sergeant Herrera and Montford and Robertson Unit Doe Defendants retaliated against him. *See* Am. Compl., at 3; Questionnaire, at 21–22. Despite the court's efforts, through the use of a questionnaire, to understand the basis for Epley's retaliation claim, Epley provided incoherent and vague assertions to support his claim. *See, e.g.,* Questionnaire, at 22 (In response to the court's question asking why he believes Defendants retaliated against him, Epley responded, "All the defendants retaliated for the same underlying reason whether or not they knew the reason. The Texas prison officials use a particular form of communication to skirt being held liable. . . . [T]he officials use their positions and influences to cause harm and difficulties because they know that it is what they are expected to do. They 'back-up the team', because they need the 'team to back-them-up', so to speak. It is called: 'Going with the grey', in prison lingo."). The court reads Epley's Amended Complaint and questionnaire responses as alleging two distinct retaliation claims: (1) Defendants used force in retaliation for Epley's desire to file a religious lawsuit; and (2) Defendants retaliated through verbal threats and insults because Epley requested medical treatment.[17] *See* Am. Compl., at 3; Questionnaire, at 22 ¶ 10.b. (In response to court's question asking why Epley believed Defendants retaliated against him, Epley responded, "The goal of the conspiracy was to prevent me from filing my religious lawsuit."), ¶ 10.a. ("Based on Sergeant Herrera's conduct, demeanor, tone of voice . . . it is clear

---

[16] As the court has already discussed, Epley fails to plead facts demonstrating a claim based on either.

[17] To the extent Epley contends that Defendants denied him medical treatment, his claim is addressed in Section II.E.

to me that the night time Does [sic] Defendants . . . had informed Sergeant Herrera that I had made repeated efforts to obtain much-needed medical care.  Sergeant Herrera wanted to punish me (e.g., ridicule, insults, threats . . .) for having had the audacity to ask for medical-care . . . .").  Because Epley's assertions are not clear, however, the court also considers whether Defendants' alleged denial of medical care was in retaliation for Epley's plan to file a lawsuit.

A plaintiff must demonstrate the following to establish a claim for retaliation:  "(1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation."  *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 863 (5th Cir. 2004) (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)).  "The inmate must allege more than his personal belief that he is the victim of retaliation."  *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (citing *Johnson v. Rodriguez*, 110 F.3d 225, 231 (5th Cir. 1998)).  "To substantiate a claim of retaliation, '[t]he inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.'"  *Haddix v. Kerss*, 203 F. App'x 551, 554 (5th Cir. 2006) (quoting *Woods*, 60 F.3d at 1166).  A prisoner's conclusory allegations are insufficient to support a retaliation claim.  *Jones*, 188 F.3d at 325.

Epley has not alleged facts demonstrating the elements necessary to state a retaliation claim.  He has not alleged any facts showing that Defendants intended to retaliate against him, nor has he established the requisite "but for" causation.  Other than his personal belief that Defendants retaliated, he has asserted no facts indicating that Defendants intended to retaliate.  With respect to Epley's claim that Defendants used force in retaliation for Epley's planned religious lawsuit, as discussed above the authenticated video footage shows that Defendants used force only after Epley refused to comply with multiple orders to accept housing and submit to a strip search and hand

34

restraints. Where an inmate threatens the order and security of an institution, some degree of force is justified to gain compliance. *See, e.g.*, *Soto*, 744 F.2d at 1267. Although Epley attempts to connect officials' alleged discovery of his plan to file a § 1983 lawsuit to the June 6 incident, "temporal proximity alone is insufficient to prove but for causation." *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007); *see Enlow v. Tishomingo Cty.*, 45 F.3d 885, 889 (5th Cir. 1995) (explaining that a "sequence of events, by itself, does not amount to a reasonable inference of retaliatory intent"). The subsequent alleged denial of medical care post-use of force similarly fails to establish a causal connection to the planned lawsuit. In sum, Epley has not alleged facts connecting the two events, i.e., showing that the alleged force or lack of medical treatment would not have occurred absent Defendants' purported retaliatory motive.

Similarly, Epley's claim that Sergeant Herrera and Doe Defendants retaliated against him for requesting medical treatment is without merit. As analyzed above, Epley pleaded no facts showing Defendants were subjectively aware of his alleged need for medical care. Moreover, the alleged retaliatory act—Sergeant Herrera "ridicule[d], insult[ed], [and] threat[ened] Epley"— cannot form the basis of a constitutional retaliation claim. *See Morris v. Powell*, 449 F.3d 682, 684–85 (5th Cir. 2006) (holding that a prisoner must allege more than a *de minimis* adverse act to state a viable retaliation claim); *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993) ("Mere allegations of verbal abuse do not present actionable claims under § 1983."); *Gonzales v. Currie*, Civil Action No. 2:13–CV–201, 2014 WL 222353, at *5 (S.D. Tex. Jan. 21, 2014) (adopting magistrate judge's recommendation that prisoner's retaliation claim be dismissed, where the retaliatory adverse act prisoner alleged—"a verbal reprimand and five days loss of recreation"— amounted to an unactionable, *de minimis* injury).

