**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| CHARLES EPLEY | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No. 5:18-cv-0142-C-BQ |
| | § | |
| MARCO GONZALEZ, et al., | § | |
| Defendants. | § | |

## PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE U.S. MAGISTRATE JUDGE

On May 29-2019, U.S. Magistrate Judge D. Gordon Bryant, Jr. issued its REPORT AND RECOMMENDATION OF THE U.S. MAGISTRATE JUDGE (ECF 57)(Hereinafter: the R&R).

On June 10-2019, Plaintiff moved this Honorable Court to grant a meaningful Extension of Time to allow him to prepare a hopefully coherent Objection/appeal to the R&R (ECF 59). More specifically, Plaintiff asked for more than thirty days, but would make the most of thirty days.

On June 11-2019, this Court granted ten (10) days (ECF 60). The deadline is now: June 21-2019.

On June 15-2019, Plaintiff filed his MOTION FOR LEAVE TO REVIEW THE AUTHENTICATED VIDEO FOOTAGE AND RECORDS TO MAKE MEANINGFUL OBJECTIONS TO THE REPORT AND RECOMMENDATION ISSUED BY U.S. MAGISTRATE JUDGE D. GORDON BRYANT, JR. ON MAY 29-2019 (ECF 61).

Plaintiff incorporates be reference the above document (i.e., ECF 61) and its attached exhibits to this OBJECTIONS, for all purposes.

The time provided by the Court Order dated June 11-2019 (ECF 60) created an exceptional circumstance; Thus, Plaintiff moved the Court to Appoint Counsel on June 16-2019 (ECF 62).

On June 18, 2019, Plaintiff filed another Motion for Extension of Time (ECF 63).

Having not heard from the Court about either his MOTION FOR APPOINTMENT OF COUNSEL (ECF 62) and/or his last MOTION FOR EXTENSION OF TIME (ECF 63), Plaintiff submit this incomplete OBJECTIONS so as to not waive his right to Object/appeal.

For the record, Plaintiff will continue to complete his OBJECTIONS which he will present to the Court as soon as it will be available.

Herein, Plaintiff will:

A.  Report genuine facts and events of a more general nature because they have been dismissed, ignored or misinterpreted in the R&R (ECF 57), whereas, they are critically important to understand the context in which the acts of retaliation committed by the defendants occurred, and the acts of retaliation themselves.

B.  Review the entire R&R and make specific OBJECTIONS in sequence, as time allows him to do.

## PLAINTIFF'S DISABILITY

Plaintiff appreciates this Court's efforts and that it considered the fact that Plaintiff is proceeding pro se. Notwithstanding the above, Plaintiff must, respectfully, outlines the fact that what has prevented him from: (1). Filing much-needed pleadings; (2). Presenting certain relevant and material facts in the pleadings that he did filed; was his debilitating:

- Post-Traumatic Stress Disorder,

- Traumatic Brain Injury symptoms

- Recurring severe depressive episodes, at times with suicidal ideations.

Plaintiff is also impaired/handicapped by the side-effects of his eight (8) prescribed medications. Four (4) medications prescribed for the above mental ailments (e.g., PTSD, depression). And four (4) additional different medications prescribed for the Traumatic Brain Injury symptoms.

For example, Plaintiff has great difficulties remembering information. When Plaintiff finished reading page fifty-four of the R&R, he could not remember page one. In fact, when Plaintiff finished reading page nine of the R&R, he could not remember page one. When Plaintiff reads the same text over and over again, in an effort to better understand what he reads, he becomes overwhelmed, symptomatic (e.g., PTSD, migraine attacks…), and severely depressed.

Plaintiff is, respectfully, moving this Honorable Court to give full consideration to the fact that he is presently disabled under French laws and that Plaintiff is more disabled than Ms. Mary Dees, the Plaintiff who prevailed in: Dees V. Austin Travis County Mental Health and Mental Retardation, 860 F. Supp. 1186 (W.D. Tex. 1994), during her lawsuit.

Moreover, litigating this lawsuit further exacerbates Plaintiff's Post-Traumatic Stress Disorder by causing encephalic retraumatization because it "brings to mind the traumatic incident, encephalic activity, portraying the original trauma or some variant usually occurs". The more Plaintiff tries to litigate this lawsuit the more impaired he becomes. Hence, the need to stop for long periods of time which results in delays and the inability to file complete/meaningful/coherent pleadings in a timely manner. The debilitating process of encephalic retraumatization is described in the first attached exhibit written by world famous psychiatrist C.B. Scrignard M.D.

In effect, it is impossible for Plaintiff to litigate this lawsuit prose and not be retraumatized.

**PLAINTIFF'S DISABILITY IMPAIRS HIS ABILITY TO PRESENT HIS OBJECTIONS**

 Plaintiff felt compelled to, once again, reports his disability because it impairs his ability to clearly/coherently present his objections. Herein, Plaintiff is Objecting to what he believes should be objected to; however, there are Objections which Plaintiff should be making - so as to protect his legal claims in this lawsuit - which Plaintiff is not capable of presenting herein because he is a disabled prose litigant. To be clear, Plaintiff is not waiving the unstated, and unknown to Plaintiff, Objections. Instead, Plaintiff is doing the best he can under very difficult conditions.

The pleadings submitted in this lawsuit are signed by Plaintiff; however, they are not entirely drafted by Plaintiff. Because Plaintiff knows that he is incapable of writing better documents by himself, he submits to the Court the documents written by the layperson willing to help him.

When Plaintiff is not too debilitated, he is having "conversations" about what happened to him in the Texas prisons with a native French speaker who has no experience with the U.S. legal system. The person also reviews whatever documents Plaintiff was able to bring back from Texas. The person then helps Plaintiff recite the facts and explain what happened.

Often the information previously reported, pertaining to Plaintiff injuries, are restated for the Court to be informed that Plaintiff continues to be disabled. Plaintiff also repeats himself because he forgets what he writes. This is the manner the documents sent to the Court are compiled.

This Honorable Court would not make an accurate assessment of Plaintiff's ability to litigate if it were to assume Plaintiff's level of functioning based on the documents sent to the Court.

Plaintiff is also restricted in what he can send to the Court because he must be careful to not exhaust the patience and the time of the layperson helping him write the documents by asking for help too often. When there is nobody available to help Plaintiff, the documents are not written.

It should be noted that Plaintiff has previously moved this Honorable court to appoint an attorney to him because of his disability and the exceptional circumstances. As of this writing, this Honorable Court has not appointed an attorney to Plaintiff. Before going further, Plaintiff once more moves this Honorable Court to Appointment Counsel so as to help make the official records reflect every meritorious Objections which should be made.

What Plaintiff is laboring to say is that he is not waiving any Objection because of "litigation strategy". The failure to make meritorious Objections in this document is caused by Plaintiff's disability which is a factor because Plaintiff proceeds prose.

## THE SEGREAGATION OF THE DEFENDANTS AMONG THREE DIFFERENT COURTS HAS HARMED PLAINTIFF'S LEGAL CLAIMS

When the Court segregated the defendants into three groups in three different courts, the following happened:

First, each Court focused on the events which occurred in its division, ignoring the larger picture. The larger picture is paramount to understand plaintiff's legal claims because the defendants and their co-conspirators at the Montford, Robertson, and Lynaugh prisons, and at the Headquarters in Huntsville, and with Ramsey prison-based Captain Reginald Gilbert/Major Juan Jackson) directly and indirectly coordinated their actions and omissions so as to violate Plaintiff's rights secured by the U.S. Constitution to:

1. Prevent Plaintiff from litigating his religious lawsuit in the federal Court in Houston;
   NOTE: To be clear, Plaintiff had more than a mere "intention" to file a religious lawsuit. Plaintiff has been raising his religious claims in administrative and medical records for years. Moreover, Plaintiff had what the Texas prison law library officials call (to be best of Plaintiff's memory) an "actively progressing anticipated litigation". This means that Plaintiff had, for example, asked prisoners to help him with the legal research at the Ramsey law library. Plaintiff had also obtained religious records/exhibits for the lawsuit.

2. Retaliate against Plaintiff:
- For having had the intention to file his religious lawsuit in a federal Court.
- To prevent him from doing at the Lynaugh prison what he intended to do at Ramsey.
- To intimidate similarly situated prisoners from doing what Plaintiff intended to do.

NOTE: Per the <u>second</u> attached exhibit, the religious lawsuit that Plaintiff intended to file at the Ramsey prison in 2016 had merit as evidenced by the fact that on January 24-2019 the Honorable U.S. Federal District Judge Nelva Gonzales Ramos GRANTED certain Texas prisoners the right to grow their cranial hair long. Thus, preventing Plaintiff's lawsuit caused Plaintiff to be harmed.

The records in that lawsuit also shows that the Texas prison officials:

    A.  Severely punished the prisoners who wanted to grow their cranial hair long;

    B.  Vigorously litigated – even making the same frivolous/absurd arguments and invoking the same false pretexts, as they have done for years in the preceding lawsuits - to prevent the federal Court from allowing the Texas prisoners to grown their cranial hair long.

Plaintiff feel compelled to reports that due to his sincerely held religious beliefs he has <u>not</u> cut his cranial hair since he was released from the Texas prison system. Moreover, Plaintiff continues to be clean-shaven, also for religious reasons. Upon request, Plaintiff will send a photo of himself.

Plaintiff offers his apology to this Honorable Court if he were to be redundant but it is the collusion between the defendants which proves their state of minds i.e., the subjective component of deliverance indifference. The defendants colluded to, for example, retaliate against Plaintiff.

Plaintiff fears that by only entertaining the harms done to him (i.e., the objective component) at while dismissing the reasons why the harm was done to Plaintiff because the collusion (among the prison officials so as to harm Plaintiff) begun at prisons located <u>outside</u> the Northern District, Plaintiff will be prevented from proving that the defendants <u>inside</u> the Northern District were deliberately indifference.