For these reasons, Epley has failed to state a claim for retaliation under § 1983 against Defendants. *See, e.g., Daley v. Micieli*, Civil Action No. 2:11–cv–2010, 2014 WL 6388517, at *4–5 (W.D. La. May 21, 2014) (recommending dismissal of prisoner's retaliation claim where allegation that defendant put him in an area so another inmate could attack him after prisoner reported defendant's illegal actions to supervisors, standing alone, amounted to only a subjective belief of motive); *Thompson v. Dukes*, Civil No. 7:08–CV–090–O, 2011 WL 4702471, at *3 (N.D. Tex. Sept. 30, 2011) (dismissing prisoner's retaliation claim where, "[a]lthough he was given ample opportunity to set forth the facts underlying his complaint," prisoner did not "allege any scenario which could show that, but for a retaliatory motive, in retaliation for exercising a constitutional right, the incidents of which he complains would not have occurred"). The district court should dismiss Epley's retaliation claims.

**J.      Epley has not pleaded facts demonstrating any Montford Unit or Robertson Unit Doe Defendants violated his constitutional rights.**

Epley makes a variety of claims against Doe Defendants at the Montford and Robertson Units. To whatever degree the court has not expressly addressed such claims above, it does so now. Epley avers that on June 7, 2016, an unknown male bus driver, who transported Epley from Montford to the Robertson Unit, advised a Doe Robertson Unit nurse not to provide Epley with any medical care for his alleged injuries. Questionnaire, at 17–18. He further asserts that the Doe bus driver "had the legal duty to ensure that [Epley] was fit to board his bus for the transfer to Robertson," but failed to do so. *Id.* at 18. Finally, Epley alleges that certain Robertson Unit Doe Defendants "denied food to aliment [him]self." *Id.* at 19–20.

To the extent Epley alleges that the Doe bus driver's actions constituted deliberate indifference to his serious medical needs, he has not stated a claim. Epley pleads no facts showing that the Doe bus driver was qualified to provide medical care, and the mere allegation that the Doe

36

bus driver verbally advised a nurse to deny treatment does not violate the Eighth Amendment. Moreover, the records, which Epley filed as a supplemental document (ECF No. 54), reflect that the Robertson Unit nurse examined Epley, noting that he denied "homicidal/suicidal ideations, hunger strike and any wound care needs." The medical record reflects that in the nurse's opinion, Epley did not require any treatment. Based on these facts, Epley has not stated a claim for deliberate indifference. *See generally Dickerson v. Murray*, Civil Action No. 3:11-CV-200, 2014 WL 12526722, at *2 (S.D. Tex. Jan. 15, 2014) ("As long as medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional right, even though the prisoner may disagree with the course of treatment."); *McGiffin v. Curry*, Civil Action H–07–1179, 2009 WL 10703961, at *8 (S.D. Tex. Oct. 30, 2009) (finding prisoner had not established an Eighth Amendment claim because the records showed he received medical treatment).

In addition, Epley's claim that Robertson Unit Doe Defendants did not provide him with adequate meals is also without merit. Prisons are required to serve well-balanced meals containing sufficient nutritional value to sustain health. *See, e.g.*, *Berry*, 192 F.3d at 507. Meals need not, however, be elaborate or satisfying. *See George v. King*, 837 F.2d 705, 707 (5th Cir. 1988). Deprivation of food constitutes cruel and unusual punishment only when an inmate is denied "the minimal civilized measure of life's necessities." *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Whether denial of food establishes a constitutional violation depends upon the amount and duration of the alleged deprivation; in general, only a "continuous and substantial denial of food" will suffice. *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998).

Initially, the court notes that Epley's allegations are general and do not describe whether officials denied him all meals or only certain meals. Nevertheless, in analyzing Epley's claim, the court assumes as true, as the court must at this stage of litigation, Epley's allegation that Robertson Doe Defendants denied him "access to food to aliment [him]self." Questionnaire, at 21. The records and Epley's pleadings show that officials housed him at the Robertson Unit for only two days. Moreover, Epley does not allege he suffered any harm as a result of the alleged denial of food. *See id.* (In response to court's question that Epley "[d]escribe, including specific facts, how [he was] harmed by" Doe Defendants, Epley merely responded that they "denied access to food."). The alleged denial of all meals for two days, standing alone, does not violate the Constitution. *See Berry*, 192 F.3d at 508 (affirming district court's dismissal of prisoner's claim that he missed several meals where prisoner did not allege any specific physical harm, including weight loss or other adverse physical effects); *see also Lockamy v. Rodriguez*, 403 F. App'x 950, 951 (5th Cir. 2010) (affirming summary judgment dismissal of prisoner's claim that defendant denied him every meal during a 54-hour period, where prisoner did not present any evidence showing he suffered physical injury as a result of the denial). Accordingly, the district court should dismiss Epley's claims against the Doe Defendants.