It is Plaintiff's experience that to advance their agendas and to accommodate the security officials (possibly to have their contracts renewed) the medical officials in the Texas prisons routinely either conceal/suppress or exaggerate, in their medical reports, the symptoms of the prisoners.

## THE PRISONERS ARE NOT TRANSFERRED RANDOMLY
## WITHIN THE TEXAS PRISON SYSTEM

It is important to recognize that transferring prisoners adds to the costs of operating the Texas prison system. Google reports that there are around 140,000 prisoners inside the Texas prisons. Transferring prisoners without reasons would be prohibitively expensive. Thus, the prisoners are not randomly transferred within the Texas prison system. To make decisions, the senior officials with the State Classification Committee (SCC), in Huntsville, rely on the recommendations made by the officials where the prisoners are assigned. This means that the officials at the prisons routinely communicate with the Huntsville-based State Classification Committee, usually by e-mails, but also by telephone so as to avoid creating permanent records which can be later subpoenaed during lawsuits.

A prisoner is always transferred for a reason. The transfer of a prisoner has always a purpose.

To prove the subjective component of deliberate indifference i.e., the state of mind of the defendants with the State Classification Committee, Plaintiff must prove:

    A. The reason why he was transferred from the Ramsey prison to the Lynaugh prison.

    B. What the defendants were trying to accomplish by transferring him from the Ramsey prison to the Lynaugh prison.

The Wardens have particular functions many of which pertains to matters outside the prison. Thus, Wardens rarely personally know all the prisoners assigned to their prisons. To transfer prisoners, the Wardens usually rely on the recommendations made by the following:

- The Heads/Directors of Classification at the prisons;

- The Building Majors (Major Juan Jackson at the Ramsey prison in May of 2016);

- The Building Captains (Captain Reginald Gilbert at the Ramsey prison in May of 2016).

Usually, the Building Captains and Majors make lists of the prisoners they want to have transferred, the reasons invoked to transfer the prisoners are also noted in the administrative records. Next, the records are forwarded to the Wardens who usually approve and send them to the State Classification Committee in Huntsville. It is the officials with the State Classification Committee who order the transfers of prisoners and decide where the prisoners are transferred.

To prove the subjective component of deliberate indifference of the defendants, Plaintiff must prove the subjective component of deliberate indifference of the Huntsville-based defendants who ordered his transfer. To do that, the first step is to identify the member(s) of the State Classification Committee who issued the order to transfer Plaintiff from the Ramsey prison.

Next, Plaintiff must ascertain his/her/their reason(s) for transferring him by obtaining the records provided by the Ramsey prison officials and conducting, for example, meaningful interrogatories.

To dismiss defendants before discovery is conducted would prevents Plaintiff from proving the subjective component of deliberate indifference because it makes it impossible to establish that the defendants colluded to, for example, retaliated against Plaintiff.

The actions and omissions committed by each defendant may appear to have been committed independently and only because of circumstances present at the time the defendant made the decisions. Thus, deliberate indifference would be assumed to not be present. It is only when all the actions and omissions are considered in the aggregate that the subjective component of deliberate indifference becomes clear and convincing.

For example, the Texas prisoners do not have a right to be assigned to a particular prison or building within a prison. Thus, Plaintiff housing assignment may appear to be a routine administrative decision. However, when an older prisoner, from a distant foreign country, afflicted with debilitating serious medical condition and Post-Traumatic Stress Disorder is housed with hundreds of gang members, he will inevitably be exploited/victimized. The defendants knew that. Thus, why did the defendants make the decision to transfer Plaintiff, across the vast state of Texas, from the Ramsey prison - where Plaintiff was not being victimized/where Plaintiff wanted to stay until his release to avoid being harmed - to where he was harmed?

Next, why was Plaintiff transferred to the Montford prison within hours of arriving to Lynaugh? Possibly because the transfer itself caused Plaintiff to deteriorate to such degree that he had to be transferred to a medical facility, which is evidence that transferring plaintiff harmed him.

Alternatively, the information entered in the medical records by the Lynaugh-based medical officials, about Plaintiff's symptoms, could have been exaggerated to justify sending Plaintiff to Montford so as to take his **single-cell** medical restriction to place a cellmate who will harm Plaintiff, per the information provided by Ramsey prison Building Captain Reginald Gilbert. When the facts are considered in the aggregate, the second reason clearly prevails.

The following is the events reported in their chronological order:

1. Plaintiff was assigned to the Ramsey prison for a period of about twenty (20) years (during which he was sent to, for example, medical units for brief periods of time).

2. On the day he left the Ramsey prison, African-American Building Captain Reginald Gilbert told Plaintiff that the officials were going to take his **single**-cell medical restriction so as to have African-American cellmates to rape him.

3. Plaintiff is transferred to Lynaugh. Upon arriving, Plaintiff is then quickly transferred to Montford. No psychiatrist examines Plaintiff at Montford. Yet, the defendants violate his **single**-cell medical restriction - given to him by a psychiatrist and maintained by all the psychiatrists who have examined Plaintiff during a period of about twenty years - and place him in a cell with three African-Americans who victimized him.

4. The defendants at Montford, Robertson and Lynaugh concealed Plaintiff's injuries, and denied him much-needed medical care… At Lynaugh, the defendants try to violate the medical order that Plaintiff be always kept alone in a cell (i.e., **single-celled**) for his health/safety.

Once retaliation is being considered, what happened to Plaintiff is easier to understand.

There is a clear, coherent/consistent pattern which provides the answer: To harm Plaintiff.

Aside from medical problems, Plaintiff's life at the Ramsey prison was mostly unremarkable for years. It was not due to "bad luck" that suddenly Plaintiff found himself engulfed into a vortex of violence causing severe injuries. It was not due to "bad luck" that the Texas prison officials suddenly violated Plaintiff's Constitutional rights everywhere Plaintiff's went.

It very important to note that Plaintiff was NOT given any disciplinary case wherever he was sent. No disciplinary case was given to Plaintiff at the Ramsey (prior to the transfer), Huntsville, Robertson, Montford, and Lynaugh prisons because Plaintiff's behavior continued to be exemplary and law abiding even when subjected to clear and serious Constitutional violations.

Plaintiff could very well be the only Texas prisoner who having been subjected to a Use of Force by five or six Texas prison officials was NOT given a disciplinary case. The Texas officials could not find that Plaintiff had done anything wrong. They could not even file a false disciplinary case.

If Plaintiff did not do anything wrong, why was he so severely injured in a medical facility?

Plaintiff was clearly severely injured. Somebody is liable for the injuries. If – as the Texas prison officials have implicitly admitted by not administratively disciplining Plaintiff – Plaintiff has not brought upon himself the actions and omissions committed by the Texas prison officials (i.e., the Constitutional violations) then the Texas prison officials are the ones liable for their actions and omissions because they violated federal laws and the U.S. Constitution.

Only when retaliation is considered does the entire sequence of apparently unrelated events (such as: The transfer from Ramsey to Lynaugh, the withholding of Plaintiff's legal materials at the Ramsey prison, the transfer from Lynaugh to Montford, the brutal assault, the severe injuries, the victimization inside the four-men cell at Montford, the denials of much-needed medical care, the housing assignments at Lynaugh, the denial of protection at Lynaugh, the violation of his medical restriction, the illegal seizing of his religious materials…) can be explained and understood.

## HOW THE TEXAS PRISON OFFICIALS COMMUNICATE AND ACT
## SO AS TO AVOID BEING HELD LIABLE FOR THEIR ACTIONS AND OMMISSIONS

The Texas prison officials want to impose a certain order, upon the prisoners, which is based neither on Texas laws nor federal laws, and certainly not on the Constitution of the United States. The Texas prison order has everything to do with perpetuating a particular culture.
Relations between the prisoners and the prison officials are based on certain unwritten codes of Conduct based on the sort of mental/emotional & physical punishments the prison officials want to inflict upon the prisoners regardless of the federal laws and the United States Constitution.

In effect, there are two Texas prison systems:

1. The administrative one which is presented to the taxpayers, the Legislature, the Courts…

2. The physical one in which Constitutional violations occur on a daily basis.

The Texas prison officials are able to conceal the violations which occur in the physical Texas prison system by colluding with one another and by generating the kind of paperwork which gives the illusion that the administrative Texas prison system is the real Texas prison system. For example, the prisoners have the legal rights to file grievances. And the Courts expect the prisoners to exhaust their so-called "administrative remedies" before burdening the Courts. Yet, the Texas prisoners know that filing grievances will cause them to suffer acts of retaliation.

The greatest "offense" is to file a lawsuit, particularly in a federal court which is often perceived to be the enemy by most Texas prison officials and the last hope for protection by the prisoners.

Plaintiff's legal claims are now being reviewed by this Honorable Court only because Plaintiff was released shortly before the statute of limitation expired. Had Plaintiff not be released, he would have been unable to file this lawsuit. Had he nevertheless filed "something" with the court, he could have been transferred from the Ramsey prison back to the Lynaugh prison. The Texas prison officials' pretext to justify transferring Plaintiff would been to allow Plaintiff to be closer to the Court. Plaintiff's property, including most of his legal materials, would have been held at Ramsey. Plaintiff could have been once again subjected to the actions and omissions of the Lynaugh-based defendants. Plaintiff could also have been returned to Montford to be subjected to additional injuries. The Lynaugh defendants could have resumed violating the medical order so as to take Plaintiff's **single-cell** medical restriction to place into Plaintiff's cell a prisoner who would have victimized Plaintiff. For the above reasons, Plaintiff would not have filed his lawsuit.