**K.      Epley has not alleged viable constitutional claims against Warden Stevens, K. Ward, C. Martinez, M. Blalock, Steve Massie, Katheryn Bell, Maggie Schillaci, Zeke Tisdale, Nicholas Morrell, Sharon Howell, Does with the "Step 2 Medical Grievance Program," and Does in the State Classification Committee.**

Epley alleges that he filed grievances related to the June 6 incident, which Warden Stevens reviewed and signed. Am. Compl., at 23. Epley argues that Warden Stevens's review of, but failure to take any action on, such grievances evidences not only Stevens's personal involvement in the alleged constitutional violations, but also his tacit approval of same. Questionnaire, at 12–13. Epley further asserts that Warden Stevens failed to properly train his employees and

implemented an informal policy of: permitting unconstitutional uses of force; ignoring prisoners' medical complaints; and failing to protect prisoners. Am. Compl., at 23; Questionnaire, at 13–15.

Similarly, Epley contends that K. Ward, C. Martinez, M. Blalock, Steve Massie, and Does with the "Step 2 Medical Grievance Program" violated his constitutional rights when they reviewed his grievances and failed to remedy the alleged wrongs. *See* Am. Compl., at 39–42. Epley also claims that Katheryn Bell and Maggie Schillaci, "both supervisors with the TDCJ Office of the Administrative Monitor for Use of Force," denied his requests for a copy of the use of force video. *Id.* at 42. Further, Epley asserts that Zeke Tisdale, Nicholas Morrell, and Sharon Howell knowingly made false entries in his records, failed to take corrective action against Defendants, helped to conceal the alleged violations against Epley by refusing to provide him with a copy of the use of force video, and failed to adequately train TDCJ staff. *Id.* at 45. Finally, Epley avers that Does in the State Classification Committee violated his rights by transferring him to another TDCJ unit to harm him and in retaliation for planning file a § 1983 lawsuit. *See id.* at 43–44.

### 1. *Epley's claim against Warden Stevens should be dismissed because the law does not impose vicarious liability under § 1983 for the actions of subordinates, and Epley has not alleged sufficient facts to state a claim based on an unconstitutional policy.*

To the extent Epley alleges Warden Stevens is responsible for the actions of his subordinates, his claim must be dismissed. A supervisory official is not liable for the acts of his subordinates unless: (1) he affirmatively participated in an act that caused a constitutional deprivation, or (2) he implemented an unconstitutional policy that resulted in injury to the plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)). A prisoner must sufficiently allege facts showing either personal involvement or implementation of an unconstitutional policy to make a supervisor responsible

under § 1983, as prison supervisors "are not liable for the actions of their subordinates on any theory of vicarious liability." *Thompkins*, 828 F.2d at 303.

At the outset, the court notes that Epley has not stated a viable constitutional claim; thus, he cannot state a claim for supervisory liability. *See Mouille*, 977 F.2d at 929. Even assuming he alleged a constitutional violation, however, Epley has not asserted a non-frivolous claim against Warden Stevens based on supervisory liability. In his Amended Complaint, Epley contends that Warden Stevens "[l]earned of the violations of [his] rights, when he viewed the video as he must have done, when he read my grievances - which he signed - . . . and failed to take the necessary corrective actions." Am. Compl., at 23. Epley concedes that he never spoke directly with Warden Stevens; Epley instead claims that the Warden reviewed his grievances and failed to properly investigate the June 6 incident, which is insufficient to establish personal involvement. *See* Questionnaire, at 12–13. Based upon these facts, Epley has not pleaded a viable supervisory liability claim because he has not demonstrated Stevens was personally involved in any of the alleged constitutional violations. *See, e.g.*, *Whitlock v. Stephens*, Civil Action No. 5:14cv94, 2016 WL 11474208, at *5 (E.D. Tex. Oct. 5, 2016) (stating that prisoner "cannot use the grievance process to impute personal liability," where prisoner merely alleged that the warden investigated and signed prisoner's grievance); *Marquez v. Quarterman*, 652 F. Supp. 2d 785, 790 (E.D. Tex. 2009) ("The Plaintiff does not have a basis for a civil rights lawsuit against [defendant] just because he denied the Plaintiff's Step 2 grievance."); *Lueck v. Wathen*, 262 F. Supp. 2d 690, 696 (N.D. Tex. 2003) (citing *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983)) (explaining that prisoner's claim against assistant warden, who served on prison grievance committee and allegedly wrongfully denied prisoner's grievance, failed to state a claim where prisoner did not allege

40

warden was personally involved in any constitutional violation, as "[p]ersonal involvement is an essential element in a civil rights action").