Plaintiff was incarcerated twenty-eight (28) years. Plaintiff estimates that eighty-five percent (85%) of the acts of violence which occur inside the Texas prisons are between cellmates. One cellmate abuses the other. Less than five percent (5%) of the assaults are reported to the officials.

When the officials are informed, they often resist taking any corrective action because they do not want to be held liable for having placed prisoners with the wrong cellmates. They also do not want to be held liable for having placed prisoners with cellmates when they should have been **single-celled**. When the victims force the officials to intervene, the following usually happen:

1. They write a false disciplinary case to the victim. For example, if a prisoner reports having been assaulted, then he is given a disciplinary case for fighting.

2. They place the victim in Administrative Segregation (Ad-Seg) under the pretext of conducting an investigation or because of the false fighting disciplinary case.

   NOTE: Plaintiff was never given a disciplinary case. Yet, he was placed in Ad-Seg at the Lynaugh prison for a few hours, before being taken to the Montford prison. Plaintiff believes that the real reason why he was placed in Ad-Seg was to let him know of Ad-Seg's housing conditions so as to discourage him from asking for protection upon being returned to the Lynaugh prison from the Montford prison.

   At the Lynaugh prison, the officials use the air-conditioned to subject the prisoners in Ad-Seg to continuing very cold temperatures. The prisoners inevitably try to stop the

cold air from blowing, inside the cells from the vents, with sheets of paper. The officials who know about the frigid temperature, prevent the prisoners from reducing their exposure to the cold air.

3. Many prisoners who do not receive money from the "outside-world" to buy food are hungry. At the Lynaugh prison, many of them sell drugs to buy food. Others turn to prostitution. Most, try to extort their cellmates. When a victim is taken to Ad-Seg, the officials often allow the offending cellmate to take the property, belongings to the victim, which was left inside the cell where the abuses took place. This is done to discourage the victims from reporting having been victimized by their cellmates.

4. Upon being returned to General Population from Ad-Seg, the officials broadcast that the victim is a snitch – and that he is weak - for having asked for protection. This encourages additional acts of victimization from both the prisoners and the officials.

All of the above are integral parts of the physical reality inside the Texas prisons. It was to subject Plaintiff to the above that the defendants wanted to take Plaintiff's **single-cell** restriction. The above combined with Plaintiff's serious medical conditions would have further debilitated him so as to prevent him from presenting his religious claims to the federal Court.

For all reasons stated above, Plaintiff would not have been able to file this lawsuit had he not been released from the Texas prison system shortly before the statute of limitation expired.

The Texas prison officials have organized themselves to quickly identify and react - against the prisoners who resist the unwritten codes of conduct - by committing certain actions/omissions.

As a result, there is adversity and, often, violence. The Texas prison officials have learned to evade being held liable by, for example, be careful how they speak, even among themselves, because they never know who will cooperate with the federal officials, if pressured to do so. The Texas prison officials communicate by acting in a certain manner, displaying particular demeanor, using gestures… Certain, Texas prison officials proudly wear blue bandanas, in their pockets as "colors", to identify the members who have pledged to enforce the "grey's code of conduct". It is called, in the prison lingo, "going with the grey".

Plaintiff understands that this Honorable Court is making recommendations based on the available information. And Plaintiff recognizes that he has not been as clear as he should have been. Plaintiff would have been clearer and provided additional relevant and material facts had he not been afflicted with debilitating Traumatic Brain Injuries symptoms and mental disorders.

## RETALIATION IS ALWAYS PRESENT IN THE TEXAS PRISON SYSTEM

What Plaintiff is laboring to communicate is that the above were not independent acts which may or may not – when considered individually – be construed to have been done in retaliation. The defendants did not "spontaneously" and independently decide on their own to retaliate. Instead, the "initiative" to retaliate came from the defendants with the State Classification Committee officials in Huntsville, and from them to Lynaugh defendant Michele Sellers.

As the head/Director of the Classification at Lynaugh AND the Chair of Unit Classification Committee when Plaintiff arrived at Lynaugh both on Thursday June 02, 2016, AND on Thursday June 09, 2016, Defendant Michelle Sellers was responsible for enforcing the decisions the John/Jane Doe defendants, with the State Classification Committee in Huntsville, had taken.

Next, the other defendants acted as "team players", possibly, neither knowing, nor understanding, nor caring for defendants Michelle Sellers' rationales for her actions and omissions.

Plaintiff believes that it was either defendant Michelle Sellers and/or an official(s) with the State Classification Committee, in Huntsville, who instructed the Assistant Warden of the Montford Psychiatric facility to have Plaintiff placed into a multi prisoners cell – by force if necessary – so as to later allow the Lynaugh prison defendants to place a prisoner inside Plaintiff's cell to harm him, possibly rape/kill him. For these reasons, it is important to investigate the communications exchanged between the Assistant Warden of the Montford Psychiatric Facility with the other defendants. By communications, Plaintiff is not only referring to the so-called "authenticated records" – which are compiled to maintain the appearance of legitimacy – by also the e-mails and that interrogatories/depositions be used to ascertain the content of the telephone conversations.

The grievance officials reviewed the grievances that Plaintiff submitted. Thus, they had personal knowledge of the facts that Plaintiff was reporting. Assuming that nobody asked them to compromise the investigation process, they nevertheless knew that they had to go along with the retaliation or somebody else willing to go along with the retaliation (i.e., to go along with the "program" as the Texas prison officials say) would eventually take their jobs.

The grievance officials' function was to impede the grievance's investigation process so as to protect the other defendants. And this is what they did. This is what the grievance officials always do in the Texas prisons. All the defendants had a particular job to do (a function), and they did it.

The above also applies to all the defendants who participated in the grievance process because, as it is currently implemented, the grievance process is, essentially, nothing more than a procedure used by the Texas prison administration to identify the prisoners who:

1. Are challenging the prison officials;

2. Can potentially file a lawsuit against them because they have exhausted their so-called administrative remedies.

All the defendants who participated in the grievance process also participated, either directly or indirectly, in the retaliation because by denying rulings based upon the facts, they denied to Plaintiff the **protection** from additional harm the grievance process was supposed to provide. Thus, the defendants continued to harm Plaintiff by, for example, denying him protection.

## THE SINGLE-CELL MEDICAL RESTRICTION

The only exceptional element about the retaliation against Plaintiff is the fact that he had a medical order protecting him. More specifically, the **single-cell** medical restriction.

The **single**-**cell** medical restriction used to be given – as they should be - almost on an as needed basis to protect both the person afflicted with the medical condition and the prisoner who would have been his cellmate. The security officials did not like the fact that prisoners could be protected by medical orders issued my doctors. Thus, they illegally but successfully pressured the medical officials to not only <u>not</u> give the **single**-**cell** medical restriction but to also <u>rescind</u> the **single**-**cells** which had been issued. Very few Texas prisoners now have the **single**-**cell** medical restriction, whereas, several thousand prisoners presently need **single**-**cells** for their health/safety.

NOTE: If the Texas prisoners afflicted with serious medical conditions - such as Post-Traumatic Stress Disorder - needed and were given **single**-**cell** medical restrictions twenty years ago. Then, the Texas prisoners afflicted with the very same serious medical conditions – such as PTSD – need and should be given **single**-**cell** medical restrictions now. The fact that they are not given the much-needed **single**-**cell** medical restriction explains the extremely high level of violence between cellmates inside the Texas prisons. The above, when considered in the aggregate, reveals why Plaintiff's fears for his health and safety and his need for protection were well founded. Per the attached <u>third</u> exhibit it is clearly established that the level of violence among prisoners afflicted with mental disorder is very high inside the Texas prisons, such as the Montford prison.

Plaintiff's **single**-**cell** medical restriction was never rescinded due to a combination of reasons, such as:

- Plaintiff's Post-Traumatic Stress Disorder is exceptionally severe. The attached <u>fourth</u> exhibit, which is the medical report from psychiatrist Cristina Cruz-Grost, is illustrative.

- Plaintiff is exceptionally vulnerable for the reasons stated at, for example, page 30 of 49 of the Amended Complaint, dated May 31-2018, (ECF 15, filed June 06-2018).

   Also see Exhibit # 10 (Step One grievance # 2016163422, June 16-2016) of ECF 15.

- In 1994 and at the Michel prison, plaintiff suffered a Traumatic Brain Injury (TBI) when he was repeatedly kicked in head, by African-American prisoners, even after he was lying on the floor unconscious (see attached <u>fifth</u> exhibit).

   In certain circumstance, the TBI combined with the PTSD cause Plaintiff to neither comprehend what is happening around him nor to act accordingly.

Had Plaintiff not been **single-celled** - during a period of about twenty (20) years - a dangerous cellmate would have been placed in his cell, and he may have well been raped or even killed like the prisoner who was killed by his cellmate (a cellmate he wanted to escape from) at the Ramsey prison in January of 2018, a few days before plaintiff was released (see attached <u>sixth</u> exhibit). The Texas prison officials would have, more than likely, evaded being held liable by blaming Plaintiff's cellmate and/or Plaintiff's "failure" to ask for protection...


## THE ILLEGAL COLLUSION TO VIOLATE THE SINGLE-CELL MEDICAL ORDER


It is the events pertaining to the **single-cell** medical restriction which reveals the retaliation. It is the **single-cell** medical restriction – issued and maintained during twenty years by all the psychiatrists who have examined Plaintiff - which is the reason why the defendants violated Plaintiff's Constitutional rights. <u>The defendants wanting to have Plaintiff injured by a cellmate combined with the fact that they could not find a psychiatrist willing to rescind the medical order that Plaintiff's be housed in a single-cell is the motive/reason for the Constitutional violations.</u>

Scrutinizing medical records can reveal the state-of-mind of the defendants. Due to space limitation, the following is illustrative:

A. The medical records compiled by the medical officials reveals that on Thur. June 02, 2016 - the day Plaintiff arrived at Lynaugh which is the day he was transferred to Montford where he was brutalized because the Montford defendants violated the **single-cell** medical restriction issued by the psychiatrists – the Lynaugh officials knew that Plaintiff was **single-cell only**, per the attachment dated June 02-16, 14:53, which is the <u>seventh</u> exhibit.