Similarly, Epley has not stated a non-frivolous claim against Warden Stevens based on the alleged implementation of an unconstitutional policy or for his alleged failure to train his employees.  To establish a claim against Warden Stevens based on his alleged failure to train, Epley must show:  "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."  *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998) (citing *Hinshaw v. Doffer*, 785 F.2d 1260, 1263 (5th Cir. 1986)).  For a plaintiff to prevail, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Walker v. Upshaw*, 515 F. App'x 334, 340 (5th Cir. 2013) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.* (quoting *Connick*, 563 U.S. at 62).

Here, Epley pleads no facts showing a pattern of unconstitutional conduct such that Warden Stevens can be said to have been deliberately indifferent.  Epley makes conclusory allegations that do not allege a pattern of conduct, but rather relate to a single discrete incident—the June 6 use of force and subsequent alleged denial of medical care.  *See* Questionnaire, at 14.  Accordingly, Epley's claim against Warden Stevens based on his failure to train should be dismissed.  *See, e.g.*, *Walker*, 515 F. App'x at 340–41 (reversing the district court's judgment and rendering judgment in favor of defendant where "[p]laintiffs [made] no attempt to show a pattern of [defendant's] employees failing to protect inmates"); *Bohannan v. Doe*, 527 F. App'x 283, 300 (5th Cir. 2013)

(affirming dismissal of plaintiff's failure to train claim where plaintiff relied "on his specific injury, i.e., single-incident liability," instead of alleging a pattern of conduct, which was insufficient to impose liability); *see also Wagner v. Tex. Dep't of Criminal Justice*, Civil Action No. 1:15-CV-177-BL, 2018 WL 2074142, at *6 (N.D. Tex. May 3, 2018) (dismissing prisoner's failure to train claim where he had not alleged sufficient facts to state a "causal connection between any failure to train and the deprivation of a constitutional right").

Similarly, Epley has not pleaded facts demonstrating that Warden Stevens implemented an unconstitutional policy. "Supervisory liability may exist under § 1983 'without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.'" *Brown v. Cain*, 546 F. App'x 471, 475 (5th Cir. 2013) (quoting *Thompkins*, 828 F.2d at 304). To establish such a claim, Epley must show "(1) that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the [agency's] policymakers with deliberate indifference as to its known or obvious consequences." *Walker*, 513 F. App'x at 339 (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004)). Like a claim for failure to train, Epley must establish "at least a pattern of similar violations." *Id.* at 341 (quoting *Johnson*, 379 F.3d at 309).

Epley pleads a single instance—not a pattern—of violations. Indeed, Epley asserts that the Warden's alleged "fail[ure] to discipline the Montford-based defendants" following the June 6 incident demonstrates his tacit support of staff committing constitutional violations. Questionnaire, at 13. But Epley does not argue that other Montford Unit prisoners' constitutional rights were similarly violated; rather, Epley contends that his constitutional rights were violated

42

on one occasion by select employees at the Montford Unit.  In effect, Epley's allegation that Warden Stevens's alleged policy "created a context in which defendants felt they were tacitly authorized to violate [his] constitutional rights" does "no more than present 'legal conclusion[s] couched as . . . factual allegations.'"  *Terry v. Le Blanc*, 479 F. App'x 644, 646 (5th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)); *see Rivera v. Salazar*, 166 F. App'x 704, 706 (5th Cir. 2005) (affirming district court's dismissal of prisoner's claim against wardens where although prisoner alleged wardens' system permitted officers to engage in misconduct without discipline, prisoner did not plead facts showing a history of complaints by other prisoners, nor did he describe the alleged unconstitutional policy or practices).

Because Epley has not alleged facts demonstrating that Warden Stevens:  (1) personally participated in any constitutional violation;  (2) failed to properly train his employees; or (3) implemented an unconstitutional policy that was the moving force behind Epley's alleged constitutional harm, the district court should dismiss such claims against Warden Stevens.