B. Per attached medical records dated June 07, 2016, 14:24, (the <u>eight</u> exhibit) Plaintiff continued to be **single-celled only** the day he arrived at the Robertson prison, which is also the day that Plaintiff left the Montford prison.

C. From Robertson, Plaintiff went directly to the Lynaugh prison without being examined by a doctor. Thus, his **single-cell only** medical restriction could not have been rescinded. Yet, the Lynaugh officials left the square pertaining to housing blank, instead of inserting: **Single-cell only**. See attached <u>ninth</u> exhibit which is the medical record compiled by the Lynaugh officials, dated Thursday June 09, 2016, 10:40.

This was done to conceal the fact that Plaintiff was **single-cell only**, as evidenced by the fact that the same work restrictions (4, 7, 9, 16, 19, 20, 21, 22, 23, 25, 26) appears on both the documents dated June 02, 2016, and June 09, 2016.

NOTE: The work restrictions are very strong indicators of the prisoners' level of disability. Having eleven (11) work restrictions is very high. Plaintiff's disability was acknowledged by: (1). The Texas prison medical officials who issued and maintained the work restrictions; (2). The administrative officials who entered into the computer a work assignment which did <u>not</u> exist... Clearly, the defendants knew that Plaintiff was disabled; Thus, very vulnerable.

D.  Plaintiff was continuously **single-celled** during a period of about twenty (20) years. The proof that Plaintiff was **single-cell only** is the document titled:

TEXAS DEPARTMENT OF CRIMINAL JUSTICE

HEALTH SUMMARY FOR CLASSIFICATION

issued on June 10, 2016. See attached <u>tenth</u> exhibit, at: II.  HOUSING ASSIGNMENT

A.  BASIC HOUSING

00  2. **SINGLE CELL ONLY**

E.  See <u>eleventh</u> attached exhibit, titled: GUIDELINES FOR COMPLETING THE HEALTH SUMMARY FOR CLASSIFICATION FORM.

F.  The document issued by the Correctional Managed Health Care, Policy Manual # A-08.4, titled: OFFENDER MEDICAL AND MENTAL HEALTH CLASSIFICATION, reads:

"**Single cell restriction** means that an offender

Cannot be housed in a multi-person cell or dorm."

See at page two (2) of three (3) of attached <u>twelfth</u> exhibit.

G.  The defendants illegally countermanded the medical order (see <u>thirteenth</u> exhibit).


## THE NATURE AND THE EXTEND OF THE RETALIATION


More importantly, the retaliation was not a collection of harmful random acts. Instead, it was intended to achieve a particular goal: Take the **single-cell** protection from Plaintiff so as to place him in a position of extreme vulnerability due to his serious medical conditions, citizenship… Even the acts which appears to be unrelated to the **single-cell** medical restriction, such as the taking of the religious medallion, were intended to mentally harm Plaintiff to defeat him so as to make it easier for the officials to take his **single-cell** medical restriction.


Instead, there were several acts committed within a general retaliation even if not all the participants knew the underlying reason why they were retaliating. This is how the Texas prison system operates. Certainly, all the defendants who had communications with officials outside their respective prisons had to be involved in the retaliation because they were informed of what was to happen to Plaintiff and they participated.


The above explain why it is not necessary for the Texas prison officials to "get together in one place" to decide how to retaliate when the decision has been made to retaliate against a prisoner. When placed in certain situations, they instantly know what is expected of them, and they swiftly act accordingly, and too often brutally even if they do not know why. The decisions about how to retaliate have been, in essence, agreed upon even before the situations occur. This the reason why it is so difficult – even impossible really - to obtain certain facts before discovery is conducted.

## OBTAINING THE FACTS

Plaintiff discerns three types of facts:

1.  The facts Plaintiff personally knows about.

2.  The facts Plaintiff can infer based on the known facts and Plaintiff's personal experiences and his knowledge of the methods and procedures relied upon by the prison officials.

3.  The facts that can only be uncovered during discovery by using, for example, depositions and interrogatories.

Not only to prove his claims, but also to state his claims in his pleadings to this Honorable Court, such as this Objections, Plaintiff must know the facts which can only be uncovered during discovery. Plaintiff cannot do that if the defendants are dismissed before discovery is conducted.

Plaintiff's task is made very difficult because the Texas prison officials have organized themselves so as to be shielded from lawsuits. Captain Reginald Gilbert made the statements he did to taunt and deride Plaintiff.  Captain Reginald Gilbert wanted to make Plaintiff regret having attempted to file a lawsuit, in a federal Court, at "his" prison (Ramsey). Captain Reginal Gilbert wanted Plaintiff to know that HE had arranged Plaintiff's transfer to a distant and violent prison - infected by organized criminal gangs - to punish Plaintiff. By contrast, most officials do not release information to the prisoners. They rarely explain their reasons for doing what they do.

The need for discovery is extremely high because the Texas prison system is a particularly

opaque, even secretive, institution where information is kept suppressed/concealed. This is

compounded by the fact that as a prisoner afflicted with debilitating serious medical conditions

his ability to obtain the needed information to state his claims is very limited, almost nil.


### PLAINTIFF WANTS TO PROSECUTE HIS LEGAL CLAIMS


Had Plaintiff not been debilitated by his PTSD, Traumatic Brain Injury symptoms and depressive

episodes, he would have presented the above facts, and additional relevant and material facts.

The above is very important because they are the facts which explain why the Texas officials

violated Plaintiff's Constitutional rights at the Montford Psychiatric Facility (in Lubbock), but

also at the Robertson prison (in Abilene) and at the Lynaugh prison (in Fort Stockton), from

Thursday June 02, 2016, until Plaintiff was returned to Brazoria County several weeks later.


Incidentally, the fact that Plaintiff was eventually returned to the Ramsey prison, located in

Brazoria County, is evidence that the transfer to the Lynaugh prison was done for very suspect

reasons which should be closely scrutinized. Objectively, the only result achieved by transferring

Plaintiff - across the vast state of Texas - from Brazoria County to the Lynaugh prison and to the

Montford prison was to caused him to be unnecessarily severely injured. And when the French

officials intervened, the defendants transferred returned Plaintiff back to Brazoria County…

Transferring Plaintiff away from Lynaugh could have been construed to just be a transfer, but transferring Plaintiff back to Brazoria County and later to the Ramsey prison is evidence that there was no just cause to transfer Plaintiff away from the Ramsey prison in the first place.

Plaintiff alleges but, also, must prove that:

1. The defendants with the State Classification Committee in Huntsville transferred Plaintiff away from the Ramsey prison to have him severely punished and harmed in retaliation;

2. When the Houston-based French Consular officials confronted the officials in Huntsville with what they had done, they implicitly admitted to their wrongdoings by backtracking and promptly returning Plaintiff to Brazoria County where he had been for twenty+ years.

Another critical element which is the fact that it takes Plaintiff considerably more time to draft his documents to the Courts than it is conceivable for members of the Courts. What may take a few hours for a normal person takes several days or weeks for Plaintiff because of his disabilities.

The medical records compiled by the Texas prison officials show that Plaintiff had been severely injured and that he was disabled when he returned to the Lynaugh prison on Thur. June 09, 2016. In fact, Plaintiff continues to be disabled by the injuries sustained in Lubbock on June 06, 2016.

Even if the violations (e.g., the sleep deprivation, denial of food) in this lawsuit do not violate the U.S. Constitution separately, when considered in the aggregate they most certainly do.

The attached <u>fourteenth</u> exhibit reveals that Plaintiff reported TBI symptoms. Moreover, the DIAGNOSIS made on June 14, 2016, read: "pain in unspecified shoulder, migraine, fracture of rib(s), sternum and thoracic spine". And certain medical defendants ordered x-rays to make the paperwork reflects that they were following the medical protocol, however, certain security defendants also intimidated Plaintiff – who is afflicted with PTSD a fear based mental disorder - from getting the x-rays, to conceal his injuries, even when Plaintiff was in the infirmary.

To continue harming Plaintiff at the Lynaugh prison the defendants knowingly/intentionally kept violating the rules stated in the AD-04.17, titled: OFFENDER HOUSING ASSIGNMENT CRITERIA AND PROCEDURES, which is the <u>fifteenth</u> attached exhibit. The reasons for the violations of AD-04.17 (Ref. 28 C.F.R § 115.42 (a-b)) make them violations of federal laws. Also see AD-04.68 OFFENDERS REQUIRING SINGLE CELL HOUSING, at page 09 of the (federal law) Prison Rape Elimination Act/PREA Report which is the <u>sixteenth</u> attached exhibit.

The Defendants continued denying much-needed medical care and protection to Plaintiff until the Houston-based French Consular officials, fearing that Plaintiff would be killed at the Lynaugh prison by the gang members, vigorously intervened.

**NO DEFENDANT SHOULD BE DISMISSED UNTIL DISCOVERY IS COMPLETED**

Last, Plaintiff Objects to any defendant being dismissed until discovery is completed. During Discovery, the known Defendants could, for example:

1. Provide facts supporting Plaintiff's allegations;

2. Help identifying the John and Jane Doe Defendants;

3. Establish the subjective component of deliberate indifference by, for example, releasing information about the timing and the nature of the communications they exchanged among themselves at the Montford prison and at the other facilities.