### 2.  *Epley has not alleged facts demonstrating that Defendants Ward, Martinez, Blalock, Massie, or Does with the "Step 2 Medical Grievance Program" were personally involved in a violation of his constitutional rights.*

Epley's claim against Defendants Ward, Martinez, Blalock, Massie, and Does with the "Step 2 Medical Grievance Program" stems solely from his allegation that they reviewed his grievances but did nothing to correct the alleged violations of his rights. Am. Compl., at 39–42 (asserting that Defendants participated in alleged constitutional violations, created a policy of harm, and failed to adequately train subordinates solely by reason of issuing adverse responses to Epley's grievances).  His claims against these Defendants fail for multiple reasons.

First, Epley does not have a constitutional right to have grievances resolved to his satisfaction. *See, e.g.*, *Garrett v. Stephens*, 675 F. App'x 444, 447 (5th Cir. 2017) (citing *Geiger*

*v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005)) (explaining that a prisoner "does not have a constitutional right to have grievances resolved in his favor or to have his claims reviewed per a grievance process that is responsive to his perceived injustices; thus, the denials of his grievances do not implicate his constitutional rights or give rise to a § 1983 claim against [defendant]"); *Dugas v. Cain*, Civil Action No. 09–0177–BAJ–CN, 2010 WL 4695313, at *5 (M.D. La. Oct. 20, 2010) (finding that "any claim regarding the alleged failure of the defendants to properly address, investigate or respond to [prisoner's] complaints or administrative grievances regarding his medical care is without legal foundation"). Moreover, the review and denial of a grievance, without more, cannot form the required basis for personal involvement in an alleged constitutional violation, nor can it support the conclusion that Defendants created or enforced a policy that resulted in a constitutional deprivation. For example, in *Garrett v. Sulser*, a prisoner alleged that the defendant's "refusal to 'properly investigate' these Step II medical grievances creates policies and procedures of deliberate indifference to his serious medical needs." Civil Action No. 6:17cv310, 2018 WL 1192996, at *5 (E.D. Tex. Mar. 7, 2018). The court rejected prisoner's argument, explaining that a prisoner "cannot evade the holding in *Geiger* simply by casting his complaint regarding the denial of his medical grievances—or dissatisfaction with the outcome of his grievances—in the form of a claim of personal involvement by [defendant] through her failure to act on [prisoner's] grievances in a way that [he] believed appropriate." *Id.* The court further rejected prisoner's conclusory allegation that the defendant's denial of grievances demonstrated a policy of deliberate indifference, noting that the prisoner had not articulated a *specific* policy the defendant "created or enforced that resulted in a constitutional deprivation"; instead, the prisoner "simply point[ed] to the denial of his grievances as evidence of a custom or policy of deliberate indifference." *Id.* Just as in *Garrett*, Epley's conclusory allegations that Defendants' denial of

grievances evidenced both their personal involvement and a policy of deliberate indifference do not withstand pretrial screening. *See id.*; *see also Martinez v. Stephens*, Civil Action No. H–16–0195, 2017 WL 607129, at *3 (S.D. Tex. Feb. 15, 2017) (noting that "[t]he Fifth Circuit Court of Appeals has not held that the signing of a response to a grievance constitutes 'personal involvement' for purposes of section 1983"); *Whitlock*, 2016 WL 11474208, at *13 (rejecting prisoner's argument that defendants personally participated in illegal policy where "the fact [prisoner] wrote letters complaining about perceived violations does not give the recipients of these letters a constitutional duty to take the action Plaintiff believed appropriate").

### 3. *Epley has not stated a cognizable claim against Does with the State Classification Committee.*

Epley asserts that Doe Defendants with the State Classification Committee (SCC) transferred him to the Lynaugh Unit to further harm him after he allegedly suffered injury at the Montford Unit. Am. Compl., at 43. Specifically, Epley alleges that he wrote a grievance concerning his treatment at the Montford Unit, and despite "ha[ving] in their records all the information" in his grievance, the SCC Does transferred him in deliberate indifference to his health and safety. *Id.* at 43–44. Epley further contends that the SCC Does transferred him to the Lynaugh Unit in retaliation for "express[ing] the desire, in the Ramsey prison law library, to file a religious lawsuit in the Houston federal court." *Id.* at 44.

To the extent Epley complains that the SCC Does should not have transferred him to a particular TDCJ unit due to his health, Epley has not stated a claim. Epley possesses no constitutional right to housing in a particular institution within TDCJ. *Meachum*, 427 U.S. at 224 (stating that "[t]he Constitution does not . . . guarantee that the convicted prisoner will be placed in any particular prison"); *Boudreaux v. Foti*, No. 95-30217, 1995 WL 581982, at *1 (5th Cir. Sept. 26, 1995) (citing *Maddox v. Thomas*, 671 F.2d 949, 950 (5th Cir. 1982)) ("An inmate

generally has no constitutional right to be imprisoned in any particular institution, even if life in one institution is less desirable."); *Lerma v. Savage*, 534 F. Supp. 462, 469 (S.D. Tex. 1982) (explaining that prisoners have no right to housing assignment at a particular TDCJ facility, and classification of prisoners is a discretionary function of TDCJ officials).