**PLAINTIFF' SPECIFIC OBJECTIONS TO THE REPORT AND RECOMMENDATIONS**

The R&R (ECF 57) was issued by United States Magistrate Judge D. Gordon Bryant, Jr. (Hereinafter: The Magistrate). The two documents referred herein the most often are:

- The Amended Complaint, filed on June 06, 2018 (Hereinafter: ECF 15);

- Plaintiff's Responses to Questionnaire, filed on January 05, 2019 (Hereinafter: ECF 56).

Plaintiff is not certain where in the R&R he can begin making his Objections. Certainly, Plaintiff vigorously objects the R&R recommending that his action be dismissed. See page 02 of ECF 57.

OBJECTION # 01. See 5TH line of page 04 of ECF 57:

Plaintiff does not avers having refused to accept housing.

Plaintiff was illegally ordered to enter into a four-person cell in violation of a medical restriction issued pursuant to a medical order. See exhibits #07, #08, #10, #11, #12, #13, #15, #16. Plaintiff did not enter the four-person cell when initially told to do so prior to the Use of Force. However, Plaintiff did not refuse to accept housing in the four-person cell. Instead, the combination of Plaintiff 's serious and severe psychiatric disorders combined with Plaintiff's serious neurological injuries **prevented** him from entering into the four-person cell. See ECF 15 at page 17 and ECF 56 at page 1. The Magistrate is making the "assumption" that Plaintiff knowingly & intentionally

refused to enter the four-person cell. This is <u>not</u> a fact. This is <u>not</u> true; Hence, the <u>objection</u>. Clearly, there is a <u>genuine</u> <u>dispute</u> <u>of a</u> <u>material</u> <u>fact</u> as to whether Plaintiff "refused".

At page 01 of ECF 56, Plaintiff tried to provide information because he was ordered by the Magistrate to do so; However, Plaintiff does not understand his own conduct due to the nature and seriousness of his psychiatric disorders and neurological injuries. Patients afflicted with disorders, far less severe than the disorders afflicting Plaintiff, routinely go to psychiatrists to understand their own conducts. Persons who have attempted suicide often cannot explain why they tried to kill themselves, whereas, they did not refuse to live.  Plaintiff was <u>injured</u> by the <u>extreme</u> <u>fear</u> caused by the officials when they illegally tried to coerce him into the 4-person cell.


## <u>CONTINUING</u> <u>OBJECTIONS</u>:

A.  To the best of Plaintiff's knowledge, the Magistrate is neither a psychiatrist nor a neurologist. Plaintiff argues that medical findings should only be made by qualified independent medical examiners, such as neuro-psychiatrists in this case. Plaintiff's <u>objects</u> to the Magistrate making medical interpretations of the facts. Plaintiff is asking for a <u>continuing</u> <u>objection</u> on this subject matter in the R&R, and the ones below.

B. Plaintiff asked for a jury to be the fact finders. Plaintiff <u>objects</u> to a bench trial.

C. As far as the so-called "authenticated" records being relied upon by the Magistrate – the review of which has been denied to Plaintiff – Plaintiff <u>objects</u> to their use until they have been verified to be true and correct. It is Plaintiff's experience, as a Texas prisoner, that the Texas prison officials routinely falsify and fabricate records so as to evade being held liable. This is particularly true with medical records which the Texas prison officials either underreport or exaggerate to advance specific agendas.

OBJECTION # 02. See footnote at page 04 of ECF 57:

Plaintiff does not merely "contends he was to be singled cell at all times".

Plaintiff was single-cell and - per the laws in effect as proved by the exhibits - he was to be single-celled at all times. See attached exhibits #07, #08, #10, #11, #12, #13, #15 and #16. Also see above at pages: #19, #20, #21, #22, #23, #24 and #28.

This is not a matter of opinion. This is not Plaintiff believes. These are the facts. It is the law.

Plaintiff objects to the wording "contends" which essentially trivializes the medical order issued and maintained by the prison psychiatrists. Plaintiff fears that by using words which downgrade the single-cell medical restriction, issued pursuant to a medical order from psychiatrists, the Magistrate causes the readers to downplay the importance of the violations committed by the defendants while, simultaneously, giving the appearance that Plaintiff did something wrong.

To be clear, Plaintiff did not do anything wrong. This is verified by two uncontroverted facts:

1. Plaintiff was not given a disciplinary case (see above at page #12);

2. Plaintiff was not taken to administrative-segregation. Had plaintiff done anything wrong he would not have been placed into the four-person cell which is in General Population.


OBJECTION # 03. See 6th line at page 05 of ECF 57:

The Magistrate wrote: "despite being given the opportunity to do so".  This is not true.

Plaintiff has reported the opposite. Clearly, there is a genuine dispute of a material fact.

Plaintiff was not given the opportunity to formally request medical treatment.

In fact, formal requests for medical care have to be made in writing. Plaintiff was denied any property at the Montford Psychiatric Facility, including but not limited to writing instruments. And because Plaintiff did not have any writing instruments at the Montford Psychiatric Facility,

he also did not have any writing instruments at the Robertson prison where he was placed in transit. Plaintiff repeated verbal requests for medical treatment where ignored by the defendants as Plaintiff has repeatedly reported. See ECF 56: g at page 04, and also pages 07, 10-11, 17-18... Plaintiff did not wait until June 10, 2016, to formally request medical treatment. Instead, Plaintiff formally requested medical treatment upon arriving at the Lynaugh prison i.e., as soon as he was able to borrow a pen, on Thursday June 09, 2016. Moreover, Plaintiff had to use a piece of scratch paper as opposed to the Sick-Call request form because he could find such a form. See attached _seventeenth_ exhibit (also see Exhibit #07 of ECF 15) which shows the date: Thursday June 09-2016 (i.e., the day Plaintiff arrived at the Lynaugh prison). It just that all that Plaintiff could do was to deposit the formal request in the sick-call box, and that his formal request for medical treatment was picked-up from the sick-call box and processed on the following day, June 10-2016. Thus, it was RECEIVED by the Lynaugh medical staff members on June 10-2016.

OBJECTION #04. See 3rd line at page 06 of ECF 57:

Plaintiff has _not_ had ample opportunity to develop the factual bases of his claims. Here is why:

First, English is the language of the United States. Due to his respect and love for the United States, Plaintiff made great efforts to learn the English language. Plaintiff learned how to write in English prior to his 1994 Traumatic Brain Injury at the Michael prison of the TDCJ. However, Plaintiff finds it very difficult to learn new things now. Learning how to develop the factual bases of his claims is not something that Plaintiff knows how to do to the satisfaction of the courts. Second, what is an ample opportunity to a person who is not afflicted with Plaintiff's mental disorders and neurological injuries is _not_ an ample opportunity to Plaintiff who takes a very long

time to write and who has to make countless time-consuming corrections/additions because he forgets what he wrote.

Third, Plaintiff has <u>not</u> been provided with ample opportunity to develop the factual bases of his claims due to being in fear of being sanctioned by this court. The following is illustrative:

    A.  In his ORDER, dated September 05-2018, (ECF 33) the Magistrate wrote, in part, I quote: "…Epley is cautioned that if continues to file frivolous documents and/or motions in this case – or any other case pending before the court – sanctions **will** be imposed against him. **Such sanctions may include monetary sanctions or a complete bar to filing pleadings without leave of the court."**

    B.  In his ORDER, dated December 28-2018, (ECF 55) the Magistrate wrote, in part, I quote: "Epley shall file his questionnaire responses with **ten days** of the date of this order. No further extensions will be granted.
**<u>Epley is admonished that failure to timely return the complete Questionnaire and declaration may and most probably will result in dismissal of his entire complaint</u>**."

Clearly, the above placed a tremendous amount of stress upon Plaintiff considering that a few lines above, the Magistrate also wrote, I quote:

"Further filing like the instant document **will be** construed as frivolous, and Epley is cautioned that if he continues to file frivolous documents and/or motions in this case – or

any other case pending before this court - sanction **will** be imposed against him. **Such sanctions may include monetary sanctions or a complete bar to filing pleadings without leave of the court**."

The above, prevented Plaintiff from fully developing the factual bases of his claims – in the Questionnaire (ECF 56) - because it had such a chilling effect upon Plaintiff who is afflicted with a fear-based mental disorder and who is indigent. The monetary sanctions alone could very well have thrown Plaintiff into the streets, during winter months!

On one hand Plaintiff was told that he could have his entire complaint dismissed if he did not rush the Questionnaire to the Court, on the other hand Plaintiff was ordered – in the very same ORDER - not to write anything frivolous, whereas, Plaintiff does not grasp what is legally frivolous in the Court in Lubbock. Plaintiff is confused by the fact that what is deemed frivolous in the court is Lubbock is apparently not frivolous in the courts in Abilene and Pecos. Plaintiff does not grasp the subjective element in "frivolous".

C.  In the Questionnaire (ECF 52), the Magistrate also ordered Plaintiff to "**answer questions succinctly**"; Yet, Plaintiff is also expected to "develop the factual bases of his claims" which requires considerable amount of information considering the number of the defendants combined with the complex retaliation on five different prisons: Ramsey, Huntsville, Lynaugh, Lubbock, Robertson and Lynaugh again after June 09, 2016. And the fact that certain defendants are liable for more than one Constitutional violation.

D. In the Questionnaire (ECF 52), the Magistrate also ordered Plaintiff to "**avoid making legal arguments or conclusions**." Yet, Plaintiff does not grasp what a legal argument or conclusion really is. Thus, writing anything becomes a frightening endeavor which exacerbates his PTSD and Traumatic Brain Injury symptoms.