To the extent Epley alleges that the SCC Does transferred him in retaliation for "expressing a desire" to file a § 1983 complaint, he likewise fails to state a claim. As discussed in Sections II.I. and G. above, Epley has not alleged that he *actually* filed a lawsuit concerning his religious rights—he merely wished to file one. Epley did not engage in constitutionally protected activity and therefore cannot establish the first element of a retaliation claim. *See, e.g., Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997) (quoting *Emplanar, Inc. v. Marsh*, 11 F.3d 1284, 1296 (5th Cir. 1994)) (observing that prisoners must show that they "engaged in constitutionally protected litigation activity," that defendants took retaliatory adverse action because of that activity, and "that such action was taken 'in an effort to chill [prisoners'] access to the courts or to punish them for having brought suit'"). Second, Epley has pleaded no facts showing that SCC Does intended to retaliate against him, nor has he demonstrated that they took a retaliatory adverse act. Standing alone, Epley's assertion that SCC Does transferred him to another TDCJ facility does not amount to an adverse act. *See, e.g., Reeves v. Wood*, 206 F. App'x 368, 369 (5th Cir. 2006) (noting that temporal proximity between the constitutionally protected activity and the alleged retaliatory adverse act is "insufficient to establish an improper retaliatory motive"); *Johnson v. Thaler*, Civil Action No. 9:11cv8, 2011 WL 2922168, at *10 (E.D. Tex. May 27, 2011) (dismissing prisoner's retaliation claim where he offered nothing beyond conclusory allegations showing that defendants transferred him to another unit for filing grievances). Stated differently, Epley has not pleaded facts showing that his transfer to another unit would not have occurred but

for SCC Does' retaliatory motive.[18] Ultimately, Epley's subjective belief that he is the victim of retaliation is insufficient to support a claim. *See Johnson*, 110 F.3d at 310 (quoting *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995)).

**L.      Epley has not stated a cognizable claim against Attorney General Ken Paxton.**

Epley alleges that Texas Attorney General (AG) Ken Paxton knowingly made false entries in his records, failed to take corrective action against Defendants, helped to conceal the violations allegedly committed against Epley by refusing to provide him with a copy of the use of force video, and failed to adequately train TDCJ staff. Am. Compl., at 45.

To the extent Epley asserts claims against AG Paxton in his official capacity, his claims should be dismissed. Paxton, as attorney general, is an arm of the State of Texas. *See Paup v. Texas*, No. 6:16-CV-417-RWS-KNM, 2017 WL 9289648, at *11 E.D. Tex. Jan. 31, 2017) (citing *Bell v. Abbott*, Civil Action No. H–12–01282, 2012 WL 3527927, at *2 (S.D. Tex. Aug. 15, 2012)). "The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest." *Anderson v. Abbott*, 83 F. App'x 594, 595 (5th Cir. 2003) (quoting *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)). Because Epley's claims for monetary damages against AG Paxton are, in effect, claims against the State of Texas, his claims should be dismissed.

Moreover, Epley has not alleged any facts demonstrating that AG Paxton was personally involved in any alleged constitutional violations. As discussed above, § 1983 does not impose vicarious liability. *Piotrowski*, 237 F.3d at 578 (citing *Brown*, 520 U.S. at 403). Instead, Epley

---

[18] The authenticated records show that Epley reported to a mental health counselor that TDCJ officials transferred him from the Ramsey Unit, where he had been housed for quite some time, because he was not currently enrolled in educational classes. Upon arrival at the Lynaugh Unit, the records show that Epley began behaving erratically, appeared distraught, and would not answer questions. As a result, Lynaugh officials referred Epley to the Montford Unit for a psychiatric examination. Upon discharge from Montford, TDCJ officials reassigned Epley to the Lynaugh Unit. According to Epley, he returned to the Ramsey Unit in December 2016—i.e., approximately six months after his initial departure. Am. Compl., at 44.

merely contends that he requested (via letter) that Paxton release the use of force video, but Paxton's office did not do so, demonstrating Paxton's efforts to "cover up" Defendants' alleged misconduct.[19]   *See* Am. Compl., at 46, 85–86.   Without an allegation that Paxton personally violated his rights, Epley cannot state a viable constitutional claim.[20]   *See, e.g.*, *Townley v. Holder*, Civil Action No. 1:12–CV–026–BL, 2012 WL 7005204, at *8 (N.D. Tex. Nov. 30, 2012) (citing *Thompson*, 709 F.2d at 382) ("Personal involvement is an essential element of a civil rights cause of action."). Accordingly, the district court should dismiss Epley's claims against AG Paxton.