E. In his responses to the Questionnaire (ECF 56), Plaintiff informed the court that he had difficulties with certain questions and that he did not understand others. For example, at page 24 of ECF 56 Plaintiff alerted the Magistrate twice of his difficulties. Plaintiff even asked for the Magistrate to guide him (see the NOTE at the top of page 07 of ECF 56). No help was ever provided. Considering the Magistrate's previous threats of sanctions, Plaintiff could not distinguish between what he could safely write from what would result in sanctions. Thus, Plaintiff self-censored himself so as to avoid being sanctioned.

What is obvious to a federal Judge and to attorneys is not obvious to Plaintiff. Plaintiff has been told that he waives away his rights by not making certain claims and requests (for appointment of counsel for example), by failing to object… Thus, this is what Plaintiff does.

Unfortunately, Plaintiff does not how to do that to the Lubbock court's satisfaction.

Additionally, Plaintiff is overwhelmed by intrusive thoughts of the traumas and of his debilitating chronic pains. This is causing Plaintiff to be "consumed" (Plaintiff is at a loss of finding a better word and his assistant cannot find another word) by the injuries. Information which are very important to Plaintiff may not be to the court. Thus, Plaintiff is unable to provide the response the court is seeking. At times, Plaintiff slowly recovers the information from his consciousness, but the documents had to be forwarded to Court several days before due to deadlines…

Most people do not understand how difficult it to live, to simply live, with PTSD combined with Traumatic Brain Injury symptoms. Litigating against the persons who have harmed you, whereas, you are handicapped daily by the very injuries they have caused you is overwhelming and very depressing. Hence, the need to have neuro-psychiatrists to explain Plaintiff's disabilities.

OBJECTION #05. See 5TH line at page 06 of ECF 57:

To the best of his knowledge, Plaintiff's Amended Complaint (ECF 15) is forty-nine (49) pages long, as opposed to almost ninety (90) as the Magistrate reported. It is forty-nine page long because it covers a campaign of retaliation at five different locations (Ramsey, Huntsville, Montford, Robertson and Lynaugh) during a period of about one month. Certainly, Plaintiff did attach medical records and formal grievances to his complaint so as to help the Court verify certain facts. Plaintiff felt compelled to object to a seemingly minor statement – in an effort to correct the record - because the accumulation of such seemingly minor misrepresentations may cause certain readers to have a distorted view of Plaintiff's entire complaint.

OBJECTION #06. See lines 10-18 at page 06 of ECF 57:

Plaintiff objects to being denied a review of the records which the Magistrate has been using against him. This is particularly true considering the facts that Plaintiff is no longer a prisoner and that he does not reside anywhere in Texas. If there ever was a justification for denying a prisoner the review of the records used against him, that justification does not exist in Plaintiff's case.

Plaintiff fears that the Magistrate is making damaging credibility determinations and/or weight the evidence and/or draw inferences without Plaintiff being in a position rebut the Magistrate's interpretations. Furthermore, Plaintiff has requested a jury trial, as opposed to a bench trial.

Plaintiff also objects to certain words as they could lead the readers to make damaging inferences. When Plaintiff does know the answer to a question, he has the legal duty to admit it. And if Plaintiff, who is not a medical doctor, cannot explain certain medical symptoms or reactions caused by his mental disorders and/or neurological injuries it should proper for him to suggest the kind of professionals who could provide the explanations to the court. Moreover, Plaintiff was traumatized by what happened to him at Montford. The Magistrate should take that into consideration, as opposed to ignoring that fact. Persons who have been traumatized are no longer able to do, act, respond, recall… as well of the persons who have not been traumatized.

Certainly, prior to the assault which occurred at Montford on Monday June 06-2016, Plaintiff avoided complications by following the recommendations and the stipulations of the medical doctors. What was different at Montford, is that the defendants did not care about Plaintiff's health and safety. The defendants wanted to violate the medical order.

OBJECTION #07. See footnote at page 07 of ECF 57:

 Plaintiff feels the need to object because while the information provided in the footnote is true, the harm comes from the fact that its incompleteness is likely to cause the readers to underestimate the nature and extend of the injuries sustained by Plaintiff on June 06-16. Again, Plaintiff believes that it is important to be very cautious when reporting medical information.

First, the previous Traumatic Brain Injury (TBI) - sustained at the Michael prison of the TDCJ in 1994 -explains Plaintiff's demeanor, conduct, reactions… on June 06-2016. Plaintiff has not seen any entry from the Magistrate giving consideration to the disabling effects of the 1994 TBI.

Second, the footnote (which is being objected to) conveys the idea that no really harm was done to Plaintiff because he had already sustained a Traumatic Brain Injury. Plaintiff asked several persons to read the footnote and they all said the same thing i.e., the footnote depreciates the head injury sustained by Plaintiff, on Monday June 06-2016, at the Montford Psychiatric Facility.

Third, the medical reality is that while the brain often recovers from an initial mild-Traumatic Brain Injury; However, the subsequent Traumatic Brain Injuries are usually even more damaging as they can cause CTE (Chronic Traumatic Encephalopathy).

See attached eighteenth and nineteenth exhibits.

In fact, the neurologists at the John Sealy Hospital in Galveston, have repeatedly warned Plaintiff to do everything he could to avoid head injuries. This is one of the reasons why Plaintiff was so afraid to be in a cell occupied by other prisoners as most of the acts of violence inside the Texas prisons occur inside the prison cells, cellmate against cellmate. See this document at page 15.

Fourth, the combination of the Traumatic Brain Injury with the Post-Traumatic Stress disorder made Plaintiff's cognitive impairments that much more serious/severe than either considered separately, particularly during periods of significant stress or trauma as Plaintiff was subjected to by the defendants in the Montford Psychiatric Facility.

Again, the Magistrate failed to provide information about that.

This is another reason why it is absolutely necessary to have a qualified independent neuro-psychiatrist to provide expert testimony as to Plaintiff's cognitive impairments/conduct, injuries… on June 06, 2016.

Fifth, while the Magistrate reports certain Post-Traumatic Stress disorder symptoms in his footnote (e.g., feelings of unreality, anxiety, panic attacks, vivid and distressing flashbacks and nightmares) suffered by Plaintiff, the Magistrate failed to report that after the events that occurred at Montford in 2016, the original PTSD became a COMPLEX-PTSD. For more information on COMPLEX-PTSD, please review attached exhibits numbered below.

Sixth, the defendants - at the Montford Psychiatric Facility - had instantaneous access to Plaintiff's digitized medical records; Thus, they knew - or should have known – that Plaintiff should not be brutalized. And that even a minor head trauma could have dramatic consequences for the rest of Plaintiff's life. And that any act of violence would worsen the pre-existing PTSD and/or cause another PTSD. PTSD can be accumulated like any other injury. In fact, the persons who already have a PTSD are more likely to be afflicted with additional PTSDs; Hence, the need for them to be **single-celled**. Again, Plaintiff asks for a neuro-psychiatrist to explain the injuries that Plaintiff has suffered.

NOTE: Because Plaintiff is not a neuro-psychiatrist, he supplements the above with the attached 21St, 22ND, 23RD, 24TH, 25TH, 26TH, 27TH and 28TH exhibits, which are considered to be reliable sources of information. To be clear, the attached exhibits are not intended to substitute for the testimony of a neuro-psychiatrist. They are only intended to be preliminary information.

OBJECTION #08. See first and second lines at page 08 of ECF 57:

Plaintiff objects to the Magistrate's statement which read, I quote: "… but Epley refused to

answer, instead muttering unintelligibly in French."


Again, the Magistrate is making medical inference - without being qualified to do that in

Plaintiff's humble opinion - as to why Plaintiff "muttered unintelligibly in French". Plaintiff was

experiencing cognitive impairments as a direct result of the Traumatic Brain Injury inflicted upon

him by the defendants during the illegal use of force. Plaintiff was trying to communicate with

the officials but was unable to do so intelligibly due to his injury. Furthermore, Plaintiff was so

traumatized that he could not even speak in English. The incident should be interpreted by a

neuro-psychiatrist, as opposed to non-medical lawyers.


Plaintiff did not "refuse". Clearly, there is another genuine dispute as to a material fact.


The Magistrate does not know what was happening inside Plaintiff's brain. In fact, Plaintiff was

so severely injured that he was unable to speak intelligibly and, in a state of confusion,

involuntarily reverted to his native language in a desperate attempt to communicate.


Sergeant Gonzalez is free to posture for the video-recording. In fact, Texas prison officials are

encouraged to do just that. It is expected of them. This what Warden McMullen did after a

prisoner had been killed by his cellmate. I was a short distance away. See attached sixth exhibit at

page two of four. Plaintiff alleges that Sergeant Gonzalez was in fact trying to conceal the nature

and extend of the injuries sustained by Plaintiff during the illegal use of force.

The combination of the bloody nose combined with Plaintiff muttering unintelligently in, possibly, French should have alarmed all the officials, both security and medical obviously. What the Magistrate reports are evidence of a concussion. The defendants should have immediately alerted the duty medical doctor for a proper and timely medical assessment and transfer to a medical hospital to be evaluated, as defendant Samuel Itie tried to do on June 10-2016.

OBJECTION #09. See lines 04-06 at page 08 of ECF 57:

Plaintiff's lack of response was consistent with a concussion. Nurse Wagner should have:

1. Alerted the proper medical supervisor(s).
2. Alerted the security officials that a medical order had been issued by psychiatrists – and again Montford is a psychiatric facility – that Plaintiff was single-cell only.

Nurse Wagner not do any of the above. In fact, she did the opposite. She went along with the violation of the medical order. Having done that, she could only deny much-needed medical care to Plaintiff so as to protect herself and the defendants.

The medical professionals who have examined Plaintiff after he left the Montford prison have stated that Plaintiff was injured. Clearly, there is a genuine issue of a material fact.