**M.**   **Epley has not pleaded facts supporting a claim under the ADA or RA.**

Epley also asserts that Defendants violated the ADA and the RA.   Am. Compl., at 48.   He contends that he suffers from post-traumatic stress disorder (PTSD), recurring depressive episodes, TBI, and persistent pain, for which Defendants denied him medical services and "reasonable housing accommodations"—namely, a single cell.   Questionnaire, at 27.   Epley further avers that Defendants failed to transport him from the Montford Unit to the Robertson Unit in a medical van in violation of the ADA and RA.   *Id.*

Title II of the ADA, which applies to public entities such as TDCJ, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   "Title II imposes an

---

[19] To the extent Epley claims that Tisdale, Morrell, and Howell similarly refused to turnover a copy of the use of force, Epley's claim fails for the same reason—he has not alleged any facts evidencing personal involvement. *See* Am. Compl., at 45.

[20] Epley attempts to avoid the requirement of personal involvement by alleging, in conclusory fashion, that AG Paxton "created practices/customs/policies allowing or encouraging the illegal acts reported herein by: Concealing/suppressing the relevant and material evidences, corrupting the integrity of the fact finding process, and allowing the prison-based officials to skirt liability." Am. Compl., at 45. The court finds that these bald allegations fall far short of pleading a meritorious claim based on the implementation of a policy that resulted in a constitutional deprivation. As noted previously, failing to investigate grievances or refusing to provide a use of force video does not violate the Constitution.

obligation on public entities to make reasonable accommodations or modifications for disabled persons, including prisoners." *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) and *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998)). To state a claim under Title II of the ADA, a plaintiff must demonstrate: "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). A qualifying disability is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

The RA similarly provides that a disabled individual shall not "solely by reason of her or his disability . . . be denied the benefits of . . . any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "To state a claim for relief under the RA, a plaintiff must allege: '(1) the existence of a program or activity within the state which receives federal financial assistance; (2) the plaintiff is an intended beneficiary of the federal assistance; and (3) the plaintiff is a qualified handicapped person, who solely by the reason of her handicap has . . . been denied benefits from, or otherwise been subject to discrimination under such program or activity.'" *Hay v. Thaler*, 470 F. App'x 411, 417–18 (5th Cir. 2012) (quoting *Melton*, 391 F.3d at 676 n.8).

The Fifth Circuit has recognized that "[j]urisprudence interpreting either [the ADA or RA] is applicable to both." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). This is because "the rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The causation requirements for the ADA and RA,

49

however, differ in that the RA proscribes discrimination "solely by reason of" disability, where the ADA states that "discrimination need not be the sole reason" for the discrimination. *Id.* Under either statute, a plaintiff must show intentional discrimination to recover compensatory damages. *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002).

At the outset, the court notes that, in effect, Epley repleads his denial of medical care claim as one under the ADA and RA. *See* Questionnaire, at 27 (alleging that "single-cell only housing is a reasonable accommodation" and claiming that he was "subjected to unnecessary pain and suffering when [he] was transported in a bus" instead of a medical van). "A claim is not proper under the ADA [or RA] if it is simply a restatement of a claim for the denial of medical care." *Hale v. Abangan*, Civil Action No. 3:15-cv-170-CWR-FKB, 2018 WL 1053520, at *3 (S.D. Miss. Jan. 26, 2018) (citing *Walls v. Tex. Dep't Criminal Justice*, 270 F. App'x 358, 359 (5th Cir. 2008)). For this reason alone, Epley's ADA and RA claims should be dismissed.

But even analyzing the merits of his claims, Epley has not pleaded facts satisfying the elements of an ADA or RA claim. First, although Epley avers that he suffers from PTSD, a TBI, depression, and pain, he has not alleged any facts—other than describing some of his symptoms—showing that these conditions render him disabled within the meaning of the ADA or RA. *See* Questionnaire, at 27–28 (contending that his conditions cause multiple symptoms and include "excruciating migraine attacks with dizziness, nausea, vomiting, confusion . . . depression, [and] occasional suicidal thoughts"). "It is well established that '[m]erely having an impairment . . . does not make one disabled for purposes of the ADA [or the RA]." *Hale*, 642 F.3d at 501 (quoting *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009)). Absent pleading facts showing how his claimed impairments substantially limit the performance of a major life activity, Epley fails to state a claim for relief. *See id.*; *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d

1047, 1050 (5th Cir. 1998) (explaining that PTSD, standing alone, "is not necessarily a disability contemplated by the ADA" and that "[t]he statute requires an impairment that substantially limits one or more of the major life activities"); *Willis v. Catahoula Corr. Ctr.*, No. 09–cv–1510, 2010 WL 2710405, at *4 (W.D. La. May 14, 2010) ("To obtain relief under the ADA, a plaintiff must demonstrate that his condition significantly impairs a major life activity, and plaintiff has made no such demonstration.").