OBJECTION #10. See 6th line at page 08 of ECF 57:

Plaintiff objects to the statement that "Epley was alert and coherent". It is an assumption made by a person who is not a qualified medical expert, and certainly not a neuro-psychiatrist. The Magistrate did not conduct a medical examination.

Persons who have suffered head injuries can react in unusual/unexpected manner. Moreover, the Magistrate ignores the fact that the events took place inside what is essentially a prison. Texas prisoners have to conceal being in pain not to be perceived to be weak which would invite additional harm. During fights, boxers sustain considerable injuries without showing outward signs of being in pain. This also happens immediately after motor-vehicle accidents. Later, it is often discovered that the victims have serious injuries.

Plaintiff was in pain.

Plaintiff wanted to see a medical doctor <u>before</u> being injured and he wanted to see a doctor <u>after</u> being injured.

Per the law in effect, it is not upon Plaintiff's to tell the officials – if he had been able to do that which he could <u>not</u> due to the head injury – to conduct a medical evaluation after a Use of Force. It must be done automatically. It is the law! Plaintiff has repeatedly attached as exhibits the officials prison records proving that. Records which the magistrate apparently ignores. A medical evaluation is something more than simply "looking" at Plaintiff and trying to conceal his blood with a rag. There is an established protocol with a series of questions to answer. If Plaintiff could not answer, then the protocol was to determine why he could not answer. It not different from the football players when they sustain concussions during a game. Medical evaluations are conducted to ascertain if they can keep playing even if they are willing to keep playing and appear to be alert/coherent. Often, they cannot keep playing.

Moreover, Plaintiff was struggling with psychiatric symptoms and he feared the defendants.

Clearly, there is a genuine issue of material fact; Hence, the <u>objection</u>.


NOTE: Plaintiff was never belligerent before or after the use of force.

Plaintiff never made any threat before or after the use of force.

Plaintiff never displayed any aggressive behavior before or after the use of force.

Plaintiff did not even raise his voice at anyone before or after the use of force…

Did the Magistrate report the above facts? NO!


It is an outrage that Plaintiff - who did nothing wrong as evidenced by the fact that he was <u>not</u>

given a disciplinary case - was injured <u>and</u> denied medical treatment inside a medical facility.

The bottom line is this: The defendants did <u>NOT</u> allow Plaintiff to be examined by a medical

doctor <u>before</u> the use of force. And the defendant did <u>NOT</u> allow Plaintiff to be examined by a

medical doctor <u>after</u> the use of force. It is that simple. This is what happened.


<u>OBJECTION</u> #11. See lines 9, 10 and 11 at page 08 of ECF 57:

The Magistrate wrote, I quote:

> "The authenticated video footage negates many of the more serious injuries alleged by
>
> Epley, e.g., a broken nose and external injuries to his head, teeth, right eye and ear, and
>
> thereby relieves the court of accepting said allegations as true."


Plaintiff <u>Objects</u> to the above statement as they are genuine issues of material facts. Furthermore,

the above statement is – like almost all the others – extremely damaging for several reasons:

First, the Magistrate's statements harm Plaintiff's credibility, whereas, credibility determinations are jury junction, not those of a Judge. Again, Plaintiff has requested a jury trial, he <u>objects</u> to a bench trial. Plaintiff <u>objects</u> to the Magistrate making credibility determinations.

Second, The Magistrate's damaging statements cannot be ignored by the Senior Judge who will be reviewing Plaintiff's objections. Plaintiff believes that when considered in the aggregate the Magistrate's statements are having a prejudicial effect. As a result, Plaintiff's Objections could be denied by the Senior Judge, and the Justices with the Appellate Court. Thus, Plaintiff <u>objects</u>.

Third, how can the Magistrate know whether or not Plaintiff sustained injuries to his teeth? The Magistrate is not a dentist. He has never looked inside Plaintiff's mouth. In fact, upon being released Plaintiff had to have urgent dental work. One tooth had to be immediately pulled out. Weeks later, eight (8) teeth had to be pulverized to place prosthesis. See ECF 56 at page 06 of 28. Plaintiff <u>objects</u> as there is a genuine issue of material fact as to Plaintiff's dental injuries.

Fourth, following traumas, bruises do not appear in minutes. The video was taken within minutes - within seconds really - after the Use of Force. The Magistrate makes one medical inference after another without being a medical expert. Plaintiff <u>objects</u> to the Magistrate doing that.

Fifth, Plaintiff <u>objects</u> to the Magistrate making inferences without considering all the facts and/or ignoring facts which contradict his desires to have Plaintiff's claims dismissed.

Sixth, there is another issue which truly worries, frightens even, Plaintiff.

The Magistrate is entrusted by the federal court system. Certain things that Plaintiff reports may or may not be taken into consideration; However, everything a federal judge writes is given considerable weight.

The statements made by the Magistrate are placing a crushing burden upon Plaintiff. This is even more so because the Magistrates invokes the "authenticated records" provided by the defendants, records which Plaintiff is not allowed to review, further placing him at a disadvantage.


The courts – even the Appellate Court for the Fifth Circuit – could rely or be influenced by the statements made by the Magistrate. This is very likely to have harmful effects for Plaintiff's quest for Justice.

The Court system relies upon the Magistrate. If the Magistrates says that he has scrutinized the authenticated records – which include Plaintiff's medical records – then the Courts will accept that as a fact. And if the Magistrate reports that the authenticated records reveal certain information, the court system will rely upon that also.

Equally important, if the Magistrate does not report facts which are in the "authenticated records", then these facts will be assumed to not exist.


The following is illustrative, simply because Plaintiff does not have access to the authenticated records and because he does not have ALL his medical records. Therefore, the following is the exception that Plaintiff can show the Court. Certainly, there is much more that Plaintiff cannot show because he is being denied the so-called "authenticated records".

In the above statement to which Plaintiff <u>objects</u> to (Lines 09, 10 and 11 at page 08 of ECF 57), the Magistrate dismissed, for example, Plaintiff's injury to his <u>right</u> eye because having <u>weighted the</u> <u>evidence</u> (the video recording in this case), the Magistrate <u>inferred</u> that there was no injury. The only manner to show injury would be for Plaintiff to have marks that would indicate that a violent impact occurred. The Magistrate - having scrutinized the "authenticated records" - suggests that there is no evidence of injury to Plaintiff eyes. And the courts are likely to accept this as being true.

Of course, for the record, Plaintiff <u>objects</u> because the magistrate is not an ophthalmologist. The Magistrate, apparently, neither knows nor recognizes how easily an eye can be damaged.

But the real issue is: Is there any evidence that Plaintiff sustained an injury to his eyes, with the right eye being more damages than the left? The Magistrate indicates that there is none.

However, the evidence that Plaintiff sustained injuries is provided by official Roxie Ingram, on Thursday June 09, 2016, within hours of having been returned to the Lynaugh prison. Roxie Ingram wrote, in part:

**<u>Some</u> <u>bruising</u> <u>under</u> <u>each</u> <u>eye</u>**. And at the bottom of the page: **<u>bruising</u> <u>under</u> <u>eye's</u>**. See attached <u>twenty</u>-<u>ninth</u> exhibit.

The Magistrate did not report the above. Why not?

Why reporting only what could make the readers believe that Plaintiff was not severely injured?

Are the "authenticated records" that unreliable? Were the authenticated records <u>edited</u>?

Are relevant and material medical records being concealed/suppressed to dismiss the lawsuit?

Why is Plaintiff not allowed to review the "authenticated records" compiled on him?


Why is Plaintiff not allowed to review his personal medical records to which he is entitled under the federal was known as HIPAA, the Health Insurance Portability and Accountability Act?

Plaintiff <u>objects</u> to be denied - by the court - his personal medical records to which he is entitled under the Health Insurance Portability and Accountability ACT (HIPAA).

Plaintiff being indigent, he cannot afford the costs resulting from making a separate request to the Texas prison officials for his medical records, under HIPAA, that the Court already has.


NOTE: The information provided by official Roxie Ingram is very important for two other reasons:

- Plaintiff did <u>not</u> wait until June 10, 2016, to seek medical care as the Magistrate stated at page 05 (Line 06) of ECF 57. Hence, in part, <u>OBJECTION</u> #03 at page 31.

- The report compiled by official Roxie Ingram <u>verifies</u> Plaintiff's repeated statements that:

  He reported what happened to him;

  He alerted the officials;

  He asked for much-needed medical care to everybody he was in contact with.


NOTE: To be clear, on June 09-2016, official Roxie Ingram had not been informed of the retaliation against Plaintiff. This is why she documented Plaintiff's request to remain **single-cell**

she talked to defendant Michel Sellers, official Roxie Ingram became a participant in violating the medical order that Plaintiff be **single-cell only**.


OBJECTION #12. See last line at page 08 and first line at page 09 of ECF 57:

> "The injuries the video footage reflects Epley did suffer – a bloody nose, abrasions, and bruised, red skin – are minor, if not de minimis, injuries."

Plaintiff objects to the above statement because of the inferences.

Plaintiff also objects because the statements goes to the weighting of the evidence which is a jury function, not this of a judge. Again, Plaintiff has asked for a jury trial. And opposed a bench trial.


The words "bloody nose" do not mean anything by themselves other than blood was coming from the nose. The words "Bloody nose" do not provide any information about the nature and extend of the injury. "The words "bloody nose" do not reveal whether or not the nose was broken. The words "bloody nose" only verify that an injury(ies) occurred. "Bloody nose" is not a diagnosis.


The same is true about the abrasions, bruises, red skin. They only verify that injuries occurred.