Moreover, Epley has pleaded no facts indicating that Defendants intentionally discriminated against him based on any qualifying disability. Epley asserts that Defendants denied him medical services, reasonable housing accommodations, access to the law library, and transport by a medical van. Questionnaire, at 27. As noted above, "[t]he ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners.'" *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012) (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)); *Whetstone v. Hall*, No. 4:17CV158-JMV, 2018 WL 522778, at *2 (N.D. Miss. Jan. 23, 2018) (citing *Bryant*, 84 F.3d at 249) ("Neither [the ADA or RA] covers the mere absence or inadequacy of medical treatment for a prisoner."). With respect to Epley's allegation that Defendants failed to transport him by medical van, he does not plead facts showing that the choice of transport had any connection to his alleged disabilities, or that Defendants intentionally treated him differently because of a disability. *See, e.g., Back v. Tex. Dep't of Criminal Justice Corr. Inst. Div.*, 716 F. App'x 255, 258 (5th Cir. 2017) (affirming dismissal of prisoner's ADA claim where he did not allege defendant intentionally discriminated against him due to his disability); *Hay*, 470 F. App'x at 418 (affirming dismissal of prisoner's ADA and RA claims where he "[did] not allege, much less explain, how his alleged disabilities made it more difficult for him to access the benefits of TDCJ's services [i.e., dentures,] or gave him less meaningful access to those services"). Epley's

allegation that Defendants denied him single-cell housing status likewise fails because he has not alleged that the denial had any relation to his alleged disabilities or was otherwise the result of discrimination based on his disabilities. *Back*, 716 F. App'x at 258; *Hay*, 470 F. App'x at 418.

The only service that Epley asserts Defendants denied him due to his alleged disabilities is access to the law library. Questionnaire, at 27. This allegation, however, fails for two reasons. First, Epley does not allege that he attempted, but Defendants denied, access to the law library while at the Montford Unit. *See id.* at 27–28. Second, Epley's assertion that "certain officials discriminated against me due to my disabilities combined with my nationality to deny me access to the law library activity/program to block me from litigating my lawsuit" is conclusory. Without specific facts supporting the claim, i.e., date(s) of the alleged denials and facts showing that denial of service was *because of* his alleged disabilities, Epley fails to establish the second and third elements of an ADA or RA claim—that Defendants denied him a service with subjective intent to discriminate based on his alleged disabilities. *See, e.g., Bruce v. Little*, 568 F. App'x 283, 286 (5th Cir. 2014) (affirming district court's dismissal of prisoner's ADA claim where prisoner "failed to allege any facts supporting an ADA claim"); *Brigham v. Tex. Dep't of Criminal Justice*, Civil Action No. 1:15-CV-440, 2016 WL 5719698, at *7 (E.D. Tex. Aug. 29, 2016) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)) (dismissing prisoner's ADA claim because he had not pleaded facts establishing any of the elements and the court should not "'strain to find inferences favorable to plaintiff'" or "'accept conclusory allegations, unwarranted deductions, or legal conclusions'").

Because Epley fails to plead facts suggesting any of the Montford Unit Defendants violated the ADA or RA, the district judge should dismiss his claims.

N.     **State law claims**

Epley alleges several state law claims, including assault, battery, and negligence. Am. Compl., at 3. Under 28 U.S.C. § 1367, a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because the court has determined that all of Epley's federal claims must be dismissed, the court declines to exercise § 1367 supplemental jurisdiction over Epley's state law claims. *See, e.g.*, *Lizotte v. Leblanc*, 456 F. App'x 511, 513 (5th Cir. 2012) (affirming district court's dismissal of plaintiff's state law claims for negligence and retaliation where court had properly dismissed all claims over which it had original jurisdiction and therefore "had an adequate basis for declining to exercise supplemental jurisdiction"); *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 455 (5th Cir. 2001) (nothing that a "district court may refuse to exercise supplemental jurisdiction" over state law claims where court dismisses claims giving rise to original jurisdiction). The undersigned therefore recommends that the district judge dismiss Epley's state law claims without prejudice. *See Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999).

### III.     <u>Recommendation</u>

For the foregoing reasons, the undersigned recommends that the United States District Judge dismiss Epley's Amended Complaint and all claims therein, excepting the state law claims, with prejudice in accordance with 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. With respect to Epley's state law claims, the undersigned recommends that the United States District Judge dismiss those claims without prejudice under 28 U.S.C. § 1367(c)(3).

IV.     **Right to Object**

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2017); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: May 29, 2019

 

**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**