Without the video-footage – which Plaintiff vigorously asked the defendants to not destroy (see Plaintiff's PRELIMINARY INJUNCTION & EMERGENCY TEMPORARY RESTRAINING ORDER (ECF 05 & 06) and their attached exhibits, filed on June 01-2018), the officials would have even denied that Plaintiff was injured at all. The defendants would have denied the "bloody nose", abrasions, bruises, red skin… The defendants would have said that had a "bloody nose" been visible they would have conducted a full medical examination to determine if the nose had

been broken. Again, Montford is a medical facility with medical-doctors present "24/7".
Moreover, to the best of Plaintiff's knowledge, there is an x-ray machine at Montford where
Plaintiff could have taken to that very same evening, Monday June 06-2016. Without delay.

Alternatively, Plaintiff could have been taken to the Montford x-ray machine before being
ordered to board the bus which took him to the Robertson prison, on Tuesday June 07-2016. This
was never done because the only thing the defendants wanted was to put Plaintiff into the four-
man cell so as to create a precedent for the Lynaugh defendants to violate the medical order.

NOTE: Initially, the defendants wanted to report - in their "authenticated records" - that Plaintiff
refused the medical treatment provided by the **single-cell** so as to create a precedent for the
Lynaugh defendants to violate the medical order. This is the reason, Plaintiff requested to speak
to a medical doctor/psychiatrist. To inform the doctors that he was not refusing the treatment
provided by the **single-cell** only medical order. Had Plaintiff been able to speak to a medical
doctor, the doctor would have ordered the defendants to place Plaintiff into a **single-cell** because
it was the only lawful thing to do. This is the reason why Plaintiff was never allowed to speak to,
much less examined by, a medical doctor or a psychiatrist. The Use of Force was evidence that
Plaintiff did not refuse the medical treatment – and the protection - provided by the **single-cell**.

OBJECTION #13. Lines 10 thru 17 AT page 09 of ECF 57:
From: "Moreover, the authenticated medical records do not reflect…" to "…his subjective pain."
Plaintiff objects because of the inferences made by the magistrate. Moreover, the inferences are
not even legitimate because the facts relied upon are not true and correct.

Certainly, the Magistrate mention the defendants having colluded among themselves so as to retaliate, however, the reasons for the acts of retaliation reported in pleadings filed prior to Plaintiff's responses to the questionnaire and at pages 24 and 25 of his response to the Questionnaire (ECF 56) have not yet been disclosed. Consequently, it is not possible to discern why the defendants violated Plaintiff's Constitutional rights.

To understand the lawsuit, it is important to recognize that the **single-cell** is at the center of the defendants every action and omission. It is not, as the Magistrate suggests a minor issue. The defendants' problem is that they could not find a medical doctor willing to rescind the medical order which protected plaintiff from harm. Thus, they tried to compelled Plaintiff to enter the four-men cell to claim that Plaintiff refused the medical treatment provided by the medical order. The Use of Force made that impossible.

Had it not been for video-recording, the Use of Force would have been covered-up. The defendants would have probably entered in the "authenticated records" that after being given "counseling" Plaintiff wanted to go to the four-men cell. And a Magistrate may have said that there is no evidence that Plaintiff ever objected to go to the four-man cell and that in so doing he refused the protection of the medical order given to him by the medical doctors…

Because of the video-recording, the defendants concealed Plaintiff's injuries. Here is why:

- To further punish Plaintiff for having sought to alert the medical doctors as to what the security officials were doing i.e., illegally countermanding the medical order.

-   Providing medical treatment to Plaintiff would have documented that Plaintiff was even more vulnerable/easy prey than he was before he was injured. Consequently, Plaintiff needed the **single-cell** even more after the injuries than before he was injured, whereas, the defendants were determined to deny Plaintiff the **single-cell** as evidenced by the conduct of the Lynaugh prison defendants after June 09-2016.

To understand what really happened at the Montford Psychiatric Facility on June 06-2016, it is important to consider what happened to Plaintiff <u>before</u> and <u>after</u> June 06-2016.

On one hand the medical officials have to follow certain protocols and procedures. The medical records have to show that certain steps were taken by the medical officials. Simultaneously, the security officials took certain actions to prevent Plaintiff from obtaining the medical care which would have highlighted his need to be **single-celled**.

For example, X-rays had to be requested by the medical officials, but the security officials had to dissuade Plaintiff from taking them. And this is what they did. Afflicted with debilitating serious medical conditions, traumatized and injured, Plaintiff was easily intimidated by the security officials, such as Lynaugh prison defendants Sergeant Heather M. Gonzales and Captain Raul Melero, on Monday June 20-2016. The reports of Plaintiff meeting with them – if compiled truthfully -would be very important. Plaintiff feared being further harmed. Plaintiff stated "fearing complications with the officials" not to further antagonize the defendants against him if he were to use stronger language. See attached <u>thirtieth</u> exhibit.

Plaintiff hoped that the grievances he had filed would cause the defendants to stop retaliating against him. They only angered the defendants further.

What saved Plaintiff were the Houston-based French Consular officials who intervened fearing that Plaintiff could be killed. They compelled the Huntsville defendants to return Plaintiff to Brazoria County, located South of Houston.

The Magistrates disregard relevant and material facts which show the retaliation unfolding.

To expose what happened, Plaintiff filed one <u>single</u> complaint (ECF 15).

Plaintiff believes that it is the Magistrate who, on August 15-2018, (ECF 24) severed and transferred the defendants to different courts making it impossible for Plaintiff to prove that the defendants colluded with each other so as to retaliate against Plaintiff.

Plaintiff have repeatedly <u>objected</u> to the severing and transferring of the defendants because it makes it impossible to prove the collusion among defendants in different prisons. See, for example, Plaintiff <u>OBJECTION</u> filed on September 10-2016 (ECF 38). More <u>OBJECTIONS</u> were filed in the Abilene-based court where certain defendants were transferred, and possibly in the Pecos-based court as well.

NOTE: Plaintiff has never suffered from "Costochondritis". Plaintiff has only reported rib pain after the assault which occurred at the Montford prison on Monday June 06-2016.

As reviewed above, the Montford defendants could have x-rayed Plaintiff at Montford either on Monday June 06-2016 or on Tuesday June 07-2016. They failed to do that. Moreover, had the x-rays been ordered pursuant to the post-Use of force's medical examination, Plaintiff would not have been able to "refuse".

If the Lynaugh defendants transferred to the Pecos-based court, about whom the Lubbock-based Magistrate keep referring to, really wanted to provide medical care to Plaintiff, as opposed to keeping among the gang members who were victimizing him, they would have sent Plaintiff to a medical prison where medical care was available, such as the Jester III prison.

NOTE: The sentence, at page 10 of ECF 57, under 1. **Extent of Injury**, which reads: "This factor, therefore weights in favor of allowing Epley's claim to proceed beyond screening." does <u>not</u> make the previous statements harmless.  If it did the Magistrate would not have burdened himself writing what he did.

The previously harmful statements contribute, in the aggregate if not separately, to the undermining – "irreparably harming" even – of Plaintiff's legal claims which the Magistrate continues to do throughout his R&R. This is the reason why Plaintiff felt the need to discuss the harmful entries.

Plaintiff felt the need to show that he was indeed severely injured as the medical records compiled after he was released are showing. For example, Plaintiff lost nine (9) teeth as a result of what the Montford defendants did to him. Certainly, the dental injuries alone were severe.

The resulting dental procedure by itself was a painful endeavor which had to be performed over a period of several weeks.

The accumulation of apparently harmless misrepresentations (always against Plaintiff it is important to note) is in the aggregate doing considerable harm to the presentation of the fact. In the end, the readers get a totally distorted understanding of the facts.

Plaintiff cannot help noticing that the Magistrate has not mentioned countless facts reported by Plaintiff in the documents he has filed with the court, including but not limited to his response to the Questionnaire (ECF 56). Plaintiff is obviously objecting to that.

All the documents identified/mentioned/referred to in this document are incorporated by reference to this Objection to the Report and Recommendation for all purposes.

## REMAINING OBJECTIONS TO THE OTHER LEGAL CLAIMS

Impaired and debilitated by his disabilities and handicaps, Plaintiff was only able to make objections to entries in pages: 04, 05, 06, 07, 08, 09 and half of page 10 (mostly to: "1. Extent of Injury"). That is only seven (7) pages out of fifty-four (54) pages. Further, Plaintiff was unable to research the legal authorities. Being in a foreign country and handicapped, Plaintiff was unable to find anyone knowledgeable in the U.S. legal system who could help him.

Plaintiff is not waiving and/or abandoning the remaining objections. It is that his mental disorders and neurological injuries do not allow him to present the objections in the time period provided by the Court. Plaintiff simply cannot do it.

Plaintiff will try to continue to make his objections. Plaintiff will then ask the Court for leave/ permission to attach them to this document so as to supplement it.

Plaintiff does not have enough time, strength, resources and assistance to discuss the other Objections, pertaining to the other claims, he would like to make in his best legal interest.


Plaintiff is therefore filing this document before the deadline expires because:

1.  Plaintiff's Motion for Appointment of Counsel, filed on June 16-2016, (ECF 62) was DENIED by the Court on June 17-2016 (ECF 65);

2.  Plaintiff's Motion for Extension of Time, filed on June 18-2016, (ECF 66) was also DENIED by the court on June 19-2019 (ECF 67).


Further, Plaintiff must file his Objection today - as opposed to, for example, tomorrow - because he needs the assistance of an acquaintance to file the documents electronically – something Plaintiff cannot do by himself – and this is the last day the acquaintance will be available before the June 21-2019, deadline expires. Thus, Plaintiff must file today or lose his right to object.


Respectfully submitted,


Signed this **19th** day of June, 2019.


CHARLES EPLEY, Plaintiff – Pro Se
BOITE POSTALE N° 30036
31701 BLAGNAC CEDEX - FRANCE

EMAIL: EpleyLegal@gmail.